**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| OBM, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 4:23-cv-01798 |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| LANCIUM LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

---

**<u>DEFENDANT LANCIUM LLC'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**
**<u>FOR LACK OF SUBJECT MATTER/DECLARATORY JUDGMENT JURISDICTION</u>**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Min. Prod., Inc. v. Osmi, Inc.*,
    870 F.3d 1337 (Fed. Cir. 2017)....................................................................... 21

*Benitec Australia, Ltd. v. Nucleonics, Inc*.,
    495 F.3d 1340 (Fed. Cir. 2007)....................................................................... 14

*Cepheid v. Roche Molecular Sys., Inc*.,
    No. C-12-4411 EMC, 2013 WL 184125 (N.D. Cal. Jan. 17, 2013) ..................... 16, 17

*Commc'ns Test Design, Inc. v. Contec LLC*,
    367 F. Supp. 3d 350 (E.D. Pa. 2019), *aff'd*, 952 F.3d 1356 (Fed. Cir.
    2020) ....................................................................................................... 24, 25

*Commc'ns Test Design, Inc. v. Contec, LLC*,
    952 F.3d 1356 (Fed. Cir. 2020)................................................................... 15, 24

*Element Six U.S. Corp. v. Novatek Inc*.,
    No. 14 Civ 0071, 2014 WL 12586395 (S.D. Tex. June 9, 2014) .................... 15, 17

*Geospan Corp. v. Pictometry Intern. Corp*.,
    598 F. Supp. 2d 968 (D. Minn. 2008) ............................................................. 16

*Harman Int'l Indus. v. Massachusetts Inst. Of Tech.*,
    Case No. 1:05-cv-01481 (N.D. Ill.), Dkt. 23.8/15/2005 ................................. 25

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc*.,
    599 F.3d 1377 (Fed. Cir. 2010)............................................................... *passim*

*Knauf Insulation, Inc. v. Rockwool Int'l A/S*,
    788 F. App'x 728 (Fed. Cir. 2019) ................................................................. 16

*Lancium LLC v. Layer1 Techs., Inc.*,
    Case No. 6:20-cv-00739-ADA (W.D. Tex.), Dkt. 1 ......................................... 23

*Lancium LLC v. US Data Mining Group, Inc. d/b/a US Bitcoin et al.*,
    6:23-cv-00344-KC (W.D. Tex. 2023), Dkt. 1.................................................. 22

*Magpul Indus., Corp. v. Blue Force Gear, Inc*.,
    No. 4:14-CV-277, 2018 WL 11413885 (S.D. Ga. Nov. 16, 2018)..................... 21

*Matthews Int'l Corp. v. Biosafe Eng'g, LLC*,
   695 F.3d 1322 (Fed. Cir. 2012) ................................................................. 14

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ................................................................... 14, 21

*Microsoft Corp. v. DataTern, Inc.*,
   755 F.3d 899, 110 U.S.P.Q.2d 1561 (Fed. Cir. 2014) ................................ 22

*Panavise Prod., Inc., v. Nat'l Prod., Inc.*,
   306 F. App'x 570 (Fed. Cir. 2009) ...................................................... 15, 19

*Prasco, LLC v. Medicis Pharm. Corp.*,
   537 F.3d 1329 (Fed. Cir. 2008) .......................................................... 15, 20

*In re Qualcomm Litigation*,
   2017 WL 5985598 (S.D. Cal. 2017) ..................................................... 16, 17

*Sandoz Inc. v. Amgen Inc.*,
   773 F.3d 1274 (Fed. Cir. 2014) .............................................................. 14

*Wooster Brush Co. v. Bercom Int'l, LLC*,
   No. 5:06-CV-474, 2008 WL 1744782 (N.D. Ohio Apr. 11, 2008) ............................ 17

**Statutes**

28 U.S.C. § 2201(a) ............................................................................ 14

**Other Authorities**

FED. R. CIV. P. 12(b)(1) ......................................................................... 1

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ARGUMENT ................................................................ 1

II.   STATEMENT OF ISSUES ......................................................................... 3

III.  NATURE AND STAGE OF PROCEEDING ............................................... 4

IV.   BACKGROUND ....................................................................................... 4

    A.    Data Center Power Management and Lancium Smart Response® ............... 4

    B.    OBM's Foreman Software Provides Different Features Than Lancium
         Smart Response®, Presenting an Opportunity For Collaboration ................. 5

    C.    Since 2021, Lancium and OBM's Discussions Were About a Business
         Partnership, With No Accusation of Infringement or Threats of
         Litigation ....................................................................................... 5

    D.    OBM's Lawsuit is Part of a PR Campaign to Curry Favor in the
         Industry ....................................................................................... 13

V.    STANDARD OF REVIEW ......................................................................... 14

VI.   ARGUMENTS & AUTHORITIES ............................................................. 15

    A.    The Facts Present No Justiciable Case or Controversy ............................. 15

         1.    Lancium's Letter Does Not Support Jurisdiction ............................. 15

         2.    Lancium Never Claimed OBM Infringed Its Patents, Nor Made
             Any Other Statements Supporting Jurisdiction ................................. 18

         3.    If OBM Did "Cease[] Offering Certain Functionality,"
             Lancium Did Not Prompt It .......................................................... 20

         4.    Lancium's Two Lawsuits Against Different Companies On
             Different Products Do Not Provide a Case or Controversy ............. 21

    B.    Alternatively, Jurisdiction Should Be Denied on Discretionary
         Grounds In View of OBM's Frustration of Ongoing Negotiations and
         Use of Litigation for PR Purposes ................................................... 23

VII.  CONCLUSION AND PRAYER FOR RELIEF ........................................... 25

Pursuant to FED. R. CIV. P. 12(b)(1), Defendant Lancium LLC ("Lancium") hereby moves to dismiss all claims asserted against it in Plaintiff's Complaint for Declaratory Judgment, and in support thereof respectfully shows the Court the following:

## I.       SUMMARY OF THE ARGUMENT

In the days leading up to filing the present action for declaratory judgment of non-infringement, OBM's CEO exchanged effusive emails with Lancium about that week's Taylor Swift concert, accepted an invite for continuing discussion about the parties' prospective lucrative business partnership, and promised deliverables for the coming week.  There was absolutely no discussion of infringement, litigation, or threats.  Objectively, this is not behavior associated with parties anticipating imminent litigation – because they were not.  OBM's Complaint selectively (and at times inaccurately) presents facts in an attempt to create jurisdiction, so it can use this lawsuit as part of an industry public relations campaign that includes hauling Defendant Lancium into this Court for litigation designed to promote Plaintiff OBM's own objectives and reputation. However, months of emails from OBM's CEO and sworn declarations from multiple Lancium executives regarding conversations with OBM show that Lancium objectively sought collaboration and never threatened anything.  There is no controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, and thus, no subject matter jurisdiction.

For OBM, this lawsuit is part of a larger public relations campaign to capitalize on anti-patent sentiment among potential customers in the bitcoin mining industry.  In a manifesto posted just days after filing the present litigation, titled "OBM Files Suit: Our Case, Reasoning, and Mission" OBM casts itself as the industry's champion, fighting to "uphold the spirit of innovation that today's cryptocurrency ecosystem—and Texas itself—was built on." Ex. 18.  OBM admits it filed the present Complaint as an industry advocacy tool, which of course is not a proper basis for

declaratory judgment jurisdiction: "[Lancium's] patent, if left unchecked, affects all heavy energy users, such as data centers, manufacturers and other industries. ***On behalf of our customers, our competitors, and our industry, we can't let that happen. That's why we filed this complaint***." *Id.*

Lancium sought a business partnership with OBM after recognizing the complementary nature of what each company does best for their overlapping customer base: OBM's Foreman software provides excellent remote miner management for bitcoin miners, while Lancium Smart Response® technology provides best-in-class dynamic power adjustment for datacenters and qualification as Controllable Load Resources (CLR). Lancium recognized that an integrated product offering of OBM's Foreman software and Lancium Smart Response® technology could allow joint customers to seamlessly experience synergistic benefits and generate significant additional revenue for both OBM and Lancium. That is why Lancium approached OBM, and is what the parties consistently discussed until OBM filed a surprise suit in the midst of discussions.

Nothing about the parties' history presents a case or controversy. OBM's Complaint selectively identifies four meetings between November 17, 2022 and May 9, 2023 and one letter from each side's counsel as though they constituted the parties' complete interactions, but its conclusory assertions are based on carefully selected facts (and certain inaccurate assertions) and do not confer jurisdiction. ***First***, the letter from Lancium's counsel referenced its whole patent portfolio with one patent as an example, made no accusation of infringement or litigation, and sought further business discussions with no deadline. After OBM's counsel replied asserting non-infringement and invalidity, Lancium did not respond with any further communications from counsel and all subsequent communications were business focused. ***Second***, OBM relies on purported statements from the parties' conversations that either the declarants here swear under oath were *not* made, or otherwise cannot be objectively viewed as presenting any threat. ***Third***,

Lancium's two prior suits on one of its patents did not present an objective threat to OBM. There were substantial differences in the types of parties and the relationships between the parties in those suits than is objectively evidenced in the Complaint and herein. And *fourth*, even if OBM ceased offering certain services in the marketplace, as it claims, this cannot be tied to any alleged actions by Lancium, which never contended OBM must cease its current activities.

The fact that Lancium never threatened OBM or asserted infringement is objectively confirmed by a flurry of upbeat emails from OBM's CEO, Daniel Lawrence, throughout the relevant time period, who was "very comfortable exploring with [Lancium] the basics of a potential business partnership," thanked Lancium for meetings, and was [l]ooking forward to seeing what you guys have in mind."

Finally, even if this Court determines OBM satisfied the jurisdictional burden under the Declaratory Judgment Act, this Court should exercise its discretion to decline to entertain OBM's claims in view of its naked attempt to undermine legitimate business negotiations—and further a PR campaign—by filing suit concurrently with its promises to engage further with Lancium about a business partnership.

If this motion is denied, Lancium will need discovery from this Court prior to filing any Answer to even determine whether a counterclaim of infringement is warranted.[1]

## II.    STATEMENT OF ISSUES

OBM's Complaint should be dismissed for any of the following reasons:

**There is insufficient declaratory judgment jurisdiction.** OBM relies on the following to claim jurisdiction: (1) a letter from Lancium's counsel to OBM, (2) statements purportedly made

---

[1] OBM contended it ceased certain activities (which raises a question of whether OBM has concern that such activities infringe). But, Lancium has not asserted prior or ongoing infringement by OBM and received a letter from OBM counsel asserting non-infringement.

in the parties' meetings, (3) that OBM purportedly ceased certain activities due to "continuing threats" from Lancium, and (4) prior litigation against other parties by Lancium.  Yet in actuality, Lancium's engagement with OBM concerned a business collaboration; Lancium never accused OBM of infringement nor threatened litigation.  OBM's CEO consistently expressed interest and excitement about the collaboration (never expressing concern or threat), and Lancium's prior litigations objectively reflect clear distinctions.  There is no objective controversy of sufficient immediacy or reality to justify jurisdiction.

**If the Court finds declaratory judgment jurisdiction, the Court should dismiss the case on discretionary grounds.**  OBM interfered with ongoing business negotiations by filing a suit without any notice while telling Lancium it would continue discussions.  Additionally, OBM's own statements indicate the suit is part of a PR campaign.  If the Court finds jurisdictional requirements are satisfied, it should nevertheless decline jurisdiction on discretionary grounds.

## III.    NATURE AND STAGE OF PROCEEDING

OBM filed its Complaint on May 16, 2023.  Dkt. 1.  Lancium timely files the present motion to dismiss under FED. R. CIV. P. 12(b) (1) for lack of subject-matter jurisdiction.

## IV.    BACKGROUND

### A.    Data Center Power Management and Lancium Smart Response®

Bitcoins are generated using specialized bitcoin miners typically sited at large bitcoin mining farms that can consume 100MW or more of power.  One of the most expensive aspects of mining is the cost of the power.  Therefore, it is advantageous for bitcoin mines to utilize power management technology to minimize power costs and maximize profitability.  Lancium developed its sophisticated Lancium Smart Response® technology for advanced power management of datacenters (including bitcoin mines).  The technology can include qualification into ERCOT's rigorous Controllable Load Resource (or "CLR") programs for certain sophisticated customers.

4

Participation as a CLR can provide significant monetary benefits over less rigorous power management programs.  Lancium was the first company to ever qualify a load into the CLR program.  Lancium patented some aspects of its technology, which it both uses to manage large scale power loads for its datacenter customers and also licenses to partners for integration into their own proprietary systems.  Additionally, Lancium owns Lancium Clean Campus™ sites, where bitcoin miners or more traditional computing customers can locate to benefit from CLR participation and renewable energy promotion using Lancium technology.  One of these sites even uses OBM's Foreman software for operational management of bitcoin mines.

**B.** **OBM's Foreman Software Provides Different Features Than Lancium Smart Response®, Presenting an Opportunity For Collaboration**

OBM's Foreman software is well-known in the industry for its ability to remotely monitor, automate, and secure the actual mining efforts of the bitcoin miners.  This is not a core functionality of Lancium Smart Response® technology; thus, other companies like OBM perform this aspect of bitcoin mining at Lancium Clean Campus™ sites and elsewhere.  Lancium approached OBM for a business partnership precisely because the two companies' expertise were in *different* market niches, presenting an opportunity to provide shared customers with one package for both functions.

**C.** **Since 2021, Lancium and OBM's Discussions Were About a Business Partnership, With No Accusation of Infringement or Threats of Litigation**

In September of 2021, Lancium's then-VP of Business Development, Travis Ely, introduced Ian Rock, Lancium's VP of IT Operations, and another Lancium employee to OBM's CEO Daniel Lawrence.  Mr. Ely described:

> [Myself and Mr. Lawrence] just got off the phone and I feel it would be worth the time to explore their product and see if there are any ways we can collaborate or incorporate this into our current development plans… it seems there are features that could potentially be complementary to our SmartResponse software.

Declaration of Ian Rock ("Rock Decl.") ¶ 6; Ex. 1.  The parties attempted to set up a meeting, but

it did not come together at that time.  Rock Decl. ¶ 6.  Lancium and OBM corresponded from at least September 2022 into 2023 on other commercial topics relating to the use of Foreman at a Lancium Clean Campus™ site.  Rock Decl. ¶ 9, Exs. 2-6.

On November 17, 2022, Ian Rock, and Dr. Raymond Cline (one of Lancium's founders and Chief Technology Officer) met with Mr. Lawrence, "to lay out our desire to form a business partnership with OBM," and detailed the value proposition of a business partnership.  Rock Decl. ¶ 8; Declaration of Dr. Raymond E. Cline, Jr. ("Cline Decl.") ¶ 3.  Contrary to the allegation in OBM's Complaint, *neither* Mr. Rock nor Mr. Cline claimed Foreman "could be infringing."  Dkt. 1 ¶ 22; Rock Decl. ¶ 8; Cline Decl. ¶ 4.  Tellingly, Mr. Lawrence **agreed** that Lancium's proposal "seemed like a good idea", and agreed to Lancium's suggestion for a subsequent meeting of development personnel.  Rock Decl. ¶ 8; Cline Decl. ¶ 5.

OBM's Complaint suggests the parties' next interaction was a letter from counsel on April 3, 2023.  Dkt. 1 ¶ 23.  This is inaccurate, as numerous emails were exchanged, and an intervening meeting occurred in early March 2023.  Rock Decl. ¶¶ 9-15; Exs. 2-7.  Notably, the emails include one where Mr. Lawrence clearly affirms the parties were exploring a potential partnership.  On January 2, 2023, Mr. Rock emailed Mr. Lawrence following up for an NDA he understood OBM wanted to continue partnership discussions.  Mr. Lawrence responded on January 5, stating:

> ***We are very comfortable exploring with you the basics of a potential business partnership*** without one…***Once we sense we're seeing customers, products and market opportunities the same way,*** then it makes total sense to enter into an NDA with strong mutual protections…***We expect that our initial conversation would be a general one regarding our views of the market and information we already know about each other to gauge the potential for a business relationship.***

Rock Decl. ¶ 12; Ex. 4.  Lancium's Mr. Rock and OBM's Mr. Lawrence met again on March 9, 2023 at the Digital Wildcatters conference.  Rock Decl. ¶ 13.  Mr. Rock detailed how the proposal "would bring in more revenue for both Lancium and OBM."  *Id.*  Here too, "[Mr. Lawrence]

responded enthusiastically, and as though he now finally understood our proposal's value, saying something like 'Oh, now I really see!'"  *Id.*  Mr. Lawrence subsequently agreed to meet with Lancium's development team when he visited Houston.  *Id.*

On March 28, 2023, Mr. Rock emailed Mr. Lawrence, stating:

> Hey Dan, It was great to talk to you at Digital Wildcatters. When are you back in town? Really want to sit and discuss working together going forward. Great opportunity for us to work together.

Rock Decl. ¶ 14; Ex. 7.  On April 3, 2023, Mr. Rock sent a follow-up email, stating:

> Dan, I reached out again last week in an endeavour to see if we could get together to discuss Foreman and Lancium business. Hoping you can get back to me but in the meantime we will send a letter over to you. Lancium is receptive to commercial opportunities for collaboration with Foreman and is certainly keen to discuss this further.

Rock Decl. ¶ 15; Ex. 7.

On April 3, 2023, Lancium's intellectual property counsel sent a letter to Mr. Lawrence, with a subject line "Foreman.mn software," promoting Lancium's technology development efforts, and reinforcing the desire for commercial collaboration.  Dkt. 1, Ex. B.  The letter identifies Lancium's 25+ patent portfolio, simply states "it is possible" that OBM's technology "may relate to" "patented technology," and identifies a specific patent associated with CLR technology as an example.  It closes by asking Mr. Lawrence to contact Ian Rock "so that we can have a productive conversation," stating Lancium "is receptive to commercial opportunities for collaboration and is certainly willing to discuss this further."  *Id.*  The letter does not provide a deadline, stating "[p]lease provide the courtesy of a reply to this letter at your earliest convenience."  *Id.*

On April 4, 2023, OBM's Mr. Lawrence emailed Lancium's Mr. Rock, stating "Ian, I received a letter from your law firm asking me to reach out to you to discuss commercial opportunities for collaboration. When can we talk? Thanks, Dan."  Rock Decl. ¶ 16; Ex. 8.  Mr. Rock and Mr. Lawrence scheduled a meeting for that day.  *Id.*  Mr. Rock stated that Lancium was

"really keen to move forward with the business partnership we had been discussing, and that our CEO, Michael McNamara wanted to speak with him, to further explain how we thought the two companies could work together."  Rock Decl. ¶ 16.

OBM's Complaint contends that the direct follow-up from this call was for Lancium to send business terms, and suggests that the parties did not communicate further between April 4, 2023 and May 2, 2023.  Dkt. 1 ¶¶ 24-25.  In fact, the immediate follow-up from this call was when Mr. Lawrence and Mr. McNamara spoke on April 5. Rock Decl. ¶ 16; Declaration of Michael McNamara ("McNamara Decl.") ¶ 2.  The parties then additionally communicated throughout April, including a meeting between Mr. McFarland and Mr. Lawrence on April 26, and emails from Mr. Lawrence scheduling a follow-up happy hour meeting with Mr. McNamara for May 18. Declaration of Scott McFarland ("McFarland Decl.") ¶¶ 2-5; Rock Decl. ¶ 17; McNamara Decl. ¶ 2; Exs. 8-11.

On the April 5, 2023 call, Mr. Lawrence spoke with Lancium's CEO Mr. McNamara to discuss the proposed collaboration at a CEO-to-CEO level.  McNamara Decl. ¶ 2.  The two spent time getting to know each other and Mr. McNamara expressed Lancium's eagerness to work with OBM and to go to market together.  *Id.*  Mr. Lawrence seemed receptive and was cordial.  *Id.*

On April 17, 2023, Mr. Lawrence emailed Mr. Rock, stating: "Hey Ian, I hope you had a great weekend! I wanted to touch base to see if you guys had a draft of those potential business terms yet. Looking forward to hearing from you."  Rock Decl. ¶ 17; Ex. 8.  Mr. Rock was on personal leave at that time, so Scott McFarland, Lancium's Chief Revenue Officer, responded:

> Hi Dan, Sorry for the late response today. I just came onboard Lancium as the Chief Revenue Officer for the business a few weeks ago. It's very nice to meet you virtually. Ian is out on PTO and has spotty coverage. I wanted to let you know that I spoke with Michael a bit ago and he will be circling back with you later this week to discuss. I look forward to getting to meet you soon.

McFarland Decl. ¶ 3; Ex. 9.  Mr. Lawrence responded that day, stating:

> Hi Scott, Welcome! And it's nice to meet you as well. Looking forward to seeing what you guys have in mind. No rush at all. Thanks, Dan.

*Id.*  On April 18, 2023, Mr. McFarland suggested "an introductory meeting" where "we can catch up on the business conversation to organize our thoughts together," which was ultimately scheduled for April 26, 2023.  *Id.*

On the April 26 call, Mr. Lawrence described OBM's Foreman software and business, and Mr. McFarland "stated that it appeared there could be good synergies for a 1 + 1 = >3 business partnership between our two organizations," and "discussed the added value this could bring to joint customers."  McFarland Decl.  ¶ 4.  He emailed Mr. Lawrence later that day, stating:

> Thank you again for the time earlier today and the transparent conversation. Very help and productive. I do believe we should continue to expand on our conversation and opportunity potential together…Perhaps we could plan to meet as an in-person follow-up at the [Bitcoin 2023] conference and have happy hour. We could discuss some partner opportunities more deeply over a beer. Would you have time on Thursday, May 18th to plan to have a beer somewhere close to the convention center? In the meantime, I will spend some more time on some potential options for us and maybe share some high-level ideas ahead of time if you wouldn't mind doing the same.

McFarland Decl.  ¶ 5; Ex. 11.  On May 1, 2023, Mr. Lawrence responded "Hey Scott, Sounds great. Grabbing a drink at BTC 2023 sounds like a good plan."  *Id.*  Mr. McFarland sent Mr. Lawrence a calendar invitation for a "Foreman Happy Hour" on May 18, 2023.  *Id.*

Yet before this could occur, on May 2, OBM's counsel sent Lancium a letter contending:

> OBM reached out to Ian Rock, Lancium's Vice President IT Operations, and other representatives at Lancium as requested in your letter, to discuss potential commercial opportunities between OBM and Lancium. Based on my client's initial discussions with Lancium, it does not appear as if Lancium's representatives are prepared to have a productive, timely conversation as your letter requests. Nevertheless, thank you for attempting to facilitate this discussion on behalf of your client. It's unfortunate that our clients have not been able to move these discussions as quickly as your letters suggests was desired.

Dkt. 1, Ex. C.  The letter also stated:

> In addition to requesting that my client reach out to Lancium, your letter also generally references the over 25 patents Lancium has obtained that allegedly relate to power grid

balancing and stabilizing technologies Lancium allegedly developed. Of note, your letter does not reference or explain how any of these over 25 patents are specifically relevant to OBM's Foreman Software or how OBM's Foreman Software practices any of the claims of these patents. Such overly broad statements made it difficult for OBM to properly evaluate the relevancy or value of Lancium's entire patent portfolio. Nevertheless, we reviewed multiple patents assigned to Lancium on the PTO database and did not identify any patents that were relevant to OBM's current software offering. We will address, however, U.S. Patent No. 10,608,433 ("the '433 patent") since your letter appears to suggest that my client's Foreman Software possibly relates to the subject matter claimed in this patent.

*Id.* OBM then included a non-infringement and invalidity analysis of the '433 patent. The letter concluded by stating:

> Given the validity concerns regarding the '433 patent and lack of relevance of Lancium's patents to OBM's current software offering, OBM is unclear on the relevancy of any potential patent licensing or commercial opportunities with Lancium at this time. This is compounded by the fact that Lancium has not made a licensing proposal to my client. If, in the future, Lancium decides to make such a licensing proposal, which OBM determines is commercially relevant, OBM would welcome such discussions.

*Id.*

Mr. McFarland then emailed OBM's Mr. Lawrence that day to set up an earlier call to "talk about some high level objectives together." Mr. Lawrence replied "Sounds great." McFarland Decl. ¶ 6; Ex. 12. The two spoke on May 4, 2023, where, as an introductory comment, Mr. McFarland stated "I am the new guy onboard at Lancium and am sure we are both wanting to avoid any litigation; in fact, I see an excellent opportunity for us to partner together based on our first call and our business models." McFarland Decl. ¶ 6. Mr. McFarland outlined initial thoughts on collaboration, and Mr. Lawrence expressed interest in seeing anticipated revenue numbers. *Id.* Mr. McFarland made clear that because this would be a non-exclusive relationship, the parties would need to define a process for identifying customers they would pursue together, versus those the companies would pursue separately.

In its Complaint, OBM claims Mr. Lawrence construed Mr. McFarland's offhand comment about wanting to *avoid* litigation as a risk of patent infringement lawsuit against OBM and relating

specifically to the Patent-in-Suit.  Dkt. 1 ¶ 27.  However, this call occurred after Lancium received the letter from OBM counsel, and contrary to the reaction alleged in the Complaint, Mr. McFarland "never got the impression that [Mr. Lawrence] read anything into this comment, and our conversations remained friendly after this call."  McFarland Decl. ¶ 6.  In fact, after the call Mr. Lawrence emailed stating "Hey Scott, Thanks again for the call today.  Looking forward to seeing your slides and proposal. Have a safe flight!"  McFarland Decl. ¶ 7; Ex. 13.  On the May 4, 2023 call, the two scheduled a follow-up call for May 9 to discuss in more detail.  McFarland Decl. ¶ 6.

On May 9, 2023, the two spoke again.  OBM's Complaint contends that "Mr. McFarland proposed business terms that would require OBM to focus exclusively on miner management and preclude OBM from offering energy curtailment functionality within Foreman."  Dkt. 1 ¶ 28.  This is inaccurate.  According to Mr. McFarland: "I never said or suggested that this proposal would restrict OBM, nor was that my understanding of the deal. Dan never asked whether our proposal would restrict OBM in any way."  McFarland Decl. ¶ 9.  Mr. McFarland presented the proposal as **non-exclusive** and they again discussed how to identify which customers to pursue jointly. McFarland Decl. ¶¶ 8-9.  Mr. McFarland expressly confirmed with Mr. Lawrence that this agreement could *coexist* with OBM's existing agreements and offerings.  *Id.*  OBM's Complaint also incorrectly suggests this was a final meeting where Lancium proposed, and OBM rejected, a fulsome offer.  Dkt. 1 ¶¶ 28-29.  Mr. McFarland orally presented broad contours of a deal and a revenue example.  McFarland Decl. ¶ 8.  Mr. Lawrence responded **favorably** to what he heard, saying, while he wanted to check their other similar agreements for comparison, he would "not have too much indigestion over an agreement like this."  *Id.*

Later that day, Mr. McFarland emailed Mr. Lawrence asking that the parties enter an updated NDA before he could send over the financial terms in writing.  McFarland Decl. ¶ 10; Ex.

14.  This is not behavior objectively associated with a rejected proposal.  Mr. Lawrence and Mr. McFarland then exchanged a series of friendly emails that weekend, where Mr. Lawrence said he would get the NDA back to Lancium by the following Monday, and that the parties would talk then.  At no time did Mr. Lawrence indicate OBM thought a deal with Lancium would not be feasible, or that he believed Lancium was intending to file litigation against OBM, or that OBM was on the verge of filing suit against Lancium just days later. The actual conversations were much more benign and even friendly:

- 5/9: Mr. Lawrence: "Hi Scott, Received! I will float this over to legal and get some eyes on it. FYI, I'm traveling Wednesday and Thursday, so any business points might not get any cycles until we head into the weekend."

- 5/9: Mr. McFarland: "Dan, I totally understand. Just whenever you can get back with it will be good. Then I'll send over some notes from what we talked about today and we can move the ball forward. Do you want to keep the call on Thursday for now or wait until after you've gotten this reviewed?"

- 5/12: Mr. McFarland: "Hi Dan, Just checking back in on this one. I know you have been out traveling. Let me know if there are any questions."

- 5/12: Mr. Lawrence: "Hey Scott, Should have something your way on Monday. Just wrapping up travel now. Work trip, then had to take my fiancé to a Taylor Swift concert. Hah! Talk Monday. Thanks, Dan."

- 5/13: Mr. McFarland: "My girlfriend will be jealous!!! Was the concert good?? We want to go here in July.  Thx, Scott"

- 5/13: Mr. Lawrence: "I definitely wouldn't call myself a true Taylor Swift fan - mostly through proximity at this point.  But it was a great show!  She will love it."

McFarland Decl. ¶ 10; Ex. 14-15.  Additionally, on the afternoon of May 11, Mr. Lawrence accepted Mr. McFarland's calendar invitation for the May 18 follow-up meeting to discuss Lancium's business proposal.  McFarland Decl. ¶ 1; Ex. 16.

However, Mr. Lawrence did not send Lancium the signed NDA on Monday May 15, nor reach back out to Mr. McFarland.  McFarland Decl. ¶¶ 10, 12.  The next Lancium heard from

OBM was the filing of the present suit on Tuesday, May 16, 2023, where OBM alleges "continuing threats from Lancium" where "Lancium's conduct puts OBM in an untenable situation where it must either exit the Texas market or live under the threat of a patent infringement lawsuit. Lancium is extracting extra-judicial patent enforcement by issuing threats that create uncertainty and insecurity and disrupts OBM's business."  Dkt. 1 ¶¶ 29, 31.

**D.    OBM's Lawsuit is Part of a PR Campaign to Curry Favor in the Industry**

Immediately upon filing the surprise Complaint, OBM engaged in a public relations campaign using the present lawsuit to gain favor in the industry and with potential customers.  On May 17, 2023, the day after filing this suit, OBM issued an inflammatory press release, claiming that OBM experienced "repeated ongoing threats by Lancium accusing OBM of infringing on its US Patent No. 10,608,433" and accused Lancium of "intimidation tactics."  Ex. 17.  The release indicated that OBM enlisted a public relations firm to manage its publicity surrounding this lawsuit and provided PR contacts. *Id.*[2]

Then, on May 22, 2023, OBM posted a manifesto on its blog titled "OBM Files Suit: Our Case, Reasoning, and Mission," stating "[f]irst and foremost, we want our customers to hear why we filed and the broader implications of this fight directly from us."  Ex. 18.  That post includes further false statements about the parties' interactions.  OBM states that Lancium "has wrongfully asserted [OBM is] infringing on its patent by offering its customers these vital CLR compliance tools."  *Id.*  OBM contends "[Lancium's] patent never should have been issued, and so long as it stands, miners who want to remain CLR compliant have *no choice* but to use Lancium's products. This is not competition."  *Id.*  OBM claims Lancium's patent "does not uphold the spirit of

---

[2] Leidar USA, Inc.'s website lists "Advocacy" services among its offerings, designed "to influence and shape public or stakeholder opinion around a topic, issue, event, or set of circumstances" and "to shape decisions and outcomes." https://leidar.com/services/advocacy/

innovation that today's cryptocurrency ecosystem—and Texas itself—was built on," and claims it is "entering this fight to prove that all providers have the right to work with regulators, follow their regulations, and compete in the market without a cloud of litigation hanging over them." *Id.* OBM concludes:

> If Lancium's actions go unchecked, that cloud will spread—across the state, the nation, and everywhere that energy and cryptocurrency regulations meet. And while we're all focused on Lancium's impact on our mining industry, their patent, if left unchecked, affects all heavy energy users, such as data centers, manufacturers and other industries.
>
> On behalf of our customers, our competitors, and our industry, we can't let that happen. ***That's why we filed this complaint***.

*Id.* (emphasis added).

## V.    STANDARD OF REVIEW

The Declaratory Judgment Act provides that, "[i]n *a case of actual controversy* within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party [.]" 28 U.S.C. § 2201(a) (emphasis added). "The Act creates a remedy, not an independent source of subject-matter jurisdiction." *Sandoz Inc. v. Amgen Inc.*, 773 F.3d 1274, 1277 (Fed. Cir. 2014) (citation omitted). "A party may not obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity." *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1329 (Fed. Cir. 2012). Rather, "the question [] is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

"The burden is on the party claiming declaratory judgment jurisdiction to establish that such jurisdiction existed at the time the claim for declaratory relief was filed." *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007). "[O]nce jurisdiction is factually

14

challenged, allegations alone are insufficient to meet the complainant's burden." *Panavise Prod., Inc., v. Nat'l Prod., Inc*., 306 F. App'x 570, 572 (Fed. Cir. 2009) (citation omitted).   Importantly, the availability of declaratory judgment is based upon the objective facts, not plaintiff's subjective "fear." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338 (Fed. Cir. 2008).   Courts discuss various factors that may be relevant based on the specific facts at issue.   *Element Six U.S. Corp. v. Novatek Inc*., No. 14 Civ 0071, 2014 WL 12586395, at *5 (S.D. Tex. June 9, 2014).

Additionally, "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Innovative Therapies, Inc. v. Kinetic Concepts, Inc*., 599 F.3d 1377, 1384 (Fed. Cir. 2010).   "As long as the district court "acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, [it] has broad discretion to refuse to entertain a declaratory judgment action." *Commc'ns Test Design, Inc. v. Contec, LLC*, 952 F.3d 1356, 1361–62 (Fed. Cir. 2020).

## VI.   ARGUMENTS & AUTHORITIES

*First*, this case presents no justiciable case or controversy.   *Second*, even if the Court held that it could find jurisdiction, it should exercise its discretion and decline to accept the case.

### A.   The Facts Present No Justiciable Case or Controversy

Here, Lancium and OBM had ongoing business relationships and since at least September 2021 discussed the possibility of collaborating to launch a new joint product.   Lancium never threatened litigation, nor asserted infringement.   None of Lancium's acts or statements during that process support finding jurisdiction, nor does its prior litigation against unrelated and differently situated parties change the result, either separately or in combination.

#### 1.   Lancium's Letter Does Not Support Jurisdiction

Lancium's April 3, 2023 letter does not support a finding of jurisdiction, based on the

language used, lack of infringement assertion, no deadline for a response, OBM's own admissions, and Lancium's non-response to OBM's invalidity and non-infringement letter.

**First,** Lancium's letter "merely identif[ied] its patent and the other party's product line" and thus "cannot establish adverse legal interests between the parties sufficient to support declaratory judgment jurisdiction." *Knauf Insulation, Inc. v. Rockwool Int'l A/S*, 788 F. App'x 728, 736 (Fed. Cir. 2019). The letter referenced Lancium's portfolio of "over 25 patents" (along with one example) stating only that "it is ***possible*** that the functionality of your Foreman Software ***may relate to the subject matter*** of patented technology developed by Lancium." Dkt. 1, Ex. B. Numerous decisions granted motions to dismiss with similar — or even stronger — language. *See, e.g.*, *Geospan Corp. v. Pictometry Intern. Corp*., 598 F. Supp. 2d 968, 969 (D. Minn. 2008) (letter stated "it seems that [plaintiff's products] may incorporate the technology covered by this patent …. let us know specifically how your oblique imagery products and services differ …"); *In re Qualcomm Litigation*, 2017 WL 5985598, **15-19 (S.D. Cal. 2017) (letter suggested review of portfolio); *Cepheid v. Roche Molecular Sys., Inc*., No. C-12-4411 EMC, 2013 WL 184125, at *11 (N.D. Cal. Jan. 17, 2013) (letter identified the patent and stated that Defendants believed a license was "necessary" for certain products).

**Second**, while Lancium's letter attached the '433 patent as an example of Lancium's patented technology in sophisticated power management, but there was no mention—let alone accusation—of infringement. This is significant, as "the complete absence of detailed infringement analysis as to the [patent] weighs severely against finding declaratory judgment jurisdiction." *In re Qualcomm*, 2017 WL 5985598, *15-*19; *Cepheid*, 2013 WL 184125, at *11 (similar); *Innovative*, 599 F.3d at 1381 (in declining jurisdiction based on representations made, emphasizing lack of infringement evaluation or allegation).

**Third**, a letter's lack of a deadline similarly counsels against finding a justiciable dispute. *In re Qualcomm*, 2017 WL 5985598, *15-*19. Lancium's letter not only lacked any deadline, but the only response sought was to set up the next business meeting with OBM's historic business contact at Lancium. Dkt. 1, Ex. B.

**Fourth**, despite the selective facts disclosed in the Complaint, the contextual evidence shows that OBM characterized this letter as a threat only for the purposes of obtaining jurisdiction. In actuality, OBM's documented contacts and actions afterwards do not evidence any objective perception of a threat. OBM emailed Mr. Rock, stating "I received a letter from your law firm asking me to reach out to you ***to discuss commercial opportunities for collaboration***. When can we talk?" Ex. 8. Similarly, OBM's counsel admitted Lancium's letter did not allege infringement: "[it] does not reference or explain how any of these over 25 patents are specifically relevant to OBM's Foreman Software or how OBM's Foreman Software practices any of the claims of these patents." Dkt. 1, Ex. C.

**Fifth,** Lancium counsel's lack of response to OBM's detailed non-infringement and invalidity letter further rebuts jurisdiction. Where a DJ plaintiff responds to an initial letter with a detailed responsive position, and the DJ defendant provides no rebuttal, courts find no ripe controversy. *See, e.g.*, *Element Six U.S. Corp.*, 2014 WL 12586395, at *5 (silence after initial letter "indicates that any threat created by [defendant's] initial correspondence has not matured into a ripe controversy"); *Wooster Brush Co. v. Bercom Int'l, LLC*, No. 5:06-CV-474, 2008 WL 1744782, at *4 (N.D. Ohio Apr. 11, 2008); *Cepheid*, 2013 WL 184125, at *11. Lancium's counsel never responded to OBM's letter. If anything, Lancium sought to *deescalate* after receiving OBM's letter, as Mr. McFarland began the next meeting by making clear his understanding that both parties were "wanting to avoid litigation", then focusing solely on the parties' proposed

collaboration.  McFarland Decl. ¶ 6.

**2.      Lancium Never Claimed OBM Infringed Its Patents, Nor Made Any Other Statements Supporting Jurisdiction**

The Complaint relies on other selective statements purportedly made in the parties' conversations, but each recitation is either rejected by sworn declarations, or otherwise in context does not objectively constitute "continuing threats" as alleged in the Complaint.  Dkt. 1 ¶29.

OBM claims that on November 17, 2022, Lancium's Messrs. Rock and Cline "stated to OBM that use of Foreman could be infringing on one or more of Lancium's patents."  Dkt. 1 ¶ 22. Yet both Mr. Rock and Mr. Cline confirm under oath they never said this.  Rock Decl. ¶ 8; Cline Decl. ¶ 4.  Their actual discussion was focused on Lancium's proposal for a partnership.  Rock Decl. ¶ 8; Cline Decl. ¶ 3.  As part of that, Mr. Cline suggested that OBM review *all* of Lancium's patent portfolio, in context with explaining how Lancium's patents provide a protective benefit to business partners and clients.  Cline Decl. ¶ 4.  Mr. Lawrence's emails thereafter recognized the parties were discussing a partnership, *not* accusations: "We are *very comfortable* exploring with you the basics of a potential business partnership."  Rock Decl. ¶ 9; Ex. 4 (emphasis added).  The Complaint omits again that when the parties spoke on March 9, 2023, there was no discussion of infringement from either side, and Mr. Lawrence responded positively.  Rock Decl. ¶ 13.

The Complaint also incorrectly asserts that, in the May 9, 2023 conversation, Lancium's Mr. McFarland proposed forcing OBM from the market.  Dkt. 1 ¶ 28.  Instead, on *both* May 9 and the prior May 4 conversation, Mr. McFarland stated the proposal was "*non*-exclusive."  McFarland Decl. ¶¶ 6, 8-9.  There could have been no misunderstanding, as much of their conversation concerned how to manage the non-exclusivity.  *Id.*  Mr. McFarland even confirmed that OBM's existing energy curtailment relationships were *also* non-exclusive, so OBM could do *both*. McFarland Decl. ¶ 8.  Mr. Lawrence's reaction also contradicts OBM's Complaint, as he replied

he would "not get too much indigestion over an agreement like this," and that he'd see how the numbers compared to existing agreements.  McFarland Decl. ¶ 8.

OBM's Complaint also suggests this was a "take-it-or-leave-it" final meeting, forcing OBM to leave the market.  Dkt. 1 ¶ 28-29.  In reality, Lancium had not even provided *any* terms yet on paper.  *After* this meeting, Mr. Lawrence agreed to complete an NDA so that Lancium could send over terms in writing, for further discussion at a *next* meeting confirmed for May 18, 2023.  McFarland Decl. ¶ 10-11; Ex. 14, Ex. 16.  Tellingly, back in January 2023, Mr. Lawrence described his view that the parties would move to get an NDA in place when they were getting *serious* about a business collaboration.  Ex. 4.

Because OBM's allegations are contradicted by the documentary evidence and sworn testimony, the Complaint's unsupported allegations are insufficient to meet the required burden and cannot provide a legally compelling basis for jurisdiction.  *Panavise*, 306 F. App'x at 572 (affirming motion, where declaration rejected complaint's unsupported allegations).

The Complaint also mischaracterizes the true nature of the May 4, 2023 meeting, contending for jurisdictional purposes that from a single statement made ("we're both trying to avoid litigation"), OBM's Mr. Lawrence "reasonably construed from these prior interactions with Lancium…as being a reference to the risk of patent infringement lawsuit."  Dkt. 1 ¶ 27.  Even taking the allegation as factually correct, a "reference to the risk of patent infringement lawsuit against OBM," (*id.*) is not the standard for jurisdiction under the Declaratory Judgment Act.

Further, and objectively, OBM's contextual statements and actions disclosed here now in this Motion, but not disclosed in the Complaint, show OBM did not perceive any threat.  Mr. Lawrence's own contemporaneous statements and writings objectively reflect a person interested in a business deal, not one perceiving any threat.  In the meeting, Mr. Lawrence stated he was

interested in seeing the numbers.  McFarland Decl. ¶ 6.  In his follow-up email later that day, he wrote "Hey Scott, Thanks again for the call today.  Looking forward to seeing your slides and proposal. Have a safe flight!"  McFarland Decl. ¶ 7; Ex. 13.   And Mr. Lawrence had responded similarly after the "prior interactions" the Complaint now claims constituted threats.  McFarland Decl. ¶ 3; Ex. 9 (April 17, 2023, after meeting with Lancium's Mr. Rock, and with CEO Mr. McNamara, stating "Looking forward to seeing what you guys have in mind.")  Even if Mr. Lawrence did somehow perceive Mr. McFarland's comment as a threat, that would be objectively unreasonable.  Mr. McFarland's statement (made shortly after *OBM's* counsel had sent *their* letter) paired the desire to avoid litigation with the clear interest in pursuing a commercial collaboration. McFarland Decl. ¶ 6.  Objectively, this statement about ***avoiding*** litigation can only be interpreted as *de-escalation* following OBM's letter, rather than a threat.   OBM's "purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement." *Prasco LLC*, 537 F.3d at 1338; *see also Innovative*, 599 F.3d at 1381 (offhand comments in "informal conversations" solicited by the plaintiff "did not constitute a threat of suit for patent infringement.")  The parties' interactions provide no basis for declaratory judgment jurisdiction.

### 3.   If OBM Did "Cease[] Offering Certain Functionality," Lancium Did Not Prompt It

OBM claims it "ceased offering certain functionality" due to Lancium's "continuing threats."  Yet, this too does not support jurisdiction, as any alleged harm has to be "fairly traceable" to the defendant's conduct. *Prasco, LLC*, 537 F.3d at 1338.  Here, as discussed above, Lancium's Mr. McFarland presented an initial sketch of a non-exclusive proposal, and confirmed the proposed relationship could coexist with OBM's existing relationships (e.g., its energy curtailment relationship with Voltus).  At the time of suit, Lancium was waiting on OBM to return an NDA so that it could provide business terms on paper, for discussion at an upcoming happy hour meeting.

McFarland Decl. ¶ 12.

### 4.   Lancium's Two Lawsuits Against Different Companies On Different Products Do Not Provide a Case or Controversy

The Complaint correctly states that Lancium filed two lawsuits, one in 2020, and one in 2023, and then provides an unsupported allegation that it believes others in the industry have been approached "with threats."  Dkt. 1 ¶¶ 19-20.  Due to the lack of any objective threat against OBM and a dissimilarity to the prior suits, the Complaint's allegations do not support a finding of jurisdiction.  While past litigation may be considered as one factor in evaluating jurisdiction, "the fact that [a patentee] had filed infringement suits against other parties for other products does not, in the absence of any act directed toward [the DJ plaintiff], meet the minimum standard discussed in *MedImmune*.")  *Innovative*, 599 F.3d at 1382 (Fed. Cir. 2010); *Allied Min. Prod., Inc. v. Osmi, Inc.*, 870 F.3d 1337, 1340 (Fed. Cir. 2017).

The DJ plaintiff in *Innovative*, like OBM, argued the DJ defendant's "known enforcement of these patents against others should be given weight in evaluating the [] statements of [defendant's] executives," and provide jurisdiction.  *Innovative*, 599 F.3d at 1381-1382.  The Federal Circuit declined to find jurisdiction, noting defendant's response that "although it indeed enforces its legal rights, it had not seen any ITI device, no ITI device had been sold, and no accusation of infringement or threat of suit had been made[.]"  *Id.*  Lancium has similarly neither asserted infringement, nor threatened litigation.  Also, the Complaint does not provide any evidence that Lancium evaluated OBM's Foreman software for infringement or has sufficient familiarity with it to make any such evaluation.

Courts also recognize that, where a DJ defendant's relationship with a DJ plaintiff is distinguishable from that with parties it has sued, this too weakens any relevance of those other cases.  *See, e.g.*, *Magpul Indus., Corp. v. Blue Force Gear, Inc.*, No. 4:14-CV-277, 2018 WL

11413885, at *10 (S.D. Ga. Nov. 16, 2018) ("strategy differential" between the parties previously sued and the present plaintiff meant prior litigation "has little bearing on whether it intends to bring suit against Plaintiff"); *Microsoft Corp. v. DataTern, Inc*., 755 F.3d 899, 903-07, 110 U.S.P.Q.2d 1561 (Fed. Cir. 2014) (emphasizing defendant's "litigation strategy appears to involve suing software users, not software suppliers.") OBM was very differently situated compared to the Defendants in Lancium's prior suits.  Both defendants were operating bitcoin mining sites in direct competition to Lancium, vigorously promoted a clearly infringing product, and had not engaged in even a single discussion with Lancium despite being aware of their infringing behavior.

In the US Bitcoin case, Lancium sent a letter to US Bitcoin's predecessor in interest with a subject line "Infringement of Lancium Patents," which accused them of operating "bitcoin mining facilities that infringe one or more patents covering Lancium's technology. With this letter we are putting you on notice…Specifically, we have identified the following operational facilities as infringing Lancium's patent rights in one or more of the below listed patents." *Lancium LLC v. US Data Mining Group, Inc. d/b/a US Bitcoin et al.*, 6:23-cv-00344-KC (W.D. Tex. 2023), Dkt. 1 ¶155; Ex. 16, 5/10/2023.  The letter listed nine specific patents and concluded by demanding a response "to discuss resolution and to potentially avoid the need for Lancium to take action to enforce its patent rights." *Id.*  US Bitcoin acquired these sites anyway and began promoting its lucrative infringing behavior in investor presentations and elsewhere.  After seven months of no communications from US Bitcoin, Lancium sued US Bitcoin for infringement of seven patents based on its operation of at least three infringing datacenters that it owns or manages.  Similarly, in the Layer1 case, Lancium's outside counsel sent correspondence titled "Lancium Intellectual Property" on May 22, 2020   to Layer1 which asserted that Layer1's "demand response functionality…may infringe one or more of Lancium's patents," attaching the '433 patent.

*Lancium LLC v. Layer1 Techs., Inc.*, Case No. 6:20-cv-00739-ADA (W.D. Tex.), Dkt. 1 ¶21; Ex. I, 8/14/2020. After Layer1 did not respond, Lancium's counsel sent a *second* email on June 2, 2020. *Id.* Only after Layer1 again refused to respond did Lancium file suit months later.

Unlike in those cases, Lancium's letter to OBM did not mention infringement or litigation. Additionally, those defendants were owner/operators of bitcoin farms, unlike OBM, which is a miner management software company. And finally, despite notifying those defendants of explicit infringement concerns, there was absolutely no communication received back from the defendants, unlike here where Lancium and OBM were engaged in active discussions about a non-exclusive joint offering of complementary software and technology to customers. Lancium's history with those parties objectively show how different it's interactions were when it *did* perceive issues.

In sum, none of Lancium's acts, alone or in combination, could be objectively perceived as presenting a controversy, and the evidence shows that, despite the characterizations in the Complaint for jurisdictional purposes, OBM did not actually itself perceive a controversy sufficient for jurisdiction, either subjectively or objectively. Further, OBM admits in its PR statements that its purpose in filing the present suit is to prevent the industry from being hampered by intellectual property developed and patented by Lancium, which is not a valid basis for DJ jurisdiction. Collectively, the full facts do not support a finding of DJ jurisdiction.

**B.    Alternatively, Jurisdiction Should Be Denied on Discretionary Grounds In View of OBM's Frustration of Ongoing Negotiations and Use of Litigation for PR Purposes**

Even if the Court finds jurisdictional prerequisites, it should dismiss the action on discretionary grounds. ***First***, with respect to frustration of ongoing negotiations, "district courts may take into account the pendency of serious negotiations to sell or license a patent in determining to exercise jurisdiction over a declaratory judgment action" and "when there are ongoing negotiations, a district court may find that the need for judicial relief is not as compelling as in

cases in which there is no real prospect of a non-judicial resolution[.]." *Commc'ns*, 952 F.3d at 1364.  In *Commc'ns Test*, the court declined jurisdiction based on conduct very similar to OBM's. *Commc'ns Test Design, Inc. v. Contec LLC*, 367 F. Supp. 3d 350, 359 (E.D. Pa. 2019), *aff'd*, 952 F.3d 1356 (Fed. Cir. 2020).  There, the plaintiff "reassured Contec that it was willing to discuss non-judicial resolution" and "agreed to have further licensing discussions the following week" but filed suit.  *Commc'ns Test*, 952 F.3d. at 1363-1364.   Plaintiff argued that it "abruptly realized [] that the year-long negotiations would not be fruitful and that [it] needed to move forward with its lawsuit," but the court held: "[it's CEO's] agreement to continue negotiations the following week, his intention to offer a counterproposal and CTDI's counsel's letter promising a desire for a non-judicial resolution and continued negotiations contradict CTDI's position."  *Commc'ns Test*, 367 F. Supp. 3d at 358, *aff'd*, 952 F.3d 1356.  The court found that "CTDI took advantage of [] Contec's reasonable belief that licensing discussions were taking place in earnest, with the obvious hope that litigation would not be necessary," and this was "inconsistent with the policy promoting extrajudicial dispute resolution, not to mention sound judicial administration and the conservation of judicial resources."  *Commc'ns Test*, 367 F. Supp. 3d at 358-359, *aff'd*, 952 F.3d 1356.

As in *Commc'ns Test*, OBM "agreed to have further [] discussions" with Lancium and provide other deliverables towards a business partnership, but instead filed suit.  First, on May 11, 2023, five days before the Complaint was filed, OBM's CEO confirmed a follow-up meeting, scheduled for two days *after* OBM surprised Lancium with its suit.  McFarland Decl. ¶ 11, Ex. 16. Second, OBM's CEO assured Lancium the parties were moving forward, until OBM's filing.  Mr. Lawrence responded favorably to each discussion with Mr. McFarland, and the parties' last communications were Mr. Lawrence blaming his delay on the Taylor Swift concert, promising he "should have something your way on Monday" and they would talk then.  McFarland Decl. ¶ 10;

Ex. 15.  Notably, this was *after* the parties' May 9, 2023 conversation, and *after* Lancium's suit against US Bitcoin.  If those events made OBM see no path forward, Mr. Lawrence could (and should) have said so, allowing for clarification or other business resolution, rather than blindsiding Lancium with a surprise suit.

It would be unjust to allow OBM to benefit from its frustration of good faith discussions with Lancium.  Thus, if jurisdiction is found, the declaratory judgment action should still be dismissed.  *Commc'ns Test*, 367 F. Supp. 3d at 359 (E.D. Pa. 2019), *aff'd*, 952 F.3d 1356 (Fed. Cir. 2020); *Innovative*, 599 F.3d at 1384 (affirming discretionary dismissal in view of plaintiff's conduct); *Harman Int'l Indus. v. Massachusetts Inst. Of Tech.*, Case No. 1:05-cv-01481 (N.D. Ill.), Dkt. 23.8/15/2005 (granting motion where plaintiff filed after stating "they would get back to [DJ defendant]" recognizing that "[w]hen an alleged infringer takes part in negotiations and indicates to the patentee that such negotiations may still be fruitful, that alleged infringer is not suffering from delay and uncertainty, but is, in fact, creating delay and uncertainty.")

***Second***, with respect to use of litigation for PR purposes, OBM's subsequent press release and blog post make clear that this litigation is part of a public relations campaign, furthering a commercial purpose of purportedly unencumbering the industry from undesirable patent protection of technology developed and in active use by Lancium and allowing OBM to be viewed as the champion of potential customers who purportedly should not be burdened by such concerns. Ex. 17-18.  This use of litigation for public relations is a serious misuse of the Declaratory Judgment Act and counsels towards denying jurisdiction.

## VII.   CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, the Court should find there is no jurisdiction and grant defendant's motion to dismiss with prejudice.  In the alternative, it should be granted on discretionary grounds.

Respectfully submitted,

**BARNES & THORNBURG, LLP**

By: /s/ Daniel A. Valenzuela
Daniel A. Valenzuela (Texas Bar No. 24067918)
Attorney-in-Charge
Barnes & Thornburg LLP
2121 N. Pearl Street, Suite 700
Dallas, Texas 75201
Phone: (214) 258-4200
Fax: (214) 258-4199
dvalenzuela@btlaw.com

Craig Leavell
IL State Bar No. 6256260
Craig.Leavell@btlaw.com

Bruce Ratain
IL State Bar No. 6324542
Bruce.Ratain@btlaw.com
One N. Wacker Drive
Suite 4400
Chicago, Illinois 60606
Telephone: 312.357.1313
Facsimile: 312.759.5646

*ATTORNEYS FOR DEFENDANT LANCIUM LLC*

26

## CERTIFICATE OF CONFERENCE

I hereby certify that Craig Leavell, counsel for Defendant and Rodney Miller, counsel for Plaintiff have conferred regarding the substance of the relief requested in this Motion. Despite best efforts, the parties' could not reach an agreement on Defendant's Motion to Dismiss, and counsel for Plaintiff indicated that he is opposed to the requested relief.

*/s/ Daniel A. Valenzuela*
Daniel A. Valenzuela

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 9, 2023, I electronically filed **DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following:

<u>*Via ECF*</u>
Rodney R. Miller
Preston H. Heard
Womble Bond Dickinson (US) LLP
271 17th Street, NW
Suite 2400
Atlanta, GA 30363
Rodney.miller@wbd-us.com

*/s/ Daniel A. Valenzuela*
Daniel A. Valenzuela