**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| OBM, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. 4:23-cv-01798 |
| | ) | |
| v. | ) | |
| | ) | |
| LANCIUM LLC, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## APPENDIX TO DEFENDANT LANCIUM'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant, Lancium LLC, in support of its Motion to Dismiss Plaintiff's Complaint, submits the following declarations, exhibits and non-published documents:

Declaration of Dr. Raymond E. Cline Jr……………………………………………...…………………..5

Declaration of Scott McFarland…………………………………………………...……...……..8

Declaration of Michael McNamara………………………………………………….…...…16

Declaration of Ian Rock……………………………………………………………...…...…..18

Exhibit 1: Electronic Communications…………………………………………………..25

Exhibit 2: Electronic Communications…………………………………………………..29

Exhibit 3: Electronic Communications…………………………………………………..34

Exhibit 4: Electronic Communications…………………………………………………..40

Exhibit 5: Electronic Communications…………………………………………………..44

Exhibit 6: Electronic Communications…………………………………………………..48

Exhibit 7: Electronic Communications…………………………………………………..51

Exhibit 8: Electronic Communications…………………………………………..……………………….54

Exhibit 9: Electronic Communications……………………………………………………..…………..58

Exhibit 10: Electronic Communications……………………………………………….…………….67

Exhibit 11: Electronic Communications……………………………………………….…………...71

Exhibit 12: Electronic Communications……………………………………………….…………..74

Exhibit 13: Electronic Communications……………………………………………….……………78

Exhibit 14: Electronic Communications……………………………………………….…………….80

Exhibit 15: Electronic Communications……………………………………………….…………….83

Exhibit 16: Electronic Communication………………………………………………..………………88

Exhibit 17: OMB Press Release………………………………………………………..………………91

Exhibit 18: OMB Blog Post………………………………………………………………..……………95

Non-Published Court Document: Dismissal Order, Civ. No. 05-cv-1481, N.D.Ill., Dkt 23……..…..100

Non-Published Court Document: Complaint, Civ. No. 20-cv-0739, W.D. Tex., Dkt 1……………..102

Non-Published Court Document: Ex. I, Civ. No. 20-cv-0739, W.D. Tex., Dkt 1-9……………...…..111

Non-Published Court Document: Complaint, Civ. No. 23-cv-0344, W.D. Tex., Dkt 1……………..114

Non-Published Court Document: Ex. 16, Civ. No. 23-cv-0344, W.D. Tex., Dkt 1………………..172

Dated: June 9, 2023

Respectfully submitted,

**BARNES & THORNBURG LLP**

By: */s/ Daniel A. Valenzuela*
Daniel A. Valenzuela (Texas Bar No. 24067918)
Barnes & Thornburg LLP
2121 N. Pearl Street, Suite 700
Dallas, Texas 75201
Phone: (214) 258-4200
Fax: (214) 258-4199
dvalenzuela@btlaw.com

*Attorney-in-Charge for Defendant Lancium LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2023, I electronically filed **APPENDIX TO DEFENDANT LANCIUM'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following:

<u>Via ECF</u>
Rodney R. Miller
Preston H. Heard
Womble Bond Dickinson (US) LLP
271 17th Street, NW
Suite 2400
Atlanta, GA 30363
Rodney.miller@wbd-us.com


*/s/ Daniel A. Valenzuela*
Daniel A. Valenzuela

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OBM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:23-cv-1798 |
| | ) | |
| LANCIUM LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF RAYMOND E. CLINE JR, PhD, IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, Raymond E. Cline, Jr., hereby declare as follows:

1. I joined Lancium in November 2017 as a co-founder and Chief Computing Officer.  In April of 2021, I became the Chief Technology Officer (CTO). As CTO I was responsible for technical direction and development of our products and solutions. I am a co-inventor of the majority of our issued patents and responsible for development of our intellectual property portfolio.

2. On November 17, 2022, I was attending the Texas Blockchain Council Summit in Austin, TX. As part of that conference we had arranged several meetings with prospective clients and partners, including Dan Lawrence, CEO of Foreman/OBM. I attended the meeting with Dan along with Ian Rock of Lancium. The meeting consisted of just the three of us: Dan, Ian, and me.

3. The Lancium goal in the conversation was to discuss a possible partnership between OBM and Lancium, based on combined use of Foreman Miner

Management, Lancium Smart Response, and the services that could be offered by both companies. We felt that this partnership would be beneficial to both companies and attractive to potential clients. We also felt that the potential revenues that Foreman could realize would be better than what we were aware they were getting from their existing partnerships with Demand Response providers, such as Voltus.

4. During the meeting Ian presented most of the proposition to Dan on a possible partnership, including some suggestions on possible revenue splits. To my recollection I explained to Dan some of the technical infrastructure that we put in place to allow Lancium Smart Response to provide ancillary services on behalf of a client. We also discussed the differences between price arbitrage, load resource, and controllable load resource, particularly in the ERCOT marketplace. I stated that we have an extensive set of patents and intellectual property covering our products and services and that we strongly protect our intellectual property. I pointed out that this was to the benefit of not only Lancium, but also our partners and clients, and that, as a partner, OBM could benefit from this protection. I suggested that Dan might want to review all of our patents to understand the breadth of our intellectual property. I did not say or suggest that we felt OBM/Foreman was in violation of any of Lancium's patents.

5. The November 17, 2022 meeting had a generally positive tone and Dan appeared to be interested in the possibility of increased revenue that a potential partnership could offer. It was agreed that Ian and Dan would have

further conversations on the partnership opportunity and that Dan would come to visit our Technology Center in Houston and offices in The Woodlands.

6.  I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Executed on this 7th day of June, 2023.

Raymond E. Cline Jr., PhD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OBM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:23-cv-1798 |
| | ) | |
| LANCIUM LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF SCOTT MCFARLAND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, Scott McFarland, hereby declare as follows:

1. I joined Lancium in March 2023, and I am the Chief Revenue Officer at Lancium. I am responsible for all sales activities related to revenue. I lead the business development, sales, and technical sales organizations regarding our Lancium Smart Response software and our Lancium Clean Campuses (which are Lancium-owned sites that use renewable energy, and operate as Controllable Load Resources (CLRs) to the Texas power grid operator, ERCOT.)

2. I first connected with OBM's CEO Dan Lawrence via email. Dan had previously been connected with my colleague, Ian Rock, to discuss potential collaboration between our companies.  On April 17, 2023, Dan emailed Ian to follow up on potential details of Lancium and Foreman's partnership. That request was forwarded to me since Ian was to be out on extended PTO from April 17 to April 28.

3.   On April 17, 2023, I reached out to Dan by email to introduce myself and let him know that Ian was out on PTO.  Dan responded later that day.  I then emailed Dan again the following day, April 18th, to request an introductory phone call.  Our call was originally scheduled for Monday, April 24th. A true and correct copy of this email thread is attached as Exhibit 9.  On April 24th, Dan asked to reschedule our meeting for Wednesday, April 26th, and we did so over a few emails back and forth. A true and correct copy of this email thread is attached as Exhibit 10.

4.   On April 26th, Dan and I spoke by phone. The call on April 26th was an introduction to each other. Because I was new to Lancium and to OBM/Foreman, my goal was to understand OBM's business, pricing, and existing partnerships in more detail, to understand how we could craft an appropriate partnership deal that would be attractive and in line with their expectations. After initial introductions I focused on asking questions about their current business model and go-to-market. I asked specifically about the number of customers they had, the size of those customers, and their typical business model. Dan provided me a high-level overview of Foreman as a 'fleet management tool' for Bitcoin miners. He stated that they do configuration, deployment, management, automation, monitoring, inventory, site visualization, and historical reporting for Bitcoin miners. I also asked about their business relationship with another company called Voltus. I understood that OBM had some partnership with Voltus to provide some ancillary services, so I wanted to understand the financials. Dan stated

that the relationship was more focused on lead generation for Foreman. After hearing about their business model, I stated that it appeared there could be good synergies for a 1 + 1 = >3 business partnership between our two organizations. We discussed the added value this could bring to joint customers. I suggested that I put some partnership thoughts together for us to review in a follow-up meeting. I did not mention patents, infringement or litigation. My goal was to establish a business partnership that seemed beneficial to both companies.

5.  After my call with Dan on April 26th, I sent him a follow up email later that day, suggesting we meet for drinks and a further discussion at the Bitcoin 2023 conference on May 18th.  A true and correct copy of this email is attached in Exhibit 11.  On May 1st, Dan responded, agreeing. A true and correct copy of this email is attached in Exhibit 11.   Around that time, I sent Dan a calendar invitation for that "Foreman Happy Hour" on May 18th. I included a note in the invitation stating "Dan – Will this time work for you? I look forward to connecting. I'll get you some additional info ahead of Miami. Thx! –Scott." I also included Callum Rock from Lancium on the calendar invite.  Callum is Lancium's Business Development Manager, and I included him because the purpose of this planned meeting was to cement a business relationship with OBM.

6.  I sent a further email to Dan on May 2nd, suggesting we also talk before BTC 2023 to "talk about some high level objectives together."  A true and correct copy of this email thread is attached as Exhibit 12.  On May 4, 2023,

I had another call with Dan. The call on May 4th was scheduled for me to provide some high-level ideas regarding a possible partnership. At the beginning of the call, I said that I am the new guy onboard at Lancium and am sure we are both wanting to avoid any litigation; in fact, I see an excellent opportunity for us to partner together based on our first call and our business models. I stated that we should start in ERCOT to trial the partnership opportunity together and focus on customers of a minimum size, for example possibly those using 25MWs (megawatts) and above. We discussed that because this proposed collaboration would be non-exclusive, we would need a clear process to identify which customers we would choose to approach with our joint product, versus those we would each pursue on our own. Dan's comments were that he would like to see what we are thinking for numbers, that he would like to see the numbers as a starting point. We set a follow-up call for more formal partnership terms discussion for May 9th. My comment about wanting to avoid litigation was not intended as a threat to Dan, it was the opposite. I understood that OBM's lawyers had sent a letter to Lancium, and I just wanted to be clear we were here to work together. Based on my continuing conversations and emails with Dan subsequent to this call, I never got the impression that he read anything into this comment, and our conversations remained friendly after this call.

7. Dan emailed me on May 4th after our call. A true and correct copy of this email is attached as Exhibit 13.

8. Dan and I spoke again on May 9th.  For the May 9th call I outlined more specifically our thoughts on how a partnership would work. I stated that we should focus on customers greater than 50MWs in ERCOT that would use both the Foreman platform and Lancium Smart Response. Also, that the customer would need to be capable of becoming a CLR since this is where the value add from Lancium Smart Response really comes into play. We again discussed that since this would not be an exclusive partnership, we would need a deal registration process to ensure alignment before any engagement together. As in, because both companies could still pursue their own customers separate from those we would provide with the proposed package deal, we would need a process to identify the customers we wanted to pursue together. Those details, among many others, remained to be worked through. In terms of how we would coordinate providing the software to joint customers, I suggested that, for the customers that Lancium and OBM chose to provide the proposed package to, Foreman would provide their platform for miner/fleet management and transact that directly with the end-user. We would provide Lancium Smart Response and our Power Trading Desk for the CLR capability and power orchestration strategy and transact that directly with the end-user. We would offer a revenue share to Foreman based on the revenue from the CLR. I provided Dan example figures of what the estimated revenue would be to both companies for a customer with a 50MW load, and for one with a 300MW load. Dan had questions about what the partnership would look like, such

- 5 -

as whether they would be a channel partner. In that type of relationship, the channel partner takes on sales or other responsibilities. Dan stated that he wanted to look at some of their other channel partner agreements to see how our proposal lined up, but gave me the impression that he thought this initial outline of a deal sounded reasonable and feasible for them. Specifically, he stated that he would not have too much indigestion over an agreement like this. In response to Dan's mention of his other channel partner agreements, I confirmed with him that his other agreements, including the one with Voltus, were also non-exclusive, so that there would not be any conflict with them collaborating with us as well. He confirmed that was the case. We agreed that the next step would be for me to send over the outline of financial terms in writing.

9.  I understand that OBM's complaint says that in the May 9th meeting, I "proposed business terms that would require OBM to focus exclusively on miner management and preclude OBM from offering energy curtailment functionality within Foreman."  This is not true. As I discuss above, the relationship I proposed was non-exclusive, only pertaining to customers both companies decided to pursue with this joint package. Dan and I discussed how we would need a system to identify the customers we were choosing to pursue together, precisely because it would not be all customers. I never said or suggested that this proposal would restrict OBM, nor was that my understanding of the deal. Dan never asked whether our proposal would restrict OBM in any way.

10. On May 9th, after the call with Dan and prior to sending over any terms, I emailed Dan asking them to sign an updated NDA. He responded that day, and I emailed him again as well. A true and correct copy of these emails are attached as Exhibit 14.  We then exchanged follow-up emails that weekend, on Friday May 12th and Saturday May 13th, where Dan stated his expectation he would provide something on Monday (May 15th) and that we would talk then. We also discussed the Taylor Swift concert he had attended with his fiancé that past week. A true and correct copy of this email thread is attached as Exhibit 15.  I did not hear from Dan after Saturday May 13th.

11. Also, on Thursday, May 11th, Dan accepted my Google Calendar invitation for the Foreman Happy Hour meeting on May 18th at BTC 2023.  A true and correct copy of this Google Calendar notification is attached as Exhibit 16.

12. I was surprised that OBM sued Lancium on May 16th, because at the time, I was under the impression that we were collaboratively discussing a potential business partnership between our companies.  I was waiting for Dan to sign and return an NDA that day so that we could send over the detailed proposal for a business partnership, and Dan and I had a happy hour meeting on the calendar set for two days later, on May 18th. I never threatened Dan or stated Lancium had any intention of suing OBM in any of our conversations or emails, and nothing in our conversations or emails suggested to me that OBM was going to sue Lancium. As of May 16th, I

was under the impression that Dan would be meeting with me that week, and was optimistic that our companies would work together.

13. I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Executed on this 7th day of June, 2023.

Scott McFarland

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

OBM, INC.,                          )
                                    )
           Plaintiff,               )
                                    )
    vs.                             )          4:23-cv-1798
                                    )
LANCIUM LLC,                        )
                                    )
           Defendant.               )

## DECLARATION OF MICHAEL MCNAMARA, IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, Michael McNamara, hereby declare as follows:

1.  I am the CEO and one of the co-founders of Lancium.

2.  I had a call with Dan Lawrence, the CEO of OBM, on April 5, 2023. Knowing that our companies had been discussing a potential business partnership, I spoke with Mr. Lawrence for a CEO to CEO introduction. Our conversation was held to further discuss potential for partnerships and cross selling. On the call, we spent some time getting to know each other, and then I discussed our eagerness to work together and to go to market together with a software offering pairing our two technologies. Mr. Lawrence was receptive to the conversation, and cordial. I do not recall any discussion of patents, infringement, or litigation. The next step was for our team to continue discussions with Mr. Lawrence.

3.  I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

DocuSign Envelope ID: F809F179-1D24-4973-87B4-F9F1A1F4CE80

Executed on this 8th day of June, 2023.

DocuSigned by:

*Michael McNamara*

6775F9EF40EE4EF...

Michael McNamara

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OBM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:23-cv-1798 |
| | ) | |
| LANCIUM LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF IAN ROCK IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, Ian Rock, hereby declare as follows:

1. I am presently the Vice President of Technical Sales and Service at Lancium LLC, a role I assumed in May 2023. I joined Lancium in March of 2018 as a contractor. In February 2019, I assumed the full-time position of Director of IT Operations, and in June 2021 I was promoted to Vice-President of IT Operations.

2. Lancium's core technology offering is called Lancium Smart Response, a power management monitoring and control software that lets large power users (like data centers such as bitcoin mining facilities) quickly adjust their power consumption to account for changes in pricing and grid utilization. In the Texas market, use of our technology enables customers to qualify as Controllable Load Resource(s) ("CLR") in the Electric Reliability Council of Texas ("ERCOT"). To be clear, there are varying degrees to which data centers or bitcoin mining operations can adjust power usage in response to price. With "price curtailment," an operator can track the current power

prices, and choose to turn off its center when prices are too high. "Load response" is similar, but where the on/off trigger might be coming from the utility (eg, ERCOT) in response to the grid's load at a given time. CLR is a more sophisticated program in which a site's usage can dynamically be adjusted (rather than just turned on/off) by ERCOT. This is a complicated software functionality to get right, and to my knowledge to date, all load-only CLR's qualified in ERCOT use Lancium Smart Response.

3. As VP of IT Operations, my main responsibilities included (among other items) the daily operation and monitoring of Lancium Smart Response, support for sales and business development, interfacing with ERCOT to enable Lancium's service offerings, and developing and maintaining relationships with partners and  clients in the market place to enable business opportunities.

4. In 2021, I was aware of OBM's software called Foreman, and how it offered remote management software for day-to-day operations in the bitcoin miner management segment of the market. My impression was that Foreman would be complementary to our expertise in the CLR space in ERCOT with Lancium Smart Response, and collaborating could offer a value-add package to customers. I do not know whether Foreman can support CLR, or whether they have done any CLR projects. I certainly knew this was not their expertise; it was ours.

5. As such, Lancium considered the opportunity to engage collaboratively with Foreman, by developing a control interface between platforms that

would create a new market/customer approach which could be beneficial to both parties.  Specifically, this would pair the two software offerings for the aspects they did best: OBM's Foreman for miner management needs with Lancium Smart Response providing the CLR functionality and qualification.

6.   On September 10, 2021, I was copied on an email from Travis Ely (a now-former Lancium employee who was the VP of Business Development for Lancium at the time).  Travis's email introduced me (along with and another Lancium employee, Thomas Salvatore) to OBM's CEO, Daniel Lawrence, to explore a potential business collaboration.  Thomas and Daniel both responded, in an effort to schedule a further phone conversation.  A true and correct copy of those emails are attached as Exhibit 1.  I am not aware of any meeting that actually resulted from these efforts.

7.   We continued to try and coordinate meetings with Mr. Lawrence to discuss a potential partnership, but we were unsuccessful.

8.   I eventually met with Mr. Lawrence on November 17, 2022 at the Texas Blockchain Summit, along with Ray Cline, one of Lancium's founders. The purpose was to lay out our desire to form a business partnership with OBM. I wanted to give OBM some awareness of Lancium's background with an understanding of the value proposition our software provides in the CLR space, and how a partnership between our two companies could add value for both parties. During the meeting, we described how OBM had a recognized and appreciated miner management package in its Foreman

- 3 -

software, whereas in a complementary way, Lancium was the only one with a software solution to get clients certified as CLR assets.  We explained our view that both companies would make more money if we partnered and provided these software solutions as a package to customers.  I proposed to Mr. Lawrence that we bring together our development teams after the conference to figure out how to integrate the software into a package.  Mr. Lawrence responded that this seemed like a good idea, and agreed we should set up that subsequent meeting.  I did not mention patents, let alone infringement, during this meeting.

9.  It was typical of our experience with Mr. Lawrence that discussions took long periods of time.  For example, during this period, and today, a Lancium owned site is a customer of OBM—in addition to providing software, Lancium owns a Lancium Clean Campus data center in Fort Stockton, TX, which uses Foreman.   For compliance purposes in that business relationship, we requested OBM's SOC 2 Report (an SEC compliance document).  OBM stated they would need an NDA in place to share the SOC 2 Report, and we had to follow up at least from September 2022 through the end of February 2023. This was discussed at least in emails from September 29, 2022, September 30, 2022, October 4, 2022, November 26, 2022, January 2, 2023, January 5-6, 2023, January 16, 2023, January 18, 2023, January 20, 2023, January 25, 2023, February 24, 2023, and February 26, 2023.  True and correct copies of those email chains are attached as Exhibits 2, 3, 4, 5, 6.

10. After the Texas Blockchain Summit, on November 26th, 2022, I sent Mr. Lawrence an email asking when we could hold a follow-up conversation. A true and correct copy of that email is attached as Exhibit 2. Mr. Lawrence did not respond.

11. In this period after the TBC Summit we tried to schedule a face -to -face meeting of the teams, but were unsuccessful.

12. On January 2nd, 2023, I sent Mr. Lawrence a follow-up email. A true and correct copy of that email is attached in Exhibit 4. Mr. Lawrence and I exchanged additional emails regarding whether we needed a broader NDA to begin discussion of a business partnership (versus just the NDA for exchange of the SOC 2 Report). A true and correct copy of those emails are also attached in Exhibit 4.

13. On March 9th, 2023, I spoke with Mr. Lawrence again in person regarding a potential business partnership, at the Digital Wildcatters Empower 2023 Conference. To me, our two companies were leaving money on the table by not working together, as there was a very clear value-add that we could provide to customers by collaborating. I wanted to try and explain this again to Mr. Lawrence, in more detail, in case somehow he had not yet understood the full potential. When I saw Mr. Lawrence at the conference, I said let me just explain to you how much money there can be for our companies if we add our CLR software to packages, and offer them to both our customer bases, and our two companies then share that incremental value we would be providing. I described how I could see the revenue share working, and

how partnering in this way would bring in more revenue for both Lancium and OBM.  He responded enthusiastically, and as though he now finally understood our proposal's value, saying something like "Oh, now I really see!"  He said he was spending a lot more time in Texas these days (where Lancium is headquartered).  I responded that was great, and suggested we set up a meeting when he was in town for him to meet with Lancium's development team to start seeing how we could integrate our two software offerings.  He agreed.

14. On March 28th, 2023, I sent Mr. Lawrence another email seeking to schedule a time to talk.  A true and correct copy of that email is attached in Exhibit 7.  Mr. Lawrence did not respond.

15. On April 3rd, 2023, I sent Mr. Lawrence another follow-up email.  A true and correct copy of that email is attached in Exhibit 7.

16. On April 4th, 2023, I received an email from Mr. Lawrence requesting a time to talk.  A true and correct copy of that email is attached in Exhibit 8. Mr. Lawrence and I spoke that day.  I told him that we were really keen to move forward with the business partnership we had been discussing, and that our CEO, Michael McNamara, wanted to speak with him, to further explain how we thought the two companies could work together.  The tenor of my conversation with Mr. Lawrence was friendly, like our prior ones.  It is my understanding that Mr. Lawrence and Mr. McNamara spoke the following day.

17. I was out of the office on leave April 15th to April 30th. On April 17th, I received a follow-up email from Mr. Lawrence.  A true and correct copy of that email is attached in Exhibit 8.   Because I was out of the office, we looped in Scott McFarland, Lancium's new Chief Revenue Officer, to engage with Mr. Lawrence and discuss what a business engagement model might look like. I understand they first spoke on April 17th.

18. I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.


Executed on this 7th day of June, 2023.


_Ian J Rock_
_____
Ian Rock

# EXHIBIT 1

**From:** Daniel Lawrence <dan@obm.mn>
**Sent:** Tuesday, September 14, 2021 12:10 PM
**To:** Thomas Salvatore
**Cc:** Ian Rock; Travis Ely
**Subject:** Re: Foreman intro to Lancium

Perfect.  Thanks so much for the flexibility, Thomas.  Very much appreciated.

Thanks,
Dan

On Tue, Sep 14, 2021 at 1:08 PM Thomas Salvatore <thomas.salvatore@lancium.com> wrote:
 Friday at 2 EDT should work, I will need to be off the call at the top of the hour but I don't think we'll need the
 entire hour for the discussion.

 On Tue, Sep 14, 2021 at 12:05 PM Daniel Lawrence <dan@obm.mn> wrote:
  Managed to catch Travis on the call, who is just preparing for a flight.

  Based on our previous conversation, Thomas, how does Friday at 2 PM EDT work for you?  I'll send out an
  invite now for it (with people on this one).  If it needs to be rescheduled, please let me know.  Happy to shift
  things around.

  Thanks,
  Dan


 On Tue, Sep 14, 2021 at 1:00 PM Daniel Lawrence <dan@obm.mn> wrote:
  Hey everybody,

  I just realized that I didn't include anybody on the invite, so it's just a meeting by myself.  Oversight on my
  part.

  If you're able to make it, here's an invite to the meeting:

  Lancium <> Foreman
  Tuesday, September 14 · 1:00 – 2:00pm
  Google Meet joining info
  Video call link: https://meet.google.com/oeq-njtk-oqi
  Or dial: (US) +1 614-392-8725 PIN: 989 366 707#
  More phone numbers: https://tel.meet/oeq-njtk-oqi?pin=3510710880278

  If we need to reschedule, no trouble at all.  Sorry for the mix up.

  Thanks,
  Dan

On Fri, Sep 10, 2021 at 10:49 PM Daniel Lawrence <dan@obm.mn> wrote:
  Hi Thomas and Ian,

  It's great to meet you.  And thanks so much for the chat today, Travis.

  How does 1 PM EDT on Tuesday work for you?  I'll send out a calendar invite now, but if things need to be shifted, no problem at all.  Happy to meet your schedules.

  Looking forward to it.

  Thanks,
  Dan


On Fri, Sep 10, 2021 at 2:56 PM Thomas Salvatore <thomas.salvatore@lancium.com> wrote:
  Hi Daniel,

  I'd be happy to have a chat to discuss forman's features with you.

  I'm available Monday, Tuesday and Friday next week any time after noon with the exception of Tuesday between 3-4PM

  On Fri, Sep 10, 2021 at 1:33 PM Travis Ely <travis.ely@lancium.com> wrote:
    Hi Ian and Thomas,

    Please meet Daniel from Foreman.mn who offers a feature rich management software for managing mining farms. We just got off the phone and I feel it would be worth the time to explore their product and see if there are any ways we can collaborate or incorporate this into our current development plans.

    Now, I'm not a tech/software expert but from my perspective it seems there are features that could potentially be complementary to our SmartResponse software.

    Let's set up a time next week to have a call and discuss.

    Best regards,


    --

    **Travis Ely**

    VP Business Development

    **LANCIUM**

    **Mobile** +17023279149

    **Web** www.lancium.com

--
Thomas Salvatore
**Director of IT**
**Lancium LLC**

--
Daniel Lawrence
Co-Founder
Foreman.mn - OBM LLC
P.O. Box 50133
Baltimore, MD 21211

--
Daniel Lawrence
Co-Founder
Foreman.mn - OBM LLC
P.O. Box 50133
Baltimore, MD 21211

--
Daniel Lawrence
Co-Founder
Foreman.mn - OBM LLC
P.O. Box 50133
Baltimore, MD 21211

--
Thomas Salvatore
**Director of IT**
**Lancium LLC**

--
Daniel Lawrence
Co-Founder
Foreman.mn - OBM LLC
P.O. Box 50133
Baltimore, MD 21211

# EXHIBIT 2

**From:**            Ian Rock <ian.rock@lancium.com>
**Sent:**            Saturday, November 26, 2022 8:53 AM
**To:**              dan@obm.mn
**Subject:**         Fwd: Foreman | Lancium
**Attachments:**     image001.jpg; OBM Inc - Form NDA - Mutual (LanciumRedlines9.29.22).docx

Hey Dan,

I just wanted to follow up on this and the potential meeting this week>

Can you let me know if Wednesday and/or Thursday still looks good for you?

Thanks
ian

---------- Forwarded message ---------
From: **Brandon Greenfield** <brandon.greenfield@lancium.com>
Date: Fri, Nov 18, 2022 at 12:14 PM
Subject: Fwd: Foreman | Lancium
To: Ian Rock <ian.rock@lancium.com>


Here is the NDA redlined by legal.


Regards,

Brandon


---------- Forwarded message ---------
From: <brandon.greenfield@lancium.com>
Date: Thu, Sep 29, 2022 at 3:40 PM
Subject: RE: Foreman | Lancium
To: Daniel Lawrence <dan@obm.mn>, Jacob Luers <jake@obm.mn>
Cc: <dan.summers@lancium.com>, Leo Owens <leo.owens@lancium.com>, Ian Rock
<ian.rock@lancium.com>


Hello Danial and Jacob,


        Our legal team has reviewed the NDA and has made some suggested redlines. Please see the attached
document and let me know if this works for you and your team.

1

Regards,


Brandon Greenfield

---

**From:** brandon.greenfield@lancium.com <brandon.greenfield@lancium.com>
**Sent:** Thursday, September 29, 2022 12:00 PM
**To:** 'Daniel Lawrence' <dan@obm.mn>
**Cc:** 'Jacob Luers' <jake@obm.mn>
**Subject:** RE: Foreman | Lancium


No worries Dan, I know sometimes it is tough just to keep up with everything. Thank you for sending over the NDA, I will have my team look it over and send it back to ensure we agree before signing.


Nice to meet you Jacob! Looking forward to chatting sometime soon.


Regards,


Brandon Greenfield

---

**From:** Daniel Lawrence <dan@obm.mn>
**Sent:** Thursday, September 29, 2022 11:56 AM
**To:** Brandon Greenfield <brandon.greenfield@lancium.com>
**Cc:** Jacob Luers <jake@obm.mn>
**Subject:** Foreman | Lancium


Hey Brandon,


I hope that all is well with you!  Deepest apologies for our email chain fizzling.  We've been roped into a few site deployments over the last couple of weeks, so I'm a bit behind on things.

I'm adding Jake to the chain today.  He's my CTO, co-founder, and a great guy to help fill in some of the communication gaps.


I'm unable to make our meeting today due to a flight that got shifted around on me.  To help get things moving, though, I've attached our standard MNDA for your review.  We require one of these before we're able to share our SOC report.


Thanks so much for your patience.  Sorry again for the gaps.


Thanks,

Dan


--

Daniel Lawrence

CEO

Schedule a Meeting

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

▪


--

Ian J Rock
Vice President IT Operations
**Lancium LLC**



**The Woodlands Towers**
**9950 Woodloch Forest Drive**

**The Woodlands**
**Texas 77380**
Email: ian.rock@lancium.com
Phone: 713 839 5246

# EXHIBIT 3

**From:** Daniel Lawrence <dan@obm.mn>
**Sent:** Tuesday, October 4, 2022 9:43 AM
**To:** brandon.greenfield@lancium.com
**Cc:** Jacob Luers; dan.summers@lancium.com; Leo Owens; Ian Rock
**Subject:** Re: Foreman | Lancium

Once I saw "Danial", I decided heck with this!!!!

Kidding.  :)  It's with legal now.  Should have something back soon.

Thanks,
Dan


On Tue, Oct 4, 2022 at 10:28 AM <brandon.greenfield@lancium.com> wrote:

Hello Dan,


Just following up on this, have you gotten anything back from your team?


*Sorry for misspelling your name in the previous email!


Regards,


Brandon Greenfield


**From:** Daniel Lawrence <dan@obm.mn>
**Sent:** Friday, September 30, 2022 12:11 PM
**To:** brandon.greenfield@lancium.com
**Cc:** Jacob Luers <jake@obm.mn>; dan.summers@lancium.com; Leo Owens <leo.owens@lancium.com>; Ian Rock <ian.rock@lancium.com>
**Subject:** Re: Foreman | Lancium


Thank you, Brandon.  Just floated these over to legal.

Will let you know as soon as I have them back.


Thanks,

Dan



On Thu, Sep 29, 2022 at 4:40 PM <brandon.greenfield@lancium.com> wrote:

Hello Danial and Jacob,


Our legal team has reviewed the NDA and has made some suggested redlines. Please see the attached document and let me know if this works for you and your team.


Regards,


Brandon Greenfield

---

**From:** brandon.greenfield@lancium.com <brandon.greenfield@lancium.com>
**Sent:** Thursday, September 29, 2022 12:00 PM
**To:** 'Daniel Lawrence' <dan@obm.mn>
**Cc:** 'Jacob Luers' <jake@obm.mn>
**Subject:** RE: Foreman | Lancium


No worries Dan, I know sometimes it is tough just to keep up with everything. Thank you for sending over the NDA, I will have my team look it over and send it back to ensure we agree before signing.


Nice to meet you Jacob! Looking forward to chatting sometime soon.

Regards,


Brandon Greenfield


**From:** Daniel Lawrence <dan@obm.mn>
**Sent:** Thursday, September 29, 2022 11:56 AM
**To:** Brandon Greenfield <brandon.greenfield@lancium.com>
**Cc:** Jacob Luers <jake@obm.mn>
**Subject:** Foreman | Lancium


Hey Brandon,


I hope that all is well with you!  Deepest apologies for our email chain fizzling.  We've been roped into a few site deployments over the last couple of weeks, so I'm a bit behind on things.


I'm adding Jake to the chain today.  He's my CTO, co-founder, and a great guy to help fill in some of the communication gaps.


I'm unable to make our meeting today due to a flight that got shifted around on me.  To help get things moving, though, I've attached our standard MNDA for your review.  We require one of these before we're able to share our SOC report.


Thanks so much for your patience.  Sorry again for the gaps.


Thanks,

Dan


--

Daniel Lawrence

CEO

Schedule a Meeting

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224



**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--

Daniel Lawrence

CEO

Schedule a Meeting

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Schedule a Meeting
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 4

| | |
|---|---|
| **From:** | Daniel Lawrence <dan@obm.mn> |
| **Sent:** | Friday, January 6, 2023 1:27 PM |
| **To:** | ian.rock@lancium.com |
| **Cc:** | Brandon Greenfield |
| **Subject:** | Re: NDA |
| **Attachments:** | OBM Inc - Lanicum SOC 2 NDA.DOCX |

Hey Ian,

You're correct.  Mostly because we don't have a contractual agreement with you all yet.

Since it's for SOC 2 purposes, the attached one should be all we need.  Maybe a little easier this route.

Thanks,
Dan

On Thu, Jan 5, 2023 at 8:37 PM <ian.rock@lancium.com> wrote:
 I understood the original NDA was a requirement from Foreman side to provide SOC 1/2 reporting.

 Is this not the case?

 From the other side Dan, i am happy to set a preliminary call at your convenience.

 Ian

 Ian Rock
 Vice President IT Operations
 9950 Woodloch Forest Drive
 The Woodlands
 Texas 77380
 LANCIUM LLC
 713 839 5246

 On Jan 5, 2023, at 7:29 PM, Daniel Lawrence <dan@obm.mn> wrote:

 Hey guys,

 We just caught up with legal (sorry for the delay here - I've been out of commission for a bit,
 then the holidays).

 I was bringing them back up to speed and once I shared the context, they mentioned that an
 NDA might be premature.  We are very comfortable exploring with you the basics of a potential
 business partnership without one. Before either of us disclose what we each view as confidential
 information, we should ensure there's enough alignment on what a potential partnership would

1

look like. Once we sense we're seeing customers, products and market opportunities the same way, then it makes total sense to enter into an NDA with strong mutual protections.

What we don't want to do is have either of us disclose or be put in a position by the other's disclosure of some knowledge which complicates what either of us are doing today or thinking about doing tomorrow. We expect that our initial conversation would be a general one regarding our views of the market and information we already know about each other to gauge the potential for a business relationship. During these preliminary conversations, we don't plan to disclose information that we deem to be confidential, and don't expect you to either. We are more than comfortable not having an NDA in effect to have this initial conversation.

If you would prefer that an NDA be in place, a revised one is attached. This NDA we view as temporary, allowing us to have the same conversation we're suggesting above, after which if we decide to proceed, we can enter into a more robust NDA. Our legal team took a look at the version that we initially sent you and edited it in the spirit of what I've outlined regarding our planning initial conversation. They have tweaked the NDA to document the measured steps we would take to ensure that both of us are comfortable with sharing any sensitive information before it is shared. To be fully open, we don't plan on sharing proprietary information until we have a sense that a partnership of some form with our two organizations makes sense.

Let us know how you want to approach our discussions.  We can either do so after signing an NDA that addresses the preliminary nature of our meeting in the form attached, or we can simply meet without such an NDA and moderate what we disclose to each other until we're comfortable signing a more thorough NDA. It's really your call.

Thanks so much for the patience,
Dan


On Mon, Jan 2, 2023 at 7:50 PM Brandon Greenfield <brandon.greenfield@lancium.com> wrote:

> Hello Dan,
>
> Here is a copy of the NDA our legal team looked over. Please reach out if you have any questions or concerns.
>
>
> Regards,
>
> Brandon
>
>
> On Mon, Jan 2, 2023 at 5:55 PM <ian.rock@lancium.com> wrote:
>> Hey Dan,
>>
>> As we discussed i am hoping we can get together soon. Do need to get the NDA closed out though.
>> You have that from Brandon.
>>
>> Can we close that then fix a get togther?

Ian Rock
Vice President IT Operations
9950 Woodloch Forest Drive
The Woodlands
Texas 77380
LANCIUM LLC
713 839 5246

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224
<OBM Inc - Form NDA - Mutual (LanciumRedlines9.29.22).DOCX>

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 5

**From:**                  Daniel Lawrence <dan@obm.mn>
**Sent:**                  Wednesday, January 25, 2023 10:13 PM
**To:**                    Marcia Fanini
**Cc:**                    Ian Rock
**Subject:**             Re: Non disclosure agreement Lancium and Foreman OBM

Hi Marcia,

Just signed!

Thanks,
Dan


On Fri, Jan 20, 2023 at 11:40 AM Marcia Fanini <marcia.fanini@lancium.com> wrote:
Hi Daniel,

Have you received the new version to be signed?

Let me know if you have any questions.

**Marcia Fanini**
Assistant Director of Special Projects marcia.fanini@lancium.com




On Wed, Jan 18, 2023 at 4:44 PM Marcia Fanini <marcia.fanini@lancium.com> wrote:
Hi Daniel,

Just resent the document for your signature.

Thank you for your point!


**Marcia Fanini**
Assistant Director of Special Projects marcia.fanini@lancium.com




On Wed, Jan 18, 2023 at 10:18 AM Daniel Lawrence <dan@obm.mn> wrote:
Hi Marcia,

1

Would you mind filling in the **[STATE]** at the top regarding your company when you have a chance?

Thanks,
Dan


On Mon, Jan 16, 2023 at 12:21 PM Marcia Fanini via DocuSign <dse_NA4@docusign.net> wrote:



**DocuSign**

Marcia Fanini sent you a document to review and sign.

**REVIEW DOCUMENT**

**Marcia Fanini**
marcia.fanini@lancium.com

Daniel Lawrence,

Please DocuSign OBM Inc - Lanicum SOC 2 NDA.DOCX

Thank You, Marcia Fanini


**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
13787D2A6DDC4B4790E804C5CC83CD1C7

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're

in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Marcia Fanini who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 6

| | |
|---|---|
| **From:** | Daniel Lawrence <dan@obm.mn> |
| **Sent:** | Sunday, February 26, 2023 3:46 PM |
| **To:** | Ian Rock; Ashley Lipa |
| **Subject:** | Re: SOC report |

Hi Ian,

No problem at all!

Ashley, would you please get a Bridge Letter and a copy of our SOC report prepared for Lancium?

Thanks,
Dan


On Fri, Feb 24, 2023 at 11:32 AM Ian Rock <ian.rock@lancium.com> wrote:
 Dan,

 We have still not received the Foreman SOC report. Would it be possible for you to follow up with someone
 and have it sent over to us?

 Very much appreciate your help.

 Thanks
 Ian
 --

 Ian J Rock
 Vice President IT Operations
 **Lancium LLC**



 **The Woodlands Towers**
 **9950 Woodloch Forest Drive**
 **The Woodlands**
 **Texas 77380**
 Email: ian.rock@lancium.com
 Phone: 713 839 5246

 **CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This
 email is intended to be reviewed by only the individual or organization named above. If you are not the
 intended recipient or an authorized representative of the intended recipient, you are hereby notified that any
 review, dissemination or copying of this email and its attachments, if any, or the information contained herein
 is prohibited. If you have received this email in error, please immediately notify the sender by return email and
 delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 7

**From:** Ian Rock <ian.rock@lancium.com>
**Sent:** Monday, April 3, 2023 3:40 PM
**To:** Dan Lawrence
**Subject:** Fwd: Foreman and Lancium

Dan,

I reached out again last week in an endeavour to see if we could get together to discuss Foreman and Lancium business. Hoping you can get back to me but in the meantime we will send a letter over to you.

Lancium is receptive to commercial opportunities for collaboration with Foreman and is certainly keen to discuss this further.

Regards
Ian


---------- Forwarded message ---------
From: **Ian Rock** <ian.rock@lancium.com>
Date: Tue, Mar 28, 2023 at 10:12 AM
Subject: Foreman and Lancium
To: Dan Lawrence <dan@obm.mn>


Hey Dan,

It was great to talk to you at Digital Wildcatters.
When are you back in town? Really want to sit and discuss working together going forward. Great opportunity for us to work together.

Ian


--

Ian J Rock
Vice President IT Operations
**Lancium LLC**



**The Woodlands Towers**
**9950 Woodloch Forest Drive**
**The Woodlands**
**Texas 77380**
Email: ian.rock@lancium.com
Phone: 713 839 5246

--

Ian J Rock
Vice President IT Operations
**Lancium LLC**



**The Woodlands Towers**
**9950 Woodloch Forest Drive**
**The Woodlands**
**Texas 77380**
Email: ian.rock@lancium.com
Phone: 713 839 5246

# EXHIBIT 8

**From:**               Daniel Lawrence <dan@obm.mn>
**Sent:**                Monday, April 17, 2023 8:46 AM
**To:**                  Ian Rock
**Subject:**            Re: Lancium | Foreman

Hey Ian,

I hope you had a great weekend!

I wanted to touch base to see if you guys had a draft of those potential business terms yet.

Looking forward to hearing from you.

Thanks,
Dan

On Tue, Apr 4, 2023 at 10:42 AM Ian Rock <ian.rock@lancium.com> wrote:
> Sent you an invite for 4pm.
>
> Thanks Dan, talk to you later.
>
> Ian
>
> On Tue, Apr 4, 2023 at 9:37 AM Daniel Lawrence <dan@obm.mn> wrote:
>> Ian,
>>
>> I appreciate the calendar flexibility.  Can we shoot for 4 PM central?
>>
>> Thanks,
>> Dan
>>
>>
>> On Tue, Apr 4, 2023 at 9:38 AM Ian Rock <ian.rock@lancium.com> wrote:
>>> Hey Dan,
>>>
>>> I am good from !0:15 - 11am today or after 3PM central or pretty much anytime tomorrow.
>>>  Let me know and I will send an invite.
>>>
>>> Thanks
>>> Ian
>>>
>>> On Tue, Apr 4, 2023 at 8:12 AM Daniel Lawrence <dan@obm.mn> wrote:
>>>> Ian,
>>>>
>>>> I received a letter from your law firm asking me to reach out to you to discuss commercial opportunities for
>>>> collaboration. When can we talk?

1

Thanks,
Dan


--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224


--

Ian J Rock
Vice President IT Operations
**Lancium LLC**



**The Woodlands Towers**
**9950 Woodloch Forest Drive**
**The Woodlands**
**Texas 77380**
Email: ian.rock@lancium.com
Phone: 713 839 5246

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.


--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224


--

Ian J Rock

Vice President IT Operations
**Lancium LLC**



**The Woodlands Towers**
**9950 Woodloch Forest Drive**
**The Woodlands**
**Texas 77380**
Email: ian.rock@lancium.com
Phone: 713 839 5246

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 9

**From:** Scott McFarland <scott.mcfarland@lancium.com>
**Sent:** Tuesday, April 18, 2023 2:04 PM
**To:** Daniel Lawrence
**Subject:** Re: Lancium | Foreman

You bet! Just sent.

Thank you!
Scott

---

**From:** Daniel Lawrence <dan@obm.mn>
**Date:** Tuesday, April 18, 2023 at 1:53 PM
**To:** Scott McFarland <scott.mcfarland@lancium.com>
**Cc:** ian.rock@lancium.com <ian.rock@lancium.com>
**Subject:** Re: Lancium | Foreman

Hi Scott,

Next Monday is perfect (11 - 12).  Can you possibly shoot over an invite?

Sorry in advance if I auto-reject.  Will accept once I see it (that's a "focus time" for me that I often cancel).

Thanks,
Dan

On Tue, Apr 18, 2023 at 2:40 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

Hi Dan,


Would you have time for a call with me next Monday the 24th between 11am-12pm central or 1pm-3pm central? It would be good for you and I to get an introductory meeting and we can catch up on the business conversation to organize our thoughts together.


Let me know if any of those times work for a call and I will get us set on the calendar.


Thank you,

Scott

1

**From:** Daniel Lawrence <dan@obm.mn>
**Date:** Monday, April 17, 2023 at 6:17 PM
**To:** Scott McFarland <scott.mcfarland@lancium.com>
**Cc:** ian.rock@lancium.com <ian.rock@lancium.com>
**Subject:** Re: Lancium | Foreman

Hi Scott,

Welcome! And it's nice to meet you as well.

Looking forward to seeing what you guys have in mind. No rush at all.

Thanks,

Dan

On Mon, Apr 17, 2023 at 7:09 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

> Hi Dan,
>
> Sorry for the late response today. I just came onboard Lancium as the Chief Revenue Officer for the business a few weeks ago. It's very nice to meet you virtually.
>
> Ian is out on PTO and has spotty coverage. I wanted to let you know that I spoke with Michael a bit ago and he will be circling back with you later this week to discuss. I look forward to getting to meet you soon.
>
> Thank you,
>
> Scott
>
> **Scott McFarland**
>
> Chief Revenue Officer

Scott.McFarland@lancium.com

913.221.5108

*Have a plan. Write it down. Share it with someone that can help.*



---

**From:** ian.rock@lancium.com <ian.rock@lancium.com>
**Date:** Monday, April 17, 2023 at 11:25 AM
**To:** Scott McFarland <scott.mcfarland@lancium.com>
**Subject:** Fwd: Lancium | Foreman

Begin forwarded message:

> **From:** Daniel Lawrence <dan@obm.mn>
> **Date:** April 17, 2023 at 8:46:42 AM CDT
> **To:** Ian Rock <ian.rock@lancium.com>
> **Subject: Re: Lancium | Foreman**

Hey Ian,

I hope you had a great weekend!

I wanted to touch base to see if you guys had a draft of those potential business terms yet.

Looking forward to hearing from you.

Thanks,

Dan

On Tue, Apr 4, 2023 at 10:42 AM Ian Rock <ian.rock@lancium.com> wrote:

Sent you an invite for 4pm.

Thanks Dan, talk to you later.

Ian

On Tue, Apr 4, 2023 at 9:37 AM Daniel Lawrence <dan@obm.mn> wrote:

Ian,

I appreciate the calendar flexibility.  Can we shoot for 4 PM central?

Thanks,

Dan

On Tue, Apr 4, 2023 at 9:38 AM Ian Rock <ian.rock@lancium.com> wrote:

Hey Dan,

I am good from !0:15 - 11am today or after 3PM central or pretty much anytime tomorrow.
 Let me know and I will send an invite.

Thanks

Ian

On Tue, Apr 4, 2023 at 8:12 AM Daniel Lawrence <dan@obm.mn> wrote:

Ian,

I received a letter from your law firm asking me to reach out to you to discuss commercial opportunities for collaboration. When can we talk?

Thanks,

Dan

--

Daniel Lawrence

CEO

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

--

Ian J Rock

Vice President IT Operations

**Lancium LLC**

**Error! Filename not specified.**

**The Woodlands Towers**
**9950 Woodloch Forest Drive**

**The Woodlands**

**Texas 77380**

Email: ian.rock@lancium.com

Phone: 713 839 5246

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--

Daniel Lawrence

CEO

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

--

Ian J Rock

Vice President IT Operations

**Lancium LLC**

**Error! Filename not specified.**

**The Woodlands Towers**
**9950 Woodloch Forest Drive**

**The Woodlands**

**Texas 77380**

Email: ian.rock@lancium.com

Phone: 713 839 5246

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--

Daniel Lawrence

CEO

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

Error! Filename not specified.

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--

Daniel Lawrence

CEO

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 10

**From:**          Scott McFarland <scott.mcfarland@lancium.com>
**Sent:**          Monday, April 24, 2023 8:50 PM
**To:**            Daniel Lawrence
**Subject:**       Re: Rescheduling Meeting Today

Glad to hear it! Yes talk soon.

Thx,
Scott


Sent from my iPhone

On Apr 24, 2023, at 8:49 PM, Daniel Lawrence <dan@obm.mn> wrote:


Thanks so much for the flexibility, Scott.  Much appreciated!  Made it home safely.

Wednesday is great - chat then.

Thanks again,
Dan


On Mon, Apr 24, 2023 at 12:00 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

 Dan,


 I'm sorry about that. Seems to be a lot of travel delays these days. I've dealt with my own fair share lately and totally
 understand.


 I could do tomorrow at 1pm central or I can do Wednesday between 11am-12pm central time if either of those work. Just
 shoot me an updated invite for what works.


 I look forward to connecting and safe travels.

 Scott

**From:** Daniel Lawrence <dan@obm.mn>
**Date:** Monday, April 24, 2023 at 10:00 AM
**To:** Scott McFarland <scott.mcfarland@lancium.com>
**Subject:** Rescheduling Meeting Today

Hey Scott,


I'm sorry for the last minute notice.  I was on some PTO since last Thursday and unfortunately, my flight back home got delayed a bit so I'll be on the plane during our meeting time today.


Do you happen to have the same time open tomorrow?


Thanks so much in advance.  Sorry again for the trouble.


Thanks,

Dan


--

Daniel Lawrence

CEO

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224


**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 11

**From:**          Scott McFarland <scott.mcfarland@lancium.com>
**Sent:**          Tuesday, May 2, 2023 9:26 AM
**To:**            Daniel Lawrence
**Subject:**       UmU6IFRIQU5LIFlPVSBhbmQgZm9sbG93LXVw

Awesome! Sent you an invite. And of course… I got the auto-decline… LOL!

I also am planning on getting you some additional thoughts prior to Miami.

Thx,
Scott

---

**From:** Daniel Lawrence <dan@obm.mn>
**Date:** Monday, May 1, 2023 at 7:14 PM
**To:** Scott McFarland <scott.mcfarland@lancium.com>
**Subject:** Re: THANK YOU and follow-up

Hey Scott,

Sounds great.  Grabbing a drink at BTC 2023 sounds like a good plan.

Thanks,
Dan

On Wed, Apr 26, 2023 at 5:49 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

Dan,

Thank you again for the time earlier today and the transparent conversation. Very help and productive.

I do believe we should continue to expand on our conversation and opportunity potential together. I'm in Houston next week for meetings and then DC World the next week in Austin. The following week is Bitcoin 2023. Perhaps we could plan to meet as an in-person follow-up at the conference and have happy hour. We could discuss some partner opportunities more deeply over a beer. Would you have time on Thursday, May 18th to plan to have a beer somewhere close to the convention center?

In the meantime, I will spend some more time on some potential options for us and maybe share some high-level ideas ahead of time if you wouldn't mind doing the same.

1

Thank you,

Scott

**Scott McFarland**

Chief Revenue Officer

Scott.McFarland@lancium.com

913.221.5108

*Have a plan. Write it down. Share it with someone that can help.*



**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 12

| | |
|---|---|
| **From:** | Scott McFarland <scott.mcfarland@lancium.com> |
| **Sent:** | Tuesday, May 2, 2023 5:04 PM |
| **To:** | Daniel Lawrence |
| **Subject:** | UmU6IFF1aWNrIGNoYXQgdG9kYYXk/ |

Thx man. Safe travels tomorrow.

Scott

**From:** Daniel Lawrence <dan@obm.mn>
**Date:** Tuesday, May 2, 2023 at 5:00 PM
**To:** Scott McFarland <scott.mcfarland@lancium.com>
**Subject:** Re: Quick chat today?

Received!

Thanks,
Dan

On Tue, May 2, 2023 at 5:38 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

Hi Dan – Just sent an invite for Thursday morning at 10am EDT. I can just buzz your cell.

Thx,

Scott

**From:** Daniel Lawrence <dan@obm.mn>
**Date:** Tuesday, May 2, 2023 at 2:12 PM
**To:** Scott McFarland <scott.mcfarland@lancium.com>
**Subject:** Re: Quick chat today?

Hi Scott,

Sounds great.

1

I'm having a hard time finding a spot today since I'm traveling tomorrow. Would Thursday morning, any time before 11 EDT, or anytime after 4 PM EDT, work for you?

Thanks,

Dan

On Tue, May 2, 2023 at 1:58 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

Hey Dan,

So that we don't have to wait until Miami for the next conversation, do you have a few minutes today to get together via cell and talk about some high level objectives together? If so, can you let me know when might work and give me your cell number? I can buzz you.

Thanks,

Scott

**Scott McFarland**

Chief Revenue Officer

Scott.McFarland@lancium.com

913.221.5108

*Have a plan. Write it down. Share it with someone that can help.*



**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--

Daniel Lawrence

CEO

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 13

**From:**          Daniel Lawrence <dan@obm.mn>
**Sent:**          Thursday, May 4, 2023 9:39 AM
**To:**            Scott McFarland
**Subject:**       Thank you!

Hey Scott,

Thanks again for the call today.  Looking forward to seeing your slides and proposal.

Have a safe flight!

Thanks,
Dan


--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

1

# EXHIBIT 14

**From:**          Scott McFarland <scott.mcfarland@lancium.com>
**Sent:**          Tuesday, May 9, 2023 10:57 PM
**To:**          Daniel Lawrence
**Subject:**          Re: Lancium NDA

Dan,

I totally understand. Just whenever you can get back with it will be good. Then I'll send over some notes from what we talked about today and we can move the ball forward.

Do you want to keep the call on Thursday for now or wait until after you've gotten this reviewed?

Thanks,
Scott

Sent from my iPhone

On May 9, 2023, at 8:50 PM, Daniel Lawrence <dan@obm.mn> wrote:


Hi Scott,

Received! I will float this over to legal and get some eyes on it.

FYI, I'm traveling Wednesday and Thursday, so any business points might not get any cycles until we head into the weekend.

Thanks,
Dan

On Tue, May 9, 2023 at 5:58 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

Dan,


After our conversation this morning, it was brought to my attention that we don't have a current NDA in place between Foreman and Lancium. Attached is our standard NDA. Could you execute this and then I can send over the points from our conversation earlier today.


Give me a shout on my cell if there are any issues. I flying out of Austin here in a few.


Thank you,

1

Scott


**Scott McFarland**

Chief Revenue Officer

Scott.McFarland@lancium.com

913.221.5108

*Have a plan. Write it down. Share it with someone that can help.*


<image001.jpg>


**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 15

**From:**                  Daniel Lawrence <dan@obm.mn>
**Sent:**                   Saturday, May 13, 2023 10:37 AM
**To:**                      Scott McFarland
**Subject:**              Re: Lancium NDA

I definitely wouldn't call myself a true Taylor Swift fan - mostly through proximity at this point.  But it was a great show!  She will love it.

Thanks,
Dan


On Sat, May 13, 2023 at 12:45 AM Scott McFarland <scott.mcfarland@lancium.com> wrote:
My girlfriend will be jealous!!! Was the concert good?? We want to go here in July.

Thx,
Scott


Sent from my iPhone

On May 12, 2023, at 11:28 PM, Daniel Lawrence <dan@obm.mn> wrote:


Hey Scott,

Should have something your way on Monday. Just wrapping up travel now. Work trip, then had to take my fiancé to a Taylor Swift concert. Hah!

Talk Monday.

Thanks,
Dan

On Fri, May 12, 2023 at 2:34 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

Hi Dan,


Just checking back in on this one. I know you have been out traveling.  Let me know if there are any questions.


Have a great weekend when it gets here.

Thx,

Scott

---

**From:** Daniel Lawrence <dan@obm.mn>
**Date:** Tuesday, May 9, 2023 at 8:50 PM
**To:** Scott Mcfarland <scott.mcfarland@lancium.com>
**Subject:** Re: Lancium NDA

Hi Scott,

Received! I will float this over to legal and get some eyes on it.

FYI, I'm traveling Wednesday and Thursday, so any business points might not get any cycles until we head into the weekend.

Thanks,

Dan

On Tue, May 9, 2023 at 5:58 PM Scott McFarland <scott.mcfarland@lancium.com> wrote:

Dan,

After our conversation this morning, it was brought to my attention that we don't have a current NDA in place between Foreman and Lancium. Attached is our standard NDA. Could you execute this and then I can send over the points from our conversation earlier today.

Give me a shout on my cell if there are any issues. I flying out of Austin here in a few.

Thank you,

Scott

**Scott McFarland**

Chief Revenue Officer

Scott.McFarland@lancium.com

913.221.5108

*Have a plan. Write it down. Share it with someone that can help.*

<image001.jpg>

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--

Daniel Lawrence

CEO

Foreman.mn - OBM, Inc.

1 N Haven Street, Suite 3

Baltimore, MD 21224

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.
--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any

review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

--
Daniel Lawrence
CEO
Foreman.mn - OBM, Inc.
1 N Haven Street, Suite 3
Baltimore, MD 21224

# EXHIBIT 16

| | |
|---|---|
| **From:** | Google Calendar <calendar-notification@google.com> on behalf of dan@obm.mn |
| **Sent:** | Thursday, May 11, 2023 3:40 PM |
| **To:** | scott.mcfarland@lancium.com |
| **Subject:** | Accepted: Foreman Happy Hour - 4PM @ Thu May 18, 2023 3pm - 4:30pm (CDT) (scott.mcfarland@lancium.com) |
| **Attachments:** | invite.ics |

**dan@obm.mn has accepted this invitation.**

Dan – Will this time work for you? I look forward to connecting. I'll get you some additional info ahead of Miami. Thx! -Scott

**When**

Thursday May 18, 2023 · 3pm – 4:30pm (Central Time - Chicago)

**Organizer**

scott.mcfarland@lancium.com

**Guests**

Daniel Lawrence

Callum Rock

**View all guest info**

Invitation from Google Calendar

You are receiving this email because you are subscribed to calendar notifications. To stop receiving these emails, go to Calendar settings, select this calendar, and change "Other notifications".

Forwarding this invitation could allow any recipient to send a response to the organizer, be added to the guest list, invite others regardless of their own invitation status, or modify your RSVP. Learn more

# EXHIBIT 17

Resources   Blog   Journalists   Log In   Sign Up   Data Privacy   Send a Release

**CISION**
PR Newswire

News   Products   Contact

Search 🔍

News in Focus   Business & Money   Science & Tech   Lifestyle & Health   Policy & Public Interest   People & Culture

# OBM, Inc. Seeking Declaratory Judgement Its Technology Does Not Infringe on Lancium Patent

NEWS PROVIDED BY
**OBM, Inc →**
17 May, 2023, 09:00 ET

SHARE THIS ARTICLE

    

*New lawsuit alleges that Lancium has attempted to monopolize the CLR market in Texas using questionably enforceable patent and infringement litigation to block companies like OBM*

*OBM is taking this extraordinary but necessary legal action to open up the marketplace for all providers*

HOUSTON, May 17, 2023 /PRNewswire/ -- OBM, Inc., a Baltimore-based software company, today announced it filed a complaint in US District Court in the Southern District of Texas against Houston-based Lancium, Inc. (Lancium). OBM is seeking a declaratory judgment declaring the company is not infringing on Lancium's patent by offering its customers energy management technologies designed to comply with regulations of the Electric Reliability Council of Texas (ERCOT).

OBM filed the lawsuit following repeated ongoing threats by Lancium accusing OBM of infringing on its US Patent No. 10,608,433 (the 433 Patent). These threats have affected OBM's business relationships with multiple customers in Texas, and OBM is seeking a declaration from the Court to resolve the dispute.

"As a matter of public policy, Lancium should not have the ability to monopolize a regulatory standard intended for broad adoption of ERCOT through an untimely filed patent and suing its competitor," said Dan Lawrence, CEO of OBM.

"These accusations are unfounded and unjustified, and we've been forced to take legal action to protect our business and customer relationships," said Lawrence. "OBM does not and has never infringed on the Lancium patent, and in fact our software solution offers broader functionality than Lancium's product."

The lawsuit aims to free up the market for all cryptocurrency mining energy software providers in Texas, who are currently being blocked by Lancium's threats of patent litigation. The complaint contends that Lancium should not be able to avail itself of patent "monopoly" by claiming as its own invention long standing, publicly known and practiced technology when it filed its patent. Accordingly, the patent should have never been issued.

In order to protect the Texas electric grid from overload, especially during surge periods of peak demand or weather disruption, ERCOT created the Controllable Load Resource (CLR) policy specifically for heavy energy users like the crypto mining industry. Miners opt-in to participate in the CLR designation and are required to reduce their load consumption immediately when ERCOT requests it. This requires crypto miners to adopt and implement sophisticated energy

In order to protect the Texas electric grid from overload, especially during surge periods of peak demand or weather disruption, ERCOT created the Controllable Load Resource (CLR) policy specifically for heavy energy users like the crypto mining industry. Miners opt-in to participate in the CLR designation and are required to reduce their load consumption immediately when ERCOT requests it. This requires crypto miners to adopt and implement sophisticated energy management technologies to follow the ERCOT protocols. Lawrence stated, "While this lawsuit focuses very specifically on CLR in Texas, this suit underscores our commitment to all of our customers in Texas."

"Our software is designed to help crypto miners operate more efficiently, contain energy costs, and comply with ERCOT regulations in many ways," said Lawrence. "Lancium's use of patent laws and intimidation tactics to block out innovation in our industry not only undermines ERCOT policy and intent, it puts Texas energy consumers in jeopardy if these crypto mines can't fulfill their responsibility to reduce their load under ERCOT's CLR designation."

As stated in the lawsuit, "Upon information and belief, multiple cryptocurrency software companies that are considering assisting its customers in participating in ERCOT's energy curtailment programs and qualifying and participating as a CLR with ERCOT have been approached by Lancium with threats of enforcing the '433 Patent."

"A declaratory judgment lawsuit will allow OBM to clear the air and conduct its business free from the threat of a patent infringement lawsuit" the lawsuit states.

In the lawsuit OBM has requested a jury trial to present evidence confirming the company is not infringing on the 433 Patent, and to expose Lancium's tactics to restrain competition and chill innovation in this critical energy sector.

**About OBM**

*OBM, Inc. is a Baltimore, Maryland-based software company. Since 2018, OBM has been providing data mining software solutions to cryptocurrency companies through its software management platform, Foreman. Foreman provides for the remote monitoring and management of virtually all aspects of mining operations, particularly through its machine-level configuration and automation of customer ASIC mining machines and GPU mining machines.*

**Media Contacts:**
Meghan Tisinger
Leidar USA, Inc.
meghan.tisinger@leidar.com
703-215-5761

Maria Stagliano
Leidar USA, Inc.
maria.stagliano@leidar.com
404-245-0899

SOURCE OBM, Inc



## PRN Top Stories Newsletters

Sign up to get PRN's top stories and curated news delivered to your inbox weekly!



"with a preliminary injunction lawsuit brought by the economically similar company, the earlier patent infringement lawsuit" the lawsuit states.

In the lawsuit OBM has requested a jury trial to present evidence confirming the company is not infringing on the 433 Patent, and to expose Lancium's tactics to restrain competition and chill innovation in this critical energy sector.

**About OBM**

*OBM, Inc. is a Baltimore, Maryland-based software company. Since 2018, OBM has been providing data mining software solutions to cryptocurrency companies through its software management platform, Foreman. Foreman provides for the remote monitoring and management of virtually all aspects of mining operations, particularly through its machine-level configuration and automation of customer ASIC mining machines and GPU mining machines.*

**Media Contacts:**
Meghan Tisinger
Leidar USA, Inc.
meghan.tisinger@leidar.com
703-215-5761

Maria Stagliano
Leidar USA, Inc.
maria.stagliano@leidar.com
404-245-0899

SOURCE OBM, Inc



## PRN Top Stories Newsletters

Sign up to get PRN's top stories and curated news delivered to your inbox weekly!



Enter Your Email

Select Country    **Submit**

By signing up you agree to receive content from us. Our newsletters contain tracking pixels to help us deliver unique content based on each subscriber's engagement and interests. For more information on how we will use your data to ensure we send you relevant content please visit our PRN Consumer Newsletter Privacy Notice. You can withdraw your consent at any time in the footer of every email you'll receive.



**Contact Cision**

Cision Distribution 888-776-0942 from 8 AM - 9 PM ET
Chat with an Expert

Contact Us ⌃

**Products**

Cision Communication Cloud®
For Marketers
For Public Relations
For IR & Compliance
For Agency
For Small Business
All Products

**About**

About PR Newswire
About Cision
Become a Publishing Partner
Become a Channel Partner
Careers
Accessibility Statement

Global Sites ⌃

**My Services**

All New Releases
Online Member Center
ProfNet

Terms of Use    Privacy Policy    Information Security Policy    Site Map    RSS    Cookie Settings

Copyright © 2023 Cision US Inc.

# EXHIBIT 18

Sign In   Sign Up

Home    Blog    Learn    Updates    Tutorials    News

# OBM Files Suit: Our Case, Reasoning, and Mission

FOREMAN MINING   |   MAY 22, 2023

On Wednesday, May 17th, OBM announced that we have filed a complaint in US District Court in the Southern District of Texas against Lancium LLC.

First and foremost, we want our customers to hear why we filed and the broader implications of this fight directly from us.

To start, some facts: Lancium has aggressively sought patents on software that it, OBM, and other suppliers offer to cryptocurrency miners who wish to qualify as Controllable Load Resources (CLRs) with ERCOT on the Texas grid. ERCOT has incentivized uptake in this and other demand-response energy curtailment programs in recent years, and the tech they are built on form a burgeoning industry, ripe for innovation and to help with energy grid management.

Bottom line: the software in question is essential for facilities to comply with ERCOT's rigorous regulations and thus continue operating as CLRs. Surprisingly, Lancium successfully acquired a patent in March of 2020 that has let it corner this tech. Lancium has since aggressively defended the patent with initiating litigation and making threats of litigation.

To combat this, OBM is seeking a declaratory judgment declaring that we are not, as Lancium has wrongfully asserted, infringing on its patent by offering our customers these vital CLR compliance tools.

Lancium's accusations regarding what we are doing are unfounded. Their aggressive intellectual property claims and threats of litigation have not only forced us to shut down our CLR offerings, but they've also iced numerous other software providers across the state. To be clear, this only applies to CLR; we are continuing our other energy management offerings.

Document title: OBM Files Suit: Our Case, Reasoning, and Mission
Capture URL: https://foreman.mn/blog/obm-inc-foreman-sues-lancium-llc/
Capture timestamp (UTC): Tue, 30 May 2023 14:18:05 GMT


the state. To be clear, this only applies to CLR; we are continuing our other energy management offerings.

We are not taking the step of filing this complaint lightly, and it was not our first attempt at resolution. However, extraordinary circumstances have demanded extraordinary action.

Lancium's patent claims amount to an attempt to monopolize long-standing, publicly known tech and corner an entire regulatory sector. Its patent never should have been issued, and so long as it stands, miners who want to remain CLR compliant have *no choice* but to use Lancium's products.

This is not competition. This is not good-faith regulatory cooperation. Most of all, this does not uphold the spirit of innovation that today's cryptocurrency ecosystem—and Texas itself—was built on.

We are entering this fight to prove that *all* providers have the right to work with regulators, follow their regulations, and compete in the market without a cloud of litigation hanging over them. We are trying to stop the suffocation of a space that ERCOT itself wants to see grow, since by cooperating with CLRs it can better protect the grid from catastrophic surges like those seen in recent years.

If Lancium's actions go unchecked, that cloud will spread—across the state, the nation, and everywhere that energy and cryptocurrency regulations meet. And while we're all focused on Lancium's impact on our mining industry, their patent, if left unchecked, affects all heavy energy users, such as data centers, manufacturers and other industries.

On behalf of our customers, our competitors, and our industry, we can't let that happen. That's why we filed this complaint, and that's why we believe the court will see it for what it is: an assertion of plain justice, fair play, and common sense.

---

Stay tuned for more updates! If you have any questions, contact us on Discord, Twitter, or send us an email!

Master Your Mining with Foreman. Try it for free today!

---

**Share this article**

Document title: OBM Files Suit: Our Case, Reasoning, and Mission
Capture URL: https://foreman.mn/blog/obm-inc-foreman-sues-lancium-llc/
Capture timestamp (UTC): Tue, 30 May 2023 14:18:05 GMT



Home    Blog    Learn    Updates    Tutorials    News

Sign Up

Share this article

 Facebook    Twitter    Linkedin    Pinterest

## Subscribe to Foreman Blog

Get the latest posts delivered right to your inbox.

Enter your email...    **Subscribe**

or subscribe via RSS FEED

PREVIOUS POST



— LEARN —

### Bitmain's Antminer S19 Series: A Look at Bitcoin Mining's Most Iconic Machines

Mitch Klee                    May 12, 2023

---

RECENT POST



OBM Files Suit: Our Case, Reasoning, and Mission
May 22, 2023

Bitmain's Antminer S19 Series: A Look at Bitcoin Mining's Most Iconic Machines
May 12, 2023

What is a Mining Pool - Everything You Need To Know
April 19, 2023

TAG CLOUD

Learn    News    Tutorials    Updates

SUBSCRIBE TO FOREMAN BLOG

Get the latest posts delivered right to your inbox.

Enter your email...    **Subscribe**

ABOUT US

Foreman is a fully-hosted cryptocurrency miner management dashboard, enabling users to remotely monitor and configure ASICs, FPGAs, and GPU rigs.

Track your earnings, identify troublesome pools, and receive alerts as problems arise - all from your own, private dashboard.

---



Home    Blog    Learn    Updates    Tutorials    News

Sign In    Sign Up

f Facebook    Twitter    in Linkedin    P Pinterest

## Subscribe to Foreman Blog

Get the latest posts delivered right to your inbox.

Enter your email...    **Subscribe**

or subscribe via RSS FEED

PREVIOUS POST



— LEARN —

### Bitmain's Antminer S19 Series: A Look at Bitcoin Mining's Most Iconic Machines

Mitch Klee    May 12, 2023

---

**RECENT POST**



OBM Files Suit: Our Case, Reasoning, and Mission
May 22, 2023

Bitmain's Antminer S19 Series: A Look at Bitcoin Mining's Most Iconic Machines
May 12, 2023

What is a Mining Pool - Everything You Need To Know
April 19, 2023

**TAG CLOUD**

Learn    News    Tutorials    Updates

**SUBSCRIBE TO FOREMAN BLOG**

Get the latest posts delivered right to your inbox.

Enter your email...    **Subscribe**

**ABOUT US**

Foreman is a fully-hosted cryptocurrency miner management dashboard, enabling users to remotely monitor and configure ASICs, FPGAs, and GPU rigs.

Track your earnings, identify troublesome pools, and receive alerts as problems arise - all from your own, private dashboard.

© 2023 OBM, Inc. All rights reserved.



---

Document title: OBM Files Suit: Our Case, Reasoning, and Mission
Capture URL: https://foreman.mn/blog/obm-inc-foreman-sues-lancium-llc/
Capture timestamp (UTC): Tue, 30 May 2023 14:18:05 GMT



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 05 C 1481 | **DATE** | 8/15/2005 |
| **CASE TITLE** | Harman Int'l Indus. vs. Massachusetts Inst. of Tech. | | |

### DOCKET ENTRY TEXT:

Defendant Massachusetts Institute of Technology's Motion to Dismiss, or in the Alternative Transfer Plaintiff Harman Industries' Complaint (Dkt. No. 9) is granted in that this court declines to exercise jurisdiction over this case under the Declaratory Judgment Act. This action is hereby dismissed.

■[ For further details see text below.]     Notices mailed by judge's staff.

## STATEMENT

Before this court is defendant Massachusetts Institute of Technology's ("MIT") Motion to Dismiss, or in the Alternative Transfer Plaintiff Harman International Industries' Complaint. The motion requests that this court dismiss the pending declaratory judgment action filed by plaintiff Harman International Industries ("Harman") for lack of subject matter jurisdiction, decline to hear the action as an exercise of this court's discretion, or, finally, transfer this case to the United States District Court for the District of Massachusetts, where a later-filed affirmative action filed by MIT on the identical issues is now pending. For the following reasons, this court declines to exercise jurisdiction over this case under the Declaratory Judgment Act.

MIT is organized under the corporate laws of Massachusetts with its principal place of administration in Cambridge, Massachusetts. MIT is the exclusive owner of U.S. Patent No. 5,177,685 ("'685 patent"). Harman is a Delaware corporation with it corporate headquarters in Washington, D.C. and principal place of business in Northridge, California. Beginning in 2003, Robert Swartz, ("Swartz"), an independent contractor assisting MIT in licensing some of its technology, began disucssions with Harman about licensing the '685 patent. On December 12, 2003, Swartz and officials from Harman met to discuss the '685 patent. That meeting was held at Swartz's office in Deerfield, Illinois, which is within this judicial district. It is unrebutted that at that meeting Swartz made "veiled" threats of suit against Harman by referencing a well-known patent attorney in Chicago. (Resp., Ex. 6 ¶ 13.) Discussions continued through 2004. In November of 2004, MIT, through an opinion of counsel, explained in detail its accusations of infringement on the part of Harman. Specifically, the opinion stated: "Harman's products infringe at least 24 claims of [MIT's] Patent." (Resp., Ex 11 at 2.) It is unrebutted that at this meeting Swartz again threatened a suit against Harman, and that Swartz said MIT's "attorneys were chomping at the bit" to get this case. (Resp., Ex. 6 ¶¶ 22-23.) The final meeting between the parties was held on March 14, 2005, in Cambridge, Massachusetts. Representatives from Harman attended as before, as did Swartz, and for the first time senior members of MIT attended. The meeting was not successful, but it is undisputed that at the end of the meeting, Harman's executives shook hands with MIT' representatives and stated that they would get back to MIT about discussing the potential for taking a license to the '685 patent "within a week or two." (Mot. To Dism., Ex. A ¶ 10.) On the same day, March 14, 2005, Harman filed this lawsuit. On May 12, 2005, MIT filed suit against Harman in the United States District Court for the District of Massachusetts, alleging that certain Harman products infringe the '685 patent.

An actual controversy existed between the parties at the time this action was filed due to MIT's express charges of infringement, *Genetech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 936 (Fed. Cir. 1993) ("When the patentee has explicitly charged that a current activity of the declaratory plaintiff is an infringement, 'certainty has rendered apprehension irrelevant, and one need say no more.'") (abrogated on other grounds)(citations omitted), and Swartz's veiled threats of litigation,

*Arrowhead Indus. Water, Inc.* v. *Ecolochem, Inc.*, 846 F.2d 731, 737-38 (Fed. Cir. 1988).

Nevertheless, this court exercises its discretion to dismiss this case. "Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has substantial discretion to decline that jurisdiction." *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.* 395 F.3d 1324, 1332 (Fed. Cir. 2005) (citation omitted). The discretion to decline jurisdiction must, however, be exercised "in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813-14 (7th Cir. 1996)(citation omitted). Harman's first-filed action should be allowed to proceed, "unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, requires otherwise." *Genetech*, 998 F.2d at 937. Factors that a court may consider when exercising its discretion to hear a declaratory judgment action include the convenience to the parties, as well as the preemptive or anticipatory nature of the suit. *Electronics For Imaging, Inc. v. Coyle,* 394 F.3d 1341, *1347-48* (Fed. Cir. 2005); *Serco Services Co. v. Kelley Co.*, 51 F.3d 1037 at 1039-40 (Fed. Cir.1995) (explaining that it was proper for the district court to consider the preemptive nature of a suit as a factor in declining jurisdiction of a declaratory judgment action). This court agrees with MIT that when considering all the relevant factors, including the location of the parties, the relevant witnesses and documents, as well as the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, this case should be dismissed.

This court finds significant the fact that on the same day that Harman filed this lawsuit it led MIT to believe that negotiations would continue. To be clear, this court believes that Harman's suit may have been within the scope of the Declaratory Judgment Act if while leaving the March 14, 2005 meeting it had made clear to MIT that further negotiations would be fruitless, but this is not what Harman did. Harman took affirmative steps to indicate to the patentee that negotiations may still be successful, and only after leading MIT to believe that negotiations were continuing did Harman file this suit under the Declaratory Judgment Act. These actions support MIT's contention that Harman filed this lawsuit as a negotiation tactic. *Serco Services Co.,* 51 F.3d at 1039-40 (explaining that it was proper for the district court to consider the preemptive nature of a suit as a factor in declining jurisdiction of a declaratory judgment action); *EMC Corp.* 89 F.3d at 814. Even if Harman has no intention of continuing negotiations, Harman's conduct is not consistent with the purposes of the Declaratory Judgment Act, which exists to "provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Electronics For Imaging,* 394 F.3d at 1346. When an alleged infringer takes part in negotiations and indicates to the patentee that such negotiations may still be fruitful, that alleged infringer is not suffering from delay and uncertainty, but is, in fact, creating delay and uncertainty. After creating a delay, it does not fulfill the purposes of the Declaratory Judgment Act for the alleged infringer to capitalize on the delay by filing suit in its favored forum at the expense of the patentee, nor is the Declaratory Judgment Act served when it is used to strengthen a party's bargaining position, as was done here. *See EMC Corp.* 89 F.3d at 814.

Furthermore, the overall convenience to the parties supports dismissing this action. Neither party is located in this district, though MIT has relied upon the services of Swartz, who resides here. For the parties, a transfer to Massachusetts should increase convenience because MIT is located there while Harman, located in California, will not be significantly more inconvenienced. Witnesses are scattered between California, Detroit, Washington, D.C. and Germany for Harman, and Massachusetts and possibly Canada for MIT. Again, a transfer to Massachusetts would increase convenience to MIT's witnesses, and would not significantly increase inconvenience to Harman's witnesses, all of whom would have to travel significant distances in any event. Finally, the convenience of documentary evidence is similar to that of the parties and wittnesses with Harman's evidence being located in Germany and the Detroit area, and MIT's being located primarily in Massachusetts. Again, Massachusetts will be signficantly more convenient to MIT, and not much more inconvenient, if at all, to Harman. Thus, convenience to the litigants, supports declining to hear this declaratory judgment action. This "relative convenience of the parties [is] 'sound reason' not to continue 'this' declaratory suit. *Serco Services*, 51 F.3d at 1040.

Accordingly, for the convenience to the litigants and because exercising jurisdiction over this action would not serve the purposes of the Declaratory Judgment Act, this case is dismissed.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| LANCIUM LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 6:20-cv-00739 |
| LAYER1 TECHNOLOGIES, INC., | |
| Defendant. | **Jury Trial Demanded** |

## <u>COMPLAINT FOR PATENT INFRINGEMENT</u>

Plaintiff Lancium LLC ("Lancium"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to United States Patent No. 10,608,433 ("the '433 patent"). Defendant Layer1 Technologies, Inc. ("Layer1") infringes the '433 patent in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*.

## <u>THE PARTIES</u>

1.     Plaintiff Lancium LLC is a Limited Liability Company, with its principal office and place of business at 6006 Thomas Road, Houston, Texas, 77041.

2.     Upon information and belief, Defendant Layer1 is a Delaware Corporation whose principal office and place of business is at 221 Kearny Street, San Francisco, CA, 94108. Layer1 also has a place of business in Ward County, Texas, which is approximately 100-150 miles west of Midland, Texas, where Layer1 conducts Bitcoin mining operations.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the patent laws of the United States of America, Title 35, United States Code.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a).

5.      This Court has personal jurisdiction over the Defendant Layer1 because Layer1 has committed acts of patent infringement in this District.  Upon information and belief, Layer1, utilizes Lancium's patented systems and methods to adjust power consumption based on power option agreements in connection with Layer1's Bitcoin mining operations in this District. Layer1, therefore, has systematic and continuous contacts with this District, regularly transacts business within this District, and regularly and purposefully avails itself of the benefits of this District.  This Court further has personal jurisdiction over Layer1 generally because Layer1 maintains a principal place of business in this District (*e.g.*, Layer1's Bitcoin mining facilities are located in this District) and Layer1 regularly conducts business in this District.  Layer1, therefore, has established minimum contacts within this District such that the exercise of jurisdiction over Layer1 would not offend traditional notions of fair play and substantial justice.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1400(b) because Layer1 has committed acts of patent infringement complained of herein in this District, and has a regular and established place of business in this District.

## BACKGROUND

7.      Michael McNamara and Raymond Cline, the founders of Lancium, created the company to capitalize on the growth of both renewable energy and distributed computing.  The founders understood that the rise of renewable energy would result in greater variability of

electricity production and also electricity price. The growth of more renewable energy would also lead to increased periods and locations of negative-priced energy.

8.     Messrs. McNamara and Cline further realized that this increased variability created an opportunity. In 2017, Lancium began work on an entirely new type of data center that could essentially be "turned off" during economically opportune time periods. This new type of data center could operate during periods of negatively-priced or low-priced power and not operate (*i.e.*, not draw load), or operate in a reduced capacity (*i.e.*, draw a limited amount of load), during times when power prices were higher.

9.     These "flexible" data centers are useful for many computing workloads, including Bitcoin mining. Lancium developed and patented power management monitoring and control software ("Controllable Load Resource Technology") that permits data centers to ramp their power consumption up or down in seconds. This technology allows data centers to qualify as Controllable Load Resource(s) ("CLR") in the Electric Reliability Council of Texas ("ERCOT"). Upon information and belief, Lancium was the first load-only CLR.

10.     A load-only CLR can be thought of as interacting with the grid in an inverse fashion to the way that a power generation station interacts with the grid. For example, when the demand for electricity is low (resulting in a low price for electricity), a power generation station would typically decrease its production of power. But in such a situation, a load-only CLR would increase power consumption by, for example, engaging in computationally intensive activities requiring significant amounts of electricity such as Bitcoin mining. Likewise, during times of high-priced electricity (*e.g.*, periods of high electricity demand), a power generation station would typically increase its production of power. A load-only CLR, however, would ramp down (*i.e.*, stop (or reduce) its electricity consumption) by, for example, ceasing (or

reducing) Bitcoin mining operations. When this occurs, the load-only CLR (*i.e.*, flexible data center) receives the difference in the value of the real time electricity versus the data center's pre-existing power purchase agreement price. Lancium's Controllable Load Resource Technology allows, among other things, flexible data centers to operate as load-only CLRs and to participate directly in the energy and ancillary services market.

11. Lancium's Controllable Load Resource Technology also benefits the general public and renewable energy generators. For example, when the load-only CLR ramps down, the electricity that the load-only CLR would have used is available for use by other loads such as consumers (*e.g.*, home owners, businesses, etc.). And when electricity prices are low (*e.g.*, in times of low demand), Lancium's technology permits the flexible data center's computer systems to ramp up to, for example, mine Bitcoins, thereby providing a market for excess electricity generated by renewable energy generators (*e.g.*, wind and solar powered energy generators) helping to mitigate variability and periods and locations with negatively priced energy.

12. Lancium's Controllable Load Resource Technology attracted the interest of many companies, including, upon information and belief, Layer1 as alleged below.

## THE PATENT-IN-SUIT

13. Lancium protected its revolutionary technology by, among other things, obtaining patents. On October 28, 2019, Lancium filed a provisional application no. 62/927,119 and, shortly thereafter, utility application no. 16/702,931, which duly and legally issued on March 31, 2020 as U.S. Patent No. 10,608,433 ("the '433 patent") titled "Methods and Systems for Adjusting Power Consumption Based on a Fixed-Duration Power Option Agreement." A true and correct copy of the '433 patent is attached as Ex. A.

14. The '433 patent is assigned to Lancium, which owns all right, title, and interest in and to the '433 patent, including the right to assert all caused of action arising under the '433 patent and the rights to remedies for infringement of the '433 patent.

## LAYER1'S INFRINGEMENT

15. Layer1 owns and operates Bitcoin mining data centers in, upon information and belief, Ward County, Texas. Ex. B; Ex. C. Layer1 describes these Bitcoin mining facilities as "game changer[s] in Bitcoin mining." Ex. B, at 1. "Mining Bitcoin is about converting electricity into money," says Layer1's CEO, Alex Liegl. Ex. D, at 2. West Texas power is "the cheapest power in the world, at scale." Ex. E, at 2. Layer1's average production cost per bitcoin is $1,000.00, equating to a 90% profit margin at the bitcoin price of $9,100.00. Ex. D, at 2.

16. Layer1's Bitcoin mining facilities not only mine bitcoins. Layer1, upon information and belief, recently qualified as a load-only CLR. Ex. F. Upon information and belief, by entering into "demand response" contracts and utilizing what Layer1 characterizes as "its proprietary demand-response software," these data centers can be tapped in real time to meet peak market demand by shutting down mining operations at a minute's notice and instead allowing their load to flow onto the grid. Ex. D, at 2. "In summertime when air conditioners in Dallas, Houston, and Austin are going full tilt, Texas electricity prices sometimes surge to nosebleed levels Layer1 will be able to make more money by shutting off its mining machines and allowing the power to flow through its substation to the grid," says Alex Liegl. Ex. E, at 3. "This is what being a virtual power plant looks like . . . [s]oftware command instantly decreases or increases many megawatts of electricity and #bitcoin hashrate to stabilize public power grids." Ex. G.



Layer1's control system, including its "demand-response" software, upon information and belief, infringes Lancium's '433 patent as alleged below and in the attached exemplary claim chart (Exhibit H).

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 10,608,433

17.     Lancium incorporates by reference and re-alleges all of the preceding paragraphs of this Complaint as if fully set forth herein.

18.     Layer1 infringes at least claims 1-3, 6-9, and 11-20 of the '433 patent literally or under the doctrine of equivalents in violation of 35 U.S.C. § 271(a) by manufacturing, using, offering to sell, selling, and/or importing infringing systems and methods for adjusting power consumption utilized in or by at least Layer1's Bitcoin mining facilities ("Infringing Products"). Exhibit H, attached hereto, is an exemplary claim chart showing how the systems and methods of the Infringing Products meet every limitation of, and therefore infringe, each of the above-identified claims.[1]

19.     Lancium has suffered and continues to suffer damages as a result of Layer1's infringement in an amount to be determined at trial, which, by law, cannot be less than a reasonable royalty, but may also include lost profits, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

---

[1] To the extent the claim chart relies on exhibits not identified and attached to this Complaint, the exhibits are identified in and attached to the claim chart.

**COMPLAINT FOR PATENT INFRINGEMENT**                                        **PAGE 6**

20.     In addition, Layer1's past and ongoing infringement has caused, and continues to cause, Lancium substantial and irreparable harm for which there is no adequate remedy at law unless and until Layer1 is enjoined by this Court.

21.     Layer1's infringement is willful.  On May 22, 2020, Lancium notified Layer1 that Layer1's "data center demand response functionality . . . may infringe one or more Lancium's patents."  Ex. I.  A copy of the '433 patent was attached to the May 22, 2020 email.  *Id.*  After receiving no response from Layer1, Lancium reached out again on June 2, 2020.  Ex. I.  Layer1 did not respond, and has not responded to date.

22.     Layer1, therefore, has had actual knowledge of the '433 patent since at least May 22, 2020.

23.     Upon information and belief, Layer1 continued using Lancium's patented technology to operate its Bitcoin mining facilities in at least West Texas after May 22, 2020 (and continues those operations today).  Therefore, at least as of May 22, 2020, and thereafter, Layer1's infringement was willful.

24.     Lancium is entitled to a finding of willfulness and enhanced damages under at least 35 U.S.C. § 284 based upon Layer1's willful infringement of the '433 patent.

### PRAYER FOR RELIEF

WHEREFORE, Lancium respectfully requests that this Court find in its favor and against Layer1, and that the Court grant Lancium the following relief:

A.     Judgment in favor of Lancium that Layer1 has infringed, either literally and/or under the doctrine of equivalents, one or more claims of the '433 patent;

B.     An award of all damages adequate to compensate Lancium for Layer1's infringement of the '433 patent;

C.      Judgment that Layer1's infringement was willful and that the Court award treble damages for the period of such willful infringement pursuant to at least 35 U.S.C. § 284;

D.      An award of pre-judgment and post-judgment interest at the maximum rate permitted by law;

E.      A finding that this is an exceptional case and awarding Lancium its costs, expenses, disbursements, and reasonable attorney's fees related to Layer1's infringement under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law;

F.      A permanent injunction preventing Layer1, its officers, agents, servants and employees, and those person in active concert and participation with any of them, from infringement of one or more claims of the '433 patent or, in the alternative, if the Court finds that an injunction is not warranted, Lancium requests an award of post-judgment royalty to compensate for future infringement;

G.      That Lancium be granted all other relief, in law or equity, as the Court may deem just and proper.

## JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Lancium hereby requests a trial by jury on all issues so triable.

Dated:  August 14, 2020

Respectfully submitted,

**BARNES & THORNBURG LLP**

By: *s/Mark C. Nelson*

Mark C. Nelson
Texas Bar No. 00794361
Daniel A. Valenzuela
Texas Bar No. 24067918
BARNES & THORNBURG LLP
2121 N. Pearl Street, Suite 700
Dallas, TX 75201
Email: mnelson@btlaw.com
Email: dvalenzuela@btlaw.com
Telephone: 214-258-4200
Fax: 214-258-4199


*Attorneys for Plaintiff*
*Lancium LLC*

# EXHIBIT I

| From: | Rohde, Kurt |
|---|---|
| Sent: | Tuesday, June 2, 2020 9:09 AM |
| To: | 'contact@layer1.com' |
| Cc: | 'alex@layer1.com'; 'aliegl@layer1.com'; 'alex.liegl@layer1.com'; 'alexliegl@layer1.com'; 'alexl@layer1.com' |
| Subject: | FW: Lancium Intellectual Property |
| Attachments: | US10608433.pdf |

Dear Mr. Liegl,

I am following up on the email below. Please contact me or Michael McNamara < michael.mcnamara@lancium.com > directly at your earliest convenience so we can discuss this matter further.

Sincerely,
Kurt Rohde



**Kurt W. Rohde** | Partner | 300 South Wacker Drive | Chicago, Illinois 60606-6709
312-913-3356 direct | 312-437-3725 mobile | 312-913-0001 main | 312-913-0002 fax
rohdek@mbhb.com | www.mbhb.com
MBHB INTELLECTUAL PROPERTY LAW

**From:** Rohde, Kurt
**Sent:** Friday, May 22, 2020 5:54 PM
**To:** 'Liegl@layer1.com' ; 'contact@layer1.com'
**Subject:** Lancium Intellectual Property

To: Mr. Alex Liegl, CEO
        Layer1

My client Lancium has become aware of your activities relating to data center demand response functionality.

https://www.prnewswire.com/news-releases/layer1-launches-bitcoin-batteries-to-stabilize-energy-grids-by-releasing-electricity-to-meet-market-demand-301063984.html

https://www.forbes.com/sites/christopherhelman/2020/05/21/how-this-billionaire-backed-crypto-startup-gets-paid-to-not-mine-bitcoin/#4864d7ec7596

As you probably know, Lancium has been operating in this market for some time and is actively acquiring intellectual property for its innovations in the market for both behind-the-meter and grid-connected data centers. As an example, we would like to direct your attention to U.S. Patent No. 10,608,433, attached here for your convenience. Based on

1

publicly available information, it is possible that your approach to demand response services may infringe one or more of Lancium's patents. My client is receptive to commercial opportunities for collaboration and would be willing to discuss the matter over the phone.

Sincerely,
Kurt Rohde



**Kurt W. Rohde** | Partner | 300 South Wacker Drive | Chicago, Illinois 60606-6709
312-913-3356 direct | 312-437-3725 mobile | 312-913-0001 main | 312-913-0002 fax
rohdek@mbhb.com | www.mbhb.com
MBHB INTELLECTUAL PROPERTY LAW

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

LANCIUM LLC,

    Plaintiff,

v.

U.S. DATA MINING GROUP, INC.
(D/B/A US BITCOIN),
U.S. MINING INFRASTRUCTURE
OPERATIONS, LLC, and
U.S. DATA KING MOUNTAIN LLC,

    Defendants.

Civil Action No. 6:23-cv-00344

**Jury Trial Demanded**

## <u>COMPLAINT FOR PATENT INFRINGEMENT</u>

Plaintiff Lancium LLC ("Lancium") files this Complaint in this Western District of Texas (the "District") against Defendant U.S. Data Mining Group, Inc. (d/b/a US Bitcoin), U.S. Mining Infrastructure Operations, LLC, and U.S. Data King Mountain LLC (collectively, "Defendants") for infringement of U.S. Patent Nos. 11,016,456; 10,444,818; 11,016,553; 11,031,813; 11,025,060; 10,608,433; and 11,594,888, which are collectively referred to as the "Asserted Patents."

## <u>THE PARTIES</u>

1.    Plaintiff Lancium LLC is a limited liability company, with its principal office and place of business at 6006 Thomas Road, Houston, Texas 77041.

2.    Upon information and belief, Defendant U.S. Data Mining Group, Inc. ("USBTC") is a Nevada corporation that is registered to do business in Florida, has offices at 1221 Brickell

**COMPLAINT FOR PATENT INFRINGEMENT**           **PAGE 1**

Ave., Ste. 900, Miami, FL 33131-3800, and has Cogency Global, Inc., 115 N. Calhoun St., Ste. 4, Tallahassee, FL 32301, and 321 W. Winnie Lane, Ste. #104, Carson City, NV 89730 as its registered agent.

3.     Upon information and belief, USBTC also has places of business in at least New York, Nebraska, and Texas, including in Upton County, Texas, where USBTC conducts Bitcoin mining operations.

4.     Upon information and belief, Defendant U.S. Mining Infrastructure Operations, LLC ("USMIO") is a subsidiary of USBTC.  Upon information and belief, USMIO is a Delaware limited liability company, has a physical presence in at least Nebraska and Texas, including in Upton County, Texas, and may be served via its registered agent Cogency Global, Inc. at 850 New Burton Road, Ste. 201, Dover, DE 19904.

5.     Upon information and belief, Defendant U.S. Data King Mountain, LLC ("USDKM") is a subsidiary of USBTC.  Upon information and belief, USDKM is a Nevada limited liability company, has Cogency Global, Inc., 321 W. Winnie Lane, Ste. #104, Carson City, NV, 89730 as its registered agent, and has a physical presence in at least Upton County, Texas.

## <u>JURISDICTION AND VENUE</u>

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

7.     This Court has personal jurisdiction over USBTC because USBTC has committed acts of patent infringement in this District.  Upon information and belief, USBTC utilizes Lancium's patented systems, methods, and non-transitory computer readable medium in connection with its Bitcoin and/or other cryptocurrency mining operations in this District and in

Texas. USBTC, therefore, has systematic and continuous contacts with this District, regularly transacts business within this District, and regularly and purposefully avails itself of the benefits of this District. This Court further has personal jurisdiction over USBTC generally because USBTC maintains a regular and established place of business in this District (*e.g.*, USBTC has a Bitcoin mining facility located in this District) and USBTC regularly conducts business in this District. USBTC, therefore, has established minimum contacts within this District such that the exercise of jurisdiction over USBTC would not offend traditional notions of fair play and substantial justice.

8.      This Court has personal jurisdiction over USMIO because USMIO has committed acts of patent infringement in this District. Upon information and belief, USMIO deploys the purpose-built operating technology of USBTC to automate site operations and optimize returns at USBTC cryptocurrency mining operations, including those within Texas and within this District. USMIO, therefore, has systematic and continuous contacts with this District, regularly transacts business within this District, and regularly and purposefully avails itself of the benefits of this District. Upon information and belief, this Court further has personal jurisdiction over USMIO generally because USMIO manages 680 MW across three sites in Texas and Nebraska, including at least one site in this District, with a mix of self-mining and hosting operations (*see, e.g.*, usbitcoin.com/mining-infrastructure-operations (Exhibit 1)) and USMIO regularly conducts business in this District. USMIO, therefore, has established minimum contacts within this District such that the exercise of jurisdiction over USMIO would not offend traditional notions of fair play and substantial justice.

9.      This Court has personal jurisdiction over USDKM because USDKM has committed acts of patent infringement in this District. Upon information and belief, USDKM, as a subsidiary

of USBTC, owns 50% of a facility in Upton County, Texas referred to as the Echo site. There, in cooperation with USBTC and through USMIO, USDKM utilizes Lancium's patented systems, methods, and non-transitory computer readable medium in connection with its Bitcoin and/or other cryptocurrency mining operations in this District. USDKM, therefore, has systematic and continuous contacts with this District, regularly transacts business within this District, and regularly and purposefully avails itself of the benefits of this District. Upon information and belief, this Court further has personal jurisdiction over USDKM generally because USDKM maintains a regular and established place of business in this District (*e.g.*, USDKM has a Bitcoin mining facility located in this District) and USDKM regularly conducts business in this District. USDKM, therefore, has established minimum contacts within this District such that the exercise of jurisdiction over USBTC would not offend traditional notions of fair play and substantial justice.

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c), and 1400(b) because USBTC, USMIO, and USDKM have committed acts of patent infringement complained of herein in this District, and have a regular and established place of business in this District. In the words of USBTC's President, Asher Genroot, "[w]e are called US Bitcoin Corp., but we have found a home in Texas…. [w]e see a bright future for US Bitcoin in West Texas." (8/30/22 Midland Reporter-Telegram (Exhibit 2, at 1)).

## LANCIUM'S TECHNOLOGY

11.    Lancium was founded in 2017 to, among other things, create solutions to enable more renewable energy on the nation's power grid. Lancium understood that the rise of renewable energy would result in greater variability and volatility of both electricity production and electricity price, and that the growth of more renewable energy would lead to increased periods and locations of negative-priced energy. Lancium also understood that large loads, such as industrial users,

could not absorb and/or drop their electrical load quickly. Lancium recognized that the increased periods of negatively-priced energy, the variability and volatility of electricity production and price of renewable energy compared to traditional energy, and the short-comings of large industrial loads created opportunity.

12. Lancium began work on an entirely new and revolutionary type of datacenter that could essentially be "turned off" or "turned down" during economically opportune time periods. This new type of datacenter could operate during periods of negatively-priced or low-priced power and not operate (*i.e.*, not draw load), or operate in a reduced capacity (*i.e.*, draw a limited amount of load), during times when power prices were higher. These "flexible" datacenters are useful for many computing workloads, including cryptocurrency mining.

13. Lancium also invented novel and innovative control technology that permitted datacenters to absorb or drop load almost instantly, thus solving the slow ramping short-comings that plagued traditional large loads. These datacenters could thus take advantage of the variability and volatility of electricity production and price by selectively operating only under certain conditions (*e.g.*, when there was excess electricity available and/or during periods of negative or low electricity price) thus providing renewable generators an alternative for their electricity during periods that otherwise would make continued electricity generation unfavorable to the renewable generators.

14. The flexible datacenters could connect directly to the grid as participating loads for an Independent System Operator (ISO) and participate in, for example, the Electric Reliability of Texas ("ERCOT") Ancillary Service programs to help provide stability to the grid. The flexible datacenters could also sit behind-the-meter near the renewable generator and utilize electricity directly from the generator.

15.     Lancium's founders, Michael McNamara and Raymond Cline, as well as others at Lancium named on certain Lancium patents, conceived and patented numerous inventions relating to these pioneering concepts including, among other things, methods and systems for dynamic power delivery to a flexible datacenters using unutilized energy sources, methods and systems for distributed power control of flexible datacenters, methods and systems for auxiliary power management of behind-the-meter power loads, providing computational resource availability based on power-generation signals, methods and systems for adjusting power consumption based on a fixed duration power option agreement, dynamic power delivery to flexible datacenters, power management and power control relating to such datacenters, and modifying computing system operations based on certain factors and/or conditions. Lancium also designed, built, and operates products based on its patented inventions.

16.      Lancium's technology attracted the interest of many companies including, upon information and belief, USBTC, USMIO, and USDKM (collectively, "Defendants"), as described above and below.

## **DEFENDANTS' STRUCTURE AND OPERATIONS**

17.     USBTC was formed in 2020.  (Exhibit 3).  USBTC is a large-scale North American digital mining company that owns and/or operates cryptocurrency mining sites.  (4/12/23 HUT8 News Release (Exhibit 4, at 7); 4/17/23 HUT8 SEC Filing S-4 (Exhibit 5, at 7)).  USBTC refers to these mining sites as campuses or datacenters:  "US Bitcoin Corp (US BTC) builds and operates data centers that secure the Bitcoin network." (Exhibit 1).  Upon information and belief, USBTC currently owns and/or operates four datacenter sites in the United States with access over 730 MW of electricity.  (Exhibit 5, at 7).

18.    USBTC's datacenter sites are in Niagara Falls, NY, which is referred to as the "Alpha" site; Kearney, NE, which is referred to as the "Charlie" site; Granbury, TX, which is referred to as the "Delta" site; and King Mountain, TX, which is referred to as the "Echo" site. (Exhibit 5, at 7; 2/7/23 Strategic Merger of Hut8 Mining and US Bitcoin Corp PowerPoint Presentation (Exhibit 6, at 8)).  USBTC previously owned a site in Pecos, TX, but upon information and belief, transferred that site to one of USBTC's former lenders as part of a debt extinguishment transaction.  (Exhibit 6, at 5, fn1).

19.    Upon information and belief, USBTC has at least four revenue streams, many of which are derived from its datacenter sites: (i) self-mining revenue, (ii) hosting revenue, (iii) managed infrastructure operations revenue, and (iv) equipment sales revenue.  (Exhibit 6, at 10; Exhibit 5, at 138).

20.    Upon information and belief, self-mining revenue refers to all revenue earned from USBTC-owned cryptocurrency machines that contribute computing power to mining pools in exchange for cryptocurrency (*e.g.*, Bitcoin).  (Exhibit 5, at 7, 138)  Hosting revenue refers to revenue earned by USBTC for operating third party-owned machines at its sites in exchange for a hosting fee.  (*Id.*)  Managed infrastructure operations revenue refers to revenue earned by USBTC for operating third-party-owned Bitcoin or other cryptocurrency mining sites in exchange for a property management fee.  (*Id.*)  Equipment sales revenue refers to revenue earned by USBTC for selling mining or infrastructure equipment to third-parties.  (*Id.*).

21.    Upon information and belief, USBTC owns and operates its Alpha site.  (*Id.*).

22.    Upon information and belief, USBTC operates the Echo site and owns 50% of the Echo site.  (*Id.*).  This 50% interest was acquired in December 2022 when USBTC (through its subsidiary USDKM) acquired Compute North Member LLC's entire membership interest in

TZRC LLC. (*Id.*; 11/25/22 Asset Purchase Agreement (Exhibit 7)). The TZRC LLC membership represented 50% of all issued and outstanding membership interests in King Mountain JV with NextEra. (Exhibit 5, at 7, 138). The Echo site is co-located behind-the-meter at a wind farm in Upton County, Texas. (Exhibit 5, at 7, 138; Exhibit 6, at 13). The Echo site can draw up to 100% of the energy the wind farm produces, but it can also utilize energy sourced from ERCOT. (2/7/23 FD (Fair Disclosure) Wire 13:30:00, at 2 (Exhibit 8)).

23.      Upon information and belief, USBTC is the site operator for the Charlie and Delta sites through its subsidiary USMIO. (Exhibit 5, at 7, 138). USMIO also is the site operator for the Echo site. (*Id.*). USMIO manages ~680 MW of cryptocurrency mining capacity across these three sites with a mix of self-mining and hosting operations. (*Id.*; Exhibit 1).



24.      Upon information and belief, USBTC, through at least USMIO, offers site automation, energy management, hosting operations design and management, and other services. (Exhibit 1). USBTC, through at least USMIO, deploys the "purpose-built operating technology of US Bitcoin Corp to automate site operations and optimize returns." (Exhibit 1; Exhibit 5, at

138). "The Operator asset management platform drives miner efficiency by tracking miners in real-time at the site, container, and unit levels, automatically identifying and diagnosing miner dysfunctions, and issuing work orders to streamline repair operations." (Exhibit 1). Among the parameters tracked are fan speed, miner temperature, hashrate performance, and errors in real time such that the Operator enables USBTC to drive hashrate efficiency through precise diagnosis of environmental and infrastructural issues that affect miner efficiency. (Exhibit 5, at 138).

25.     "Reactor is an advanced, algorithmic energy curtailment software platform that USBTC believes will drive significant Bitcoin mining profitability." (Exhibit 5, at 139). Reactor monitors energy price data from grid data streams to calculate when real-time energy costs would render Bitcoin mining unprofitable. (*Id.*). The "Reactor energy curtailment platform is powered by a custom algorithm with miner-level granularity and drives enhanced site return by adjusting the energy consumption of each miner onsite in real-time based on its unique profitability profile." (Exhibit 1). Reactor is integrated with USBTC's Operator and is designed to automatically adjust power consumption of each miner in real-time based on longitudinal data on the miner's unique, observed profitability. (Exhibit 5, at 139). The algorithm can follow desired ramp curves provided by each grid, with the capability of full power ramp-down / ramp-up in seconds. (*Id.*).

26.     USBTC, through at least USMIO, helps "design and implement, technical energy management strategy that captures revenue upside and protects against downside risk … bringing deep expertise in hedge optimization, energy trading, economic curtailment, and ancillary services." (Exhibit 1). Stated differently, USBTC "brings a disciplined, technical approaching to building and managing the site energy portfolio with a strategic focus on … [e]lectron arbitrage to optimize site returns … [and] [s]eamless participation in a wide range of ancillary service programs using custom firmware with a set of rapid consumption adjustment and chip frequency modulating

commands...." (Exhibit 6, at 13; Exhibit 5, at 140 (highlighting USBTC's, through its Reactor energy curtailment platform, ability to "participate in a wide range of ancillary services programs offered by Independent System Operators…")).

27. Referring to at least USBTC's Texas sites, USBTC's President Asher Genoot explained that his company helps the state's grid overcome the problems associated with renewable energy because USBTC can ramp up datacenters when renewable energy is plentiful, and ramp down the datacenters when energy is less plentiful (*e.g.*, the wind isn't blowing). (*See*, *e.g.*, Exhibit 2. Its facilities can also absorb extra energy generated by renewables and underwrite demand while the grid infrastructure catches up. (*Id.*).

28. Defendants' infringing datacenters and conduct relating to behind-the-meter ("BTM") operation with co-located power generation plants are collectively referred to as "BTM Accused Instrumentalities." Upon information and belief, the Echo cryptocurrency datacenter (also sometimes referred to as King Mountain) is configured to receive BTM power directly from a co-located wind farm operated by NextEra. "Echo is co-located behind the meter at a wind farm and at peak wind generation periods can draw up to 100% of the energy the wind project produces; the rest of the time, the energy is sourced from ERCOT." (Exhibit 6, at 13; Exhibit 5, at 7, 138). "USBTC also owns a 50% interest in the King Mountain JV with NextEra. The King Mountain JV owns the Echo Site, a Bitcoin mining site in Upton County, Texas with access to approximately 280 MW of electricity. The Echo Site is co-located behind-the-meter at a wind farm." (Exhibit 5, at 152).

29. Upon information and belief, the Delta cryptocurrency datacenter is also co-located with a power generation facility and operates behind-the-meter. "USBTC currently operates two behind-the-meter Bitcoin mining sites, Delta and Echo, which are co-located with an energy source

and share a meter into the grid." (Exhibit 5, at 139). Upon information and belief, the Delta cryptocurrency datacenter is located in proximity to a power generation facility operated by Constellation Energy Corporation. (Exhibit 17, at 2).

30. Defendants' infringing datacenters and conduct operating in relation to ancillary services or other similar agreements and programs are collectively referred to as "AS Accused Instrumentalities." Upon information and belief, "USBTC participates in deregulated markets with sophisticated trading and arbitrage strategies that enable it to settle physical and financial products from the Bitcoin, power, and ancillary markets" (Exhibit 5, at 139), and Defendants Reactor platform is designed to "bid into ancillary service programs." (*Id.* at 139, 140 (Reactor "gives USBTC the ability to participate in a wide range of ancillary service programs")).

## THE ASSERTED PATENTS

31. Lancium protected its revolutionary technology by, among other things, obtaining patents, including the Asserted Patents.

32. On May 25, 2021, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 11,016,456 ("the '456 patent") titled "Method and System for Dynamic Power Delivery to a Flexible Data Center Using Unutilized Energy Sources." A true and correct copy of the '456 patent is attached as Exhibit 9.

33. On October 15, 2019, the USPTO duly and legally issued U.S. Patent No. 10,444,818 ("the '818 patent") titled "Methods and Systems for Distributed Power Control of Flexible Datacenters." A true and correct copy of the '818 patent is attached as Exhibit 10.

34. On May 25, 2021, the USPTO duly and legally issued U.S. Patent No. 11,016,553 ("the '553 patent") titled "Methods and Systems for Distributed Power Control of Flexible Datacenters." A true and correct copy of the '553 patent is attached as Exhibit 11.

35. On June 8, 2021, the USPTO duly and legally issued U.S. Patent No. 11,031,813 ("the '813 patent") titled "Systems and Methods for Auxiliary Power Management of Behind-the-Meter Power Loads." A true and correct copy of the '813 patent is attached as Exhibit 12.

36. On June 1, 2021, the USPTO duly and legally issued U.S. Patent No. 11,025,060 ("the '060 patent") titled "Providing Computational Resource Availability Based on Power-Generation Signals." A true and correct copy of the '060 patent is attached as Exhibit 13.

37. On March 31, 2020, the USPTO duly and legally issued U.S. Patent No. 10,608,433 ("the '433 patent") titled "Methods and Systems for Adjusting Power Consumption Based on a Fixed-Duration Power Option Agreement." A true and correct copy of the '433 patent is attached as Exhibit 14.

38. On February 28, 2023, the USPTO duly and legally issued U.S. Patent No. 11,594,888 ("the '888 patent") titled "Methods and Systems for Adjusting Power Consumption Based on a Fixed-Duration Power Option Agreement." A true and correct copy of the '888 patent is attached as Exhibit 15.

39. Lancium owns all rights, title, and interest in and to, including the right to assert all causes of action and the right to any remedies for the infringement of, each of the above-identified patents, referred to herein as the Asserted Patents.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 11,016,456

40. Lancium incorporates by reference and re-alleges all of the preceding paragraphs of this Complaint as if fully set forth herein.

41. The '456 patent generally relates to methods and systems for dynamic power deliver to flexible datacenters using unutilized energy sources. The claims of the '456 patent, including claim 1, recite novel and inventive systems and/or methods.

42.     For example, claim 1 of the '456 patent recites:

1.  A flexible datacenter comprising:

a behind-the-meter (BTM) power input system, wherein the BTM power input system is configured to receive power from a power generation station prior to the power undergoing step-up transformation for transmission to a power grid;

a power distribution system;

a plurality of computing systems; and

a datacenter control system configured to modulate power delivery to the plurality of computing systems based on an operational directive.

43.     Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including claim 1, of the '456 patent in violation of 35 U.S.C. § 271(a).  For example, Defendants have, without authorization, made, operated, used, sold access to, and offered for sale access to the BTM Accused Instrumentalities.

44.      The BTM Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '456 patent, including at least claim 1. By way of a non-limiting example, the BTM Accused Instrumentalities include infringing flexible datacenters.

45.     One or more of the BTM Accused Instrumentalities have a behind-the-meter (BTM) power input system.  (Exhibit 5, at 7, 138-139 (Echo and Delta sites located behind-the-meter)). Because the flexible datacenter is co-located with the renewable generator, upon information and belief, the BTM power input system is configured to receive power from a power generation station such as a wind farm prior to the power undergoing step-up transformation for transmission to a power grid at a Point of Interconnect (POI). The Echo site, for example, is co-located behind-the-meter at a wind farm and can receive up to 100% of its power from the wind farm.  (Exhibit 5, at 141; Exhibit 6, at 13).

**COMPLAINT FOR PATENT INFRINGEMENT**                                      **PAGE 13**

46.     The BTM Accused Instrumentalities have power distribution systems and a plurality of computing systems.  The BTM Accused Instrumentalities are configured to receive power and distribute it to cryptocurrency miners ("computing systems") owned by Defendants and/or operated/managed by Defendants.  (Exhibit 5, at 138-140; Exhibit 6, at 13-14).

47.     The BTM Accused Instrumentalities' datacenter control systems are configured to modulate power delivery to the plurality of computing systems based on an operational directive.  For example, the BTM Accused Instrumentalities have an asset management platform called Operator that monitors, among other things, the computing systems' (miners) key performance metrics at the fleet, site, container, and unit levels.  (Exhibit 5, at 138-139; Exhibit 6, at 14).



The BTM Accused Instrumentalities also have control software called, upon information and belief, "Reactor" – an "algorithmic energy curtailment platform with miner-level granularity" – that adjusts the energy consumption of miners in real time and is capable of rapid curtailment (*e.g.*, full power ramp down and/or full power ramp up) in seconds in response to signals from the software.  (Exhibit 5, at 139-140; Exhibit 6, at 14).



In addition, upon information and belief, at least the Echo site can draw up to 100% of the energy the wind farm, at which it is co-located, produces to power mining and hosting (Exhibit 8, at 2), and can also use energy sourced from ERCOT.  (*Id.*).  Upon information and belief, the decision(s) regarding the amount of power to draw from the wind farm at which the Echo site's datacenter is co-located, for example, would be implemented by the BTM Accused Instrumentalities' control system via an operational directive.

48.     On October 24, 2022, Lancium sent a letter to Compute North Holdings, Inc. notifying it that "certain Compute North affiliates are operating, and other affiliates intend to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology."  (Exhibit 16).  The letter specifically identified Compute North's King Mountain facility in McCamey, Texas operated by joint venture affiliate TZRC LLC as infringing Lancium's patent rights.  (*Id.*).  This facility is now identified by Defendants as the Echo site.  The letter also identified Compute North's Wolf Hollow planned facility in Granbury, Texas as likely to infringe. (*Id.*).  Defendants now refer to that facility as the Delta site.  The '456 patent is one of the patents specifically identified in the letter.  (*Id.*).

**COMPLAINT FOR PATENT INFRINGEMENT**                                    **PAGE 15**

49.     On information and belief, on or about November 25, 2022, Defendants acquired certain assets of Compute North LLC ("Compute North").  (Exhibit 7; Exhibit 5, at 142-143).  In connection with that transaction, Defendant USDKM acquired an interest in the King Mountain facility through an Asset Purchase Agreement between it and Compute North Member, LLC. (Exhibit 7).  Upon information and belief, USBTC is also the site operator for the Delta site through its subsidiary USMIO.  (Exhibit 5, at 7, 138).

50.     Upon information and belief, due diligence was done in connection with Defendants acquiring Compute North's assets and with Defendant USDKM acquiring an interest in King Mountain, and such diligence resulted in Defendants learning that Lancium put Compute North on notice of patent infringement with respect to the '456 patent on October 24, 2022.  Thus, Defendants had notice of the '456 patent and that Lancium contended Defendants' newly-acquired assets, and Compute North and Defendants' use and/or management thereof, infringed the '456 patent.

51.     On information and belief, in violation of 35 U.S.C. § 271(b), Defendants induce others, including third-party owners of datacenters for which Defendants manage operations, to infringe one or more of the claims of the '456 patent by encouraging and facilitating them to perform actions known by Defendants to infringe. Defendants do so, for example, by encouraging and facilitating their customers to use the BTM Accused Instrumentalities with the intent that such use will infringe the '456 patent, and Defendants do so with notice that Lancium contended that their continued operation of Compute North's previous assets infringed the '456 patent.

52.     On information and belief, in violation of 35 U.S.C. § 271(c), Defendants with knowledge of the '456 patent, sell or offer to sell the BTM Accused Instrumentalities, knowing they are especially made or especially adapted for practicing the inventions of the '456 patent and

are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, the BTM Accused Instrumentalities are designed for an infringing purpose and are not suited for other purposes. Upon information and belief, Defendants are indirectly infringing one or more claims of the '456 patent by actively contributing to their customers' direct infringement within the United States.

53.     Defendants' acts of infringement have caused and will continue to cause substantial and irreparable damage to Lancium.

54.     As a result of the infringement of the '456 patent by Defendants, Lancium has been damaged.

55.     Lancium is entitled to injunctive relief under 35 U.S.C. § 283.

56.     In addition to injunctive relief, Lancium is entitled to recover damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Lancium for the infringement, but in no event less than a reasonable royalty.

57.     Defendants' acts of infringement have been willful since they were done with knowledge of the '456 patent and with knowledge that Defendants' BTM Accused Instrumentalities and/or the use thereof infringed the '456 patent. Lancium is entitled to an award of up to treble damages pursuant to 35 U.S.C. § 284.

58.     Due to Defendants' willful infringement, this case is exceptional, and Lancium is entitled to an award of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

### COUNT II – INFRINGEMENT OF U.S. PATENT NO. 10,444,818

59.     Lancium incorporates by reference and re-alleges paragraphs 1-39 of this Complaint as if fully set forth herein.

60.     The '818 patent generally relates to methods, systems, and non-transitory computer readable medium for distributed power control of flexible data centers. The claims of the '818 patent, including claim 1, recite novel and inventive systems, methods, and/or non-transitory computer readable medium.

61.     For example, claim 1 of the '818 patent recites:

1.   A distributed power control system comprising:

a flexible datacenter comprising:

> (i) a plurality of computing systems powered by a behind-the-meter input system,
> (ii) the behind-the-meter power input system configured to receive power from a power generation system prior to the power undergoing step-up transformation for transmission to a grid and deliver the power to the plurality of computing systems, and
> (iii) a datacenter control system configured to control the plurality of computing systems and the behind-the-meter power input system;

a remote master control system configured to issue instructions to the flexible datacenter that affect an amount of behind-the-meter power consumed by the flexible datacenter;

one or more processors; and

data storage comprising a first set of instructions that, when executed by the one or more processors, cause the data center control system to perform operations comprising:

> receiving a first operational directive from the remote master control system, wherein the first operational directive is an operational directive for the flexible data center to ramp-down power consumption, and

> in response to receiving the first operational directive, causing the plurality of computing systems of the flexible datacenter to perform a first set of predetermined operations correlated with the first operational directive.

62.     Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including claim 1, of the '818 patent in

violation of 35 U.S.C. § 271(a). For example, Defendants have, without authorization, made, operated, used, sold access to, and offered for sale access to the BTM Accused Instrumentalities.

63.     The BTM Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '818 patent, including at least claim 1. By way of a non-limiting example, the BTM Accused Instrumentalities include infringing distributed power control systems.

64.     The BTM Accused Instrumentalities have a behind-the-meter (BTM) power input system. (Exhibit 5, at 7, 138-139). Because the flexible datacenter is co-located with the renewable generator, upon information and belief, the BTM power input system is configured to receive power from a power generation station such as a wind farm prior to the power undergoing step-up transformation for transmission to a power grid at a Point of Interconnect (POI). The Echo site, for example, is co-located behind-the-meter at a wind farm and can receive up to 100% of its power from the wind farm. (Exhibit 5, at 141; Exhibit 6, at 13).

65.     The BTM Accused Instrumentalities have a plurality of computing systems. The BTM Accused Instrumentalities are configured to receive BTM power and distribute it to cryptocurrency miners ("computing systems") either owned by Defendants and/or operated/managed by Defendants. (Exhibit 5, at 138-140; Exhibit 6, at 13-14).

66.     The BTM Accused Instrumentalities include control capability of the plurality of computing systems and the behind-the-meter power input system. By way of example, upon information and belief, the BTM Accused Instrumentalities include control capability to "adjust[] the energy consumption of each miner onsite in real-time based on its unique profitability profile." (Exhibit 1; Exhibit 5, at 139). Upon information and belief, the BTM Accused Instrumentalities additionally direct the BTM power input system to provide BTM power and/or grid power. For example, "Echo is co-located behind the meter at a wind farm and at peak wind generation periods

**COMPLAINT FOR PATENT INFRINGEMENT**                                    **PAGE 19**

can draw up to 100% of the energy the wind project produces; the rest of the time, the energy is sourced from ERCOT." (Exhibit 6, at 13). Upon information and belief, the BTM Accused Instrumentalities also include control capability configured to activate electrical isolation breakers in the behind-the-meter power input system for the purpose of electrically isolating the cryptocurrency miners from the power generation equipment of the wind farm. (Exhibit 6, at 13; Exhibit 5, at 139).

67. Upon information and belief, the BTM Accused Instrumentalities include control capability configured to issue instructions to the flexible datacenter that affect an amount of behind-the-meter power consumed by the flexible datacenter. The "Reactor" platform "[a]djusts consumption of each miner in real-time" and is "[c]apable of full power ramp-down and full power ramp-up in seconds," (Exhibit 6, at 14), and "USBTC's purpose-built operating technology can be deployed across the site portfolio." (*Id.* at 7).

68. Upon information and belief, the BTM Accused Instrumentalities include control capability using software and/or other programmable logic control implemented in hardware using one or more processors and data storage comprising instructions that, when executed by the one or more processors, cause a control system to perform operations. Upon information and belief, the BTM Accused Instrumentalities receive an operational directive from a remote master control system instructing the miners in the flexible datacenter to ramp down power consumption and, in response to receiving the operational directive, the computing systems perform a set of predetermined operations correlated with that operational directive to ramp down power consumption. For example, the Operator platform "enables centralized site management" and tracks groups of miners at the container level. (Exhibit 6, at 7). The Reactor platform then leverages that data captured by Operator and adjusts consumption in real time, including the

capability of full power ramp down. (*Id.* at 7; Exhibit 5, at 139). In at least one known control methodology, Defendants "developed purpose-built custom firmware with a set of rapid consumption adjustment and chip frequency modulating commands for commonly used miner models to enable this approach." (Exhibit 5, at 140). "[T]he chip frequency-modulating commands enable Reactor to adjust the efficiency of USBTC's data centers in real-time to protect against downside." (Exhibit 5, at 140). Thus, Reactor sends an operational directive directed to miners in a container and in response to receiving the operational directive, the miners adjust power consumption based on preprogramed firmware.

69.     On October 24, 2022, Lancium sent a letter to Compute North Holdings, Inc. notifying it that "certain Compute North affiliates are operating, and other affiliates intend to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology." (Exhibit 16). The letter specifically identified Compute North's King Mountain facility in McCamey, Texas operated by joint venture affiliate TZRC LLC as infringing Lancium's patent rights. (*Id.*). This facility is now identified by Defendants as the Echo site. The letter also identified Compute North's Wolf Hollow planned facility in Granbury, Texas as likely to infringe. (*Id.*). Defendants now refer to that facility as the Delta site. The '818 patent is one of the patents specifically identified in the letter. (*Id.*).

70.     On information and belief, on or about November 25, 2022, Defendants acquired certain assets of Compute North LLC ("Compute North"). (Exhibit 7; Exhibit 5, at 142-143). In connection with that transaction, Defendant USDKM acquired an interest in the King Mountain facility through an Asset Purchase Agreement between it and Compute North Member, LLC. (Exhibit 7). Upon information and belief, USBTC is also the site operator for the Delta site through its subsidiary USMIO. (Exhibit 5, at 7, 138).

71.     Upon information and belief, due diligence was done in connection with Defendants acquiring Compute North's assets and with Defendant USDKM acquiring an interest in King Mountain, and such diligence resulted in Defendants learning that Lancium put Compute North on notice of patent infringement with respect to the '818 patent on October 24, 2022.  Thus, Defendants had notice of the '818 patent and that Lancium contended Defendants' newly-acquired assets, and Compute North and Defendants' use and/or management thereof, infringed the '818 patent.

72.     On information and belief, in violation of 35 U.S.C. § 271(b), Defendants induce others, including third-party owners of datacenters for which Defendants manage operations, to infringe one or more of the claims of the '818 patent by encouraging and facilitating them to perform actions known by Defendants to infringe. Defendants do so, for example, by encouraging and facilitating their customers to use the BTM Accused Instrumentalities with the intent that such use will infringe with the '818 patent, and Defendants do so with notice that Lancium contended that their continued operation of Compute North's previous assets infringed the '818 patent.

73.     On information and belief, in violation of 35 U.S.C. § 271(c), Defendants with knowledge of the '818 patent, sell or offer to sell the BTM Accused Instrumentalities, knowing they are especially made or especially adapted for practicing the inventions of the '818 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, the BTM Accused Instrumentalities are designed for an infringing purpose and are not suited for other purposes.  Upon information and belief, Defendants are indirectly infringing one or more claims of the '818 patent by actively contributing to their customers' direct infringement within the United States.

74.     Defendants' acts of infringement have caused and will continue to cause substantial and irreparable damage to Lancium.

75.     As a result of the infringement of the '818 patent by Defendants, Lancium has been damaged.

76.     Lancium is entitled to injunctive relief under 35 U.S.C. § 283.

77.     In addition to injunctive relief, Lancium is entitled to recover damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Lancium for the infringement, but in no event less than a reasonable royalty.

78.     Defendants' acts of infringement have been willful since they were done with knowledge of the '818 patent and with knowledge that Defendants' BTM Accused Instrumentalities and/or the use thereof infringed the '818 patent. Lancium is entitled to an award of up to treble damages pursuant to 35 U.S.C. § 284.

79.     Due to Defendants' willful infringement, this case is exceptional, and Lancium is entitled to an award of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 11,016,553

80.     Lancium incorporates by reference and re-alleges paragraphs 1-39 of this Complaint as if fully set forth herein.

81.     The '553 patent generally relates to methods, systems, and non-transitory computer readable medium for distributed power control of flexible data centers. The claims of the '553 patent, including claim 1, recite novel and inventive systems, methods, and/or non-transitory computer readable medium.

82.     For example, claim 1 of the '553 patent recites:

1.  A distributed power control system comprising:

**COMPLAINT FOR PATENT INFRINGEMENT**                                    **PAGE 23**

a flexible datacenter comprising

> (i) a plurality of computing systems powered by a behind-the-meter input system,
> (ii) the behind-the-meter power input system configured to receive power from a power generation system prior to the power undergoing step-up transformation for transmission to a grid and deliver the power to the plurality of computing systems, and
> (iii) a datacenter control system configured to control the plurality of computing systems and the behind-the-meter power input system;

a remote master control system configured to issue instructions to the flexible datacenter that affect an amount of behind-the-meter power consumed by the flexible datacenter;

one or more processors; and

data storage comprising a first set of instructions that, when executed by the one or more processors, cause the data center control system to perform operations comprising:

> receiving a first operational directive from a local station control system, wherein the local station control system is configured to at least partially control the power generation system, wherein the first operational directive is an operational directive for the flexible data center to ramp-down power consumption, and

> in response to receiving the first operational directive, causing the plurality of computing systems of the flexible datacenter to perform a first set of predetermined operations correlated with the first operational directive.

83.    Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including claim 1, of the '553 patent in violation of 35 U.S.C. § 271(a).  For example, Defendants have, without authorization, made, operated, used, sold access to, and offered for sale access to the BTM Accused Instrumentalities.

84.     The BTM Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '553 patent, including at least claim 1. By way of a non-limiting example, the BTM Accused Instrumentalities include infringing distributed power control systems.

85.     The BTM Accused Instrumentalities have a behind-the-meter (BTM) power input system.  (Exhibit 5, at 7, 139).  Because the flexible datacenter is co-located with the renewable generator, upon information and belief, the BTM power input system is configured to receive power from a power generation station such as a wind farm prior to the power undergoing step-up transformation for transmission to a power grid at a Point of Interconnect (POI). The Echo site, for example, is co-located behind-the-meter at a wind farm and can receive up to 100% of its power from the wind farm.  (Exhibit 6, at 13; Exhibit 5, at 141).

86.     The BTM Accused Instrumentalities have a plurality of computing systems.  The BTM Accused Instrumentalities are configured to receive BTM power and distribute it to cryptocurrency miners ("computing systems") either owned by Defendants and/or operated/managed by Defendants.  (Exhibit 5, at 138-140; Exhibit 6, at 13-14).

87.     The BTM Accused Instrumentalities include control capability of the plurality of computing systems and the behind-the-meter power input system.  By way of example, upon information and belief, the BTM Accused Instrumentalities include control capability to "adjust[] the energy consumption of each miner onsite in real-time based on its unique profitability profile." (Exhibit 1; Exhibit 5, at 139).  Upon information and belief, the BTM Accused Instrumentalities additionally direct the BTM power input system to provide BTM power and/or grid power.  For example, "Echo is co-located behind the meter at a wind farm and at peak wind generation periods can draw up to 100% of the energy the wind project produces; the rest of the time, the energy is sourced from ERCOT." (Exhibit 6, at 13; Exhibit 5, at 141).  Upon information or belief, the BTM Accused Instrumentalities also include a datacenter control system that is configured to control the plurality of computing systems (*e.g.*, miners) and is capable of activating electrical isolation

breakers in the behind-the-meter power input system for the purpose of electrically isolating the cryptocurrency miners from the power generation equipment of the wind farm.

88.     Upon information and belief, the BTM Accused Instrumentalities include remote control capability configured to receive instructions from the power generator control system that affect an amount of behind-the-meter power consumed by the flexible datacenter.  The "Reactor" platform "[a]djusts consumption of each miner in real-time" and is "[c]apable of full power ramp-down and full power ramp-up in seconds" (Exhibit 6, at 14), and "USBTC's purpose-built operating technology can be deployed across the site portfolio."  (*Id.* at 7).

89.     Upon information and belief, at least the Delta and Echo sites' generators include data storage comprising instructions that when executed cause the datacenter control system to perform operations.  For example, upon information and belief, the generator's (*e.g.*, wind farm's) control system is able to instruct the BTM Accused Instrumentalities related to, for example, the Echo site to operate at a lower power consumption level in order to satisfy safety and grid power supply obligations of the wind farm, and therefore the BTM Accused Instrumentalities related to the Echo site are able to receive such an operational directive from the wind farm control system (*e.g.*, the BTM Accused Instrumentalities may receive Maximum Power Consumption (MPC) directives from the wind farm that are lower than an operating power consumption level, and thus function as a directive to ramp down power consumption).  Alternatively or additionally, the BTM Accused Instrumentalities, while operating and consuming power, may receive a shut down or emergency stop directive from the wind farm, which also functions as a directive to ramp down power consumption.

90.     Upon information and belief, BTM Accused Instrumentalities include control capability using software and/or other programmable logic control implemented in hardware using

one or more processors and data storage comprising instructions that, when executed by the one or more processors, cause a control system to perform operations. Upon information and belief, the BTM Accused Instrumentalities receive an operational directive from a local station control system instructing the miners in the flexible datacenter to ramp down power consumption and, in response to receiving the operational directive, the computing systems perform a set of predetermined operations correlated with that operational directive to ramp down power consumption. For example, the Operator platform "enables centralized site management" and tracks groups of miners at the container level. (Exhibit 6, at 7). The Reactor platform then leverages that data captured by Operator and adjusts consumption in real time, including the capability of full power ramp down. (Exhibit 6, at 7; Exhibit 5, at 139). In at least one known control methodology, Defendants "developed purpose-built custom firmware with a set of rapid consumption adjustment and chip frequency modulating commands for commonly used miner models to enable this approach." (Exhibit 5, at 140). "[T]he chip frequency-modulating commands enable Reactor to adjust the efficiency of USBTC's data centers in real-time to protect against downside." (*Id.*). Thus, the miners adjust power consumption based on preprogramed firmware.

91. On October 24, 2022, Lancium sent a letter to Compute North Holdings, Inc. notifying it that "certain Compute North affiliates are operating, and other affiliates intend to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology." (Exhibit 16). The letter specifically identified Compute North's King Mountain facility in McCamey, Texas operated by joint venture affiliate TZRC LLC as infringing Lancium's patent rights. (*Id*.). This facility is now identified by Defendants as the Echo site. The letter also identified Compute North's Wolf Hollow planned facility in Granbury, Texas as likely to infringe.

(*Id.*).  Defendants now refer to that facility as the Delta site.  The '553 patent is one of the patents specifically identified in the letter.  (*Id.*).

92.     On information and belief, on or about November 25, 2022, Defendants acquired certain assets of Compute North LLC ("Compute North").  (Exhibit 7; Exhibit 5, at 142-143).  In connection with that transaction, Defendant USDKM acquired an interest in the King Mountain facility through an Asset Purchase Agreement between it and Compute North Member, LLC. (Exhibit 7).  Upon information and belief, USBTC is also the site operator for the Delta site through its subsidiary USMIO.  (Exhibit 5, at 7, 138).

93.     Upon information and belief, due diligence was done in connection with Defendants acquiring Compute North's assets and with Defendant USDKM acquiring an interest in King Mountain, and such diligence resulted in Defendants learning that Lancium put Compute North on notice of patent infringement with respect to the '553 patent on October 24, 2022.  Thus, Defendants had notice of the '553 patent and that Lancium contended Defendants' newly-acquired assets, and Compute North and Defendants' use and/or management thereof, infringed the '553 patent.

94.     On information and belief, in violation of 35 U.S.C. § 271(b), Defendants induce others, including third-party owners of datacenters for which Defendants manage operations, to infringe one or more of the claims of the '553 patent by encouraging and facilitating them to perform actions known by Defendants to infringe. Defendants do so, for example, by encouraging and facilitating their customers to use the BTM Accused Instrumentalities with the intent that such use will infringe the '553 patent, and Defendants do so with notice that Lancium contended that their continued operation of Compute North's previous assets infringed the '553 patent.

**COMPLAINT FOR PATENT INFRINGEMENT**                                             **PAGE 28**

95.     On information and belief, in violation of 35 U.S.C. § 271(c), Defendants with knowledge of the '553 patent, sell or offer to sell the BTM Accused Instrumentalities, knowing they are especially made or especially adapted for practicing the inventions of the '553 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, the BTM Accused Instrumentalities are designed for an infringing purpose and are not suited for other purposes.  Upon information and belief, Defendants are indirectly infringing one or more claims of the '553 patent by actively contributing to their customers' direct infringement within the United States.

96.     Defendants' acts of infringement have caused and will continue to cause substantial and irreparable damage to Lancium.

97.     As a result of the infringement of the '553 patent by Defendants, Lancium has been damaged.

98.     Lancium is entitled to injunctive relief under 35 U.S.C. § 283.

99.     In addition to injunctive relief, Lancium is entitled to recover damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Lancium for the infringement, but in no event less than a reasonable royalty.

100.     Defendants' acts of infringement have been willful since they were done with knowledge of the '553 patent and with knowledge that Defendants' BTM Accused Instrumentalities and/or the use thereof infringed the '553 patent.  Lancium is entitled to an award of up to treble damages pursuant to 35 U.S.C. § 284.

101.     Due to Defendants' willful infringement, this case is exceptional, and Lancium is entitled to an award of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**COMPLAINT FOR PATENT INFRINGEMENT**                                          **PAGE 29**

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 11,031,813

102. Lancium incorporates by reference and re-alleges paragraphs 1-39 of this Complaint as if fully set forth herein.

103. The '813 patent generally relates to auxiliary power management of behind-the-meter power loads. The claims of the '813 patent, including claim 15, recite novel and inventive systems and methods.

104. For example, claim 15 of the '813 patent recites:

15. A method comprising:

detecting a first indication that an intermittent power generation unit is or will be transitioning to a stand-down mode from a power generation mode,

wherein the intermittent power generation unit is coupled to a grid, generates power during the power generation mode, and does not generate power during the stand-down mode,

wherein the intermittent power generation unit supplies the generated power as behind-the-meter power to a flexible datacenter prior to the generated power undergoing step-up transformation for transmission to the grid, and

wherein the flexible datacenter comprises: a datacenter control system and a plurality of computing systems configured to perform computational operations; and

based on detecting the first indication, responsively:

(a) selecting an alternate power source for power delivery to at least one of the computing system of the plurality of computing systems, and

(b) enabling power delivery from the selected alternate power source to the flexible datacenter such that the at least one computing system receives continuous power from the alternate power source, and

(c) causing a set of computing systems of the plurality of computing systems to ramp down power consumption until receiving a subsequent indication that indicates the intermittent power generation unit is transitioning to the power generation mode.

105.     Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including claim 15, of the '813 patent in violation of 35 U.S.C. § 271(a).   For example, Defendants have, without authorization, made, operated, used, sold access to, and offered for sale access to the BTM Accused Instrumentalities.

106.     The BTM Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '813 patent, including at least claim 15. By way of a non-limiting example, upon information and belief, the BTM Accused Instrumentalities include detecting a first indication that the co-located wind farm is or will be transitioning to a stand-down mode from a power generation mode and responsively selecting a grid power source as a second power source for power delivery to at least one cryptocurrency miner at the datacenter site (*e.g.* the Echo and Delta sites), enabling power delivery from the grid to the miner such that it receives continuous power from the grid, and causing other miners to ramp down power consumption until BTM power is indicated to be available again because the wind farm is transitioning to power generation.

107.     Upon information and belief, the Delta cryptocurrency datacenter is co-located with the Wolf Hollow II Generating Station. (Exhibit 5, at 7, 138; Exhibit 17, at 2). The Echo cryptocurrency datacenter is co-located with the King Mountain wind farm operated by NextEra. (Exhibit 5, at 7, 138; Exhibit 6, at 13). Upon information and belief, the wind farm generates power on an intermittent basis due to, for example, lack of wind speed or curtailment. According to Defendants, "Co-locating with intermittent generation sources materially improves site economics and enables USBTC to build long-term development pipeline partnerships."  (Exhibit 5, at 139).

108.     Upon information and belief, at least the Echo cryptocurrency datacenter is configured to receive BTM power directly from a wind farm.  (Exhibit 5, at 139).  Upon information and belief, the BTM Accused Instrumentalities additionally directs BTM power from

the wind farm as a first power source and/or grid power from grid operator ERCOT as a second power source to the computing systems at the Echo datacenter. "Echo[, for example,] is co-located behind the meter at a wind farm and at peak wind generation periods can draw up to 100% of the energy the wind project produces; the rest of the time, the energy is sourced from ERCOT." (Exhibit 6, at 13). Upon information and belief, power from the wind farm undergoes step-up transformation into high-voltage power before being transferred at a Point of Interconnect (POI) to the ERCOT transmission network. Upon information and belief, the co-located cryptocurrency datacenter at the Echo site cannot accept high-voltage power and therefore accepts its BTM power prior to the generated power undergoing step-up transformation for transmission as high-voltage power through the ERCOT grid.

109. The BTM Accused Instrumentalities related to the Echo site have a plurality of computing systems configured to perform computational operations (*e.g.*, cryptocurrency miners) either owned by Defendants and/or operated/managed by Defendants. (Exhibit 1; Exhibit 5, at 139).

110. Upon information and belief, the wind farm is not always in power generation mode and sometimes cannot or does not generate power (*i.e.*, stands down) due to lack of wind or curtailment. (*See*, *e.g.*, Exhibit 5, at 13 (noting that Echo does not always draw 100% of its power from the wind farm)). In such cases, the Defendants source power from ERCOT. (*Id.*). Upon information and belief, the BTM Accused Instrumentalities are necessarily configured to detect an indication that the wind farm (or portions of the wind farm) is or will be transitioning to a stand-down mode from a power generation mode, thereby permitting the Defendants to procure grid energy from an ERCOT marketplace and/or or switch to previously procured grid energy. (Exhibit 5, at 139 ("USBTC engages with load-serving entities on fixed forward energy supply

agreements."). Upon information and belief, Defendant's Operator platform tracks site metrics related to the **BTM Accused Instrumentalities**, including power, in real time. (Exhibit 6, at 13).



111. Upon information and belief, the BTM Accused Instrumentalities related to the Echo site are able to select an alternate power source (*e.g.*, ERCOT grid power) for one or more computing systems at the Echo cryptocurrency datacenter and enable power delivery from that alternate power source to one or more of the computing systems. (*See*, *e.g.*, Exhibit 6, at 13 (The Echo datacenter can "… draw up to 100% of the energy the wind project produces; the rest of the time, the energy is sourced from ERCOT."; Exhibit 5, at 141).

112. Additionally, the BTM Accused Instrumentalities include control capability to "adjust[] the energy consumption of each miner onsite in real-time based on its unique profitability profile." (Exhibit 1; Exhibit 5, at 139). Defendants' Reactor platform "[l]everages data captured by Operator on the observed profitability of each miner." (Exhibit 6, at 14). The "Reactor" platform adjusts consumption of each miner in real-time and is "capable of full power ramp-down and full power ramp-up in seconds," and can do so based on the observed profitability of each miner. (Exhibit 6, at 14; Exhibit 5, at 139). Upon information and belief, the BTM Accused Instrumentalities consider power prices on a per miner basis and determine which miners are no longer acceptably profitable when switched to grid power pricing and subsequently ramp down

those miners. "The speed of these power modulating commands supports USBTC's goal of maximizing profitability by examining power markets granularly to ensure that each decision made by Reactor aligns with USBTC's broader energy strategy, while the chip frequency-modulating commands enable Reactor to adjust the efficiency of USBTC's data centers in real-time to protect against downside." (Exhibit 5, at 140). Upon information and belief, this ramped down state for the otherwise unprofitable miners will continue until BTM Accused Instrumentalities receive an indication that the wind farm is transitioning back to a power generation mode and more favorable BTM pricing will again render the ramped down miners acceptably profitable at a ramped up state.

113. On October 24, 2022, Lancium sent a letter to Compute North Holdings, Inc. notifying it that "certain Compute North affiliates are operating, and other affiliates intend to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology." (Exhibit 16). The letter specifically identified Compute North's King Mountain facility in McCamey, Texas operated by joint venture affiliate TZRC LLC as infringing Lancium's patent rights. (*Id.*). This facility is now identified by Defendants as the Echo site. The letter also identified Compute North's Wolf Hollow planned facility in Granbury, Texas as likely to infringe. (*Id.*). Defendants now refer to that facility as the Delta site. The '813 patent is one of the patents specifically identified in the letter. (*Id.*).

114. On information and belief, on or about November 25, 2022, Defendants acquired certain assets of Compute North LLC ("Compute North"). (Exhibit 7; Exhibit 5, at 142-143). In connection with that transaction, Defendant USDKM acquired an interest in the King Mountain facility through an Asset Purchase Agreement between it and Compute North Member, LLC.

(Exhibit 7).  Upon information and belief, USBTC is also the site operator for the Delta site through its subsidiary USMIO.  (Exhibit 5, at 7, 138).

115.     Upon information and belief, due diligence was done in connection with Defendants acquiring Compute North's assets and with Defendant USDKM acquiring an interest in King Mountain, and such diligence resulted in Defendants learning that Lancium put Compute North on notice of patent infringement with respect to the '813 patent on October 24, 2022.  Thus, Defendants had notice of the '813 patent and that Lancium contended Defendants' newly-acquired assets, and Compute North and Defendants' use and/or management thereof, infringed the '813 patent.

116.     On information and belief, in violation of 35 U.S.C. § 271(b), Defendants induce others, including third-party owners of datacenters for which Defendants manage operations, to infringe one or more of the claims of the '813 patent by encouraging and facilitating them to perform actions known by Defendants to infringe. Defendants do so, for example, by encouraging and facilitating their customers to use the BTM Accused Instrumentalities, and with the intent that such use will infringe the '813 patent, and Defendants do so with notice that Lancium contended that their continued operation of Compute North's previous assets infringed the '813 patent.

117.     On information and belief, in violation of 35 U.S.C. § 271(c), Defendants with knowledge of the '813 patent, sell or offer to sell the BTM Accused Instrumentalities, knowing they are especially made or especially adapted for practicing the inventions of the '813 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, the BTM Accused Instrumentalities are designed for an infringing purpose and are not suited for other purposes.  Upon information and belief, Defendants are indirectly infringing

one or more claims of the '813 patent by actively contributing to their customers' direct infringement within the United States.

118.    Defendants' acts of infringement have caused and will continue to cause substantial and irreparable damage to Lancium.

119.    As a result of the infringement of the '813 patent by Defendants, Lancium has been damaged.

120.    Lancium is entitled to injunctive relief under 35 U.S.C. § 283.

121.    In addition to injunctive relief, Lancium is entitled to recover damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Lancium for the infringement, but in no event less than a reasonable royalty.

122.    Defendants' acts of infringement have been willful since they were done with knowledge of the '813 patent and with knowledge that Defendants' BTM Accused Instrumentalities and/or the use thereof infringed the '813 patent.  Lancium is entitled to an award of up to treble damages pursuant to 35 U.S.C. § 284.

123.    Due to Defendants' willful infringement, this case is exceptional, and Lancium is entitled to an award of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

### COUNT V – INFRINGEMENT OF U.S. PATENT NO. 11,025,060

124.    Lancium incorporates by reference and re-alleges paragraphs 1-39 of this Complaint as if fully set forth herein.

125.    The '060 patent generally relates to methods, systems, and non-transitory computer-readable medium for providing computational resource availability based on power-generation signals. The claims of the '060 patent, including claim 1, recite novel and inventive systems, methods, and/or non-transitory computer readable medium.

126. Claim 1 of the '060 patent recites:

1. A method comprising:

receiving, at a first control system, information indicative of a plurality of power-generation economic signals;

based on the received information, identifying, by the first control system, at least one of:
a change indicative of a power-generation economic signal that exceeds a predefined threshold change, (ii) a power-generation economic signal that is below a predefined lower threshold limit, or (iii) a power-generation economic signal that is above a predefined upper threshold limit; and

based on the identification, performing at least one of: (i) adjusting a rate of power use by a flexible datacenter and (ii) determining and providing an indication of computation resource availability to a second control system, wherein the flexible datacenter comprises a behind-the-meter power input system, a power distribution system, and a plurality of computing systems configured to receive power from the behind-the-meter power input system via the power distribution system and

wherein the adjusting a rate of power use by the flexible datacenter comprises ramping up, ramping down, or adjusting power consumption by at least one of the plurality of computing systems.

127. Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including claim 1, of the '060 patent in violation of 35 U.S.C. § 271(a). For example, Defendants have, without authorization, made, operated, used, sold access to, and offered for sale access to the BTM Accused Instrumentalities.

128. The BTM Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '060 patent, including at least claim 1.

129. The BTM Accused Instrumentalities include monitoring and receiving at a control system information indicative of a plurality of power-generation economic signals (*e.g.*, purchase price for power from various sources and/or the availability of power from the power sources). For example, Defendants' Operator and Reactor platforms receive power price information, which

for the Echo site includes two power price signals because it operates on both BTM power and grid power. "Echo is co-located behind the meter at a wind farm and at peak wind generation periods can draw up to 100% of the energy the wind project produces; the rest of the time, the energy is sourced from ERCOT." (Exhibit 6, at 13; Exhibit 5, at 139). Additionally, Defendants' Operator and Reactor platforms report on curtailment status and, upon information and belief, received information indicative of power availability. (Exhibit 6, at 14).





130. Based on the received information, Defendants' Operator and Reactor platforms identify (i) a change indicative of a power-generation economic signal that exceeds a predefined threshold change, (ii) a power-generation economic signal that is below a predefined lower

threshold limit, or (iii) a power-generation economic signal that is above a predefined upper threshold limit. Upon information and belief, the BTM Accused Instrumentalities can at a minimum identify when a power price exceeds a predefined upper threshold limit. For example, "Reactor was developed to monitor energy price data from grid data streams to calculate when real-time energy costs would render Bitcoin mining unprofitable. For example, in May 2022, Reactor triggered a curtailment event at a USBTC site in Texas when electricity prices increased to over $5,000 per MWh." (Exhibit 5, at 139).

131. The Reactor platform can, based on the identification, adjust a rate of power use by the datacenter. (*Id*. ("Reactor triggered a curtailment event…")).

132. The BTM Accused Instrumentalities have a behind-the-meter (BTM) power input system. (Exhibit 5, at 7, 139 (referring to the Echo and Delta sites being co-located behind-the-meter)). The Echo site, for example, is co-located behind-the-meter at a wind farm and can receive up to 100% of its power from the wind farm. (Exhibit 6, at 13; Exhibit 5, at 141).

133. The BTM Accused Instrumentalities have power distribution systems and a plurality of computing systems. The BTM Accused Instrumentalities are configured to receive power from the behind-the-meter power input system via the power distribution system and distribute it to cryptocurrency miners ("computing systems") either owned by Defendants and/or operated/managed by Defendants. (Exhibit 1; Exhibit 5, at 138-139).

134. The BTM Accused Instrumentalities adjust a rate of power use by the flexible datacenter, which comprises ramping up, ramping down, or adjusting power consumption by at least one of the plurality of computing systems. Upon information and belief, the BTM Accused Instrumentalities include control capability to "adjust[] the energy consumption of each miner onsite in real-time based on its unique profitability profile." (Exhibit 1; Exhibit 5, at 139). The

"Reactor" platform "[a]djusts consumption of each miner in real-time" and is "[c]apable of full power ramp-down and full power ramp-up in seconds" (Exhibit 6, at 14), and "USBTC's purpose-built operating technology can be deployed across the site portfolio."   (Exhibit 6, at 7).  The Reactor platform then leverages that data captured by Operator and adjusts consumption in real time, including the capability of full power ramp down.  (Exhibit 6, at 7; Exhibit 5, at 139).

135.    On October 24, 2022, Lancium sent a letter to Compute North Holdings, Inc. notifying it that "certain Compute North affiliates are operating, and other affiliates intend to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology." (Exhibit 16).  The letter specifically identified Compute North's King Mountain facility in McCamey, Texas operated by joint venture affiliate TZRC LLC as infringing Lancium's patent rights.  (*Id*.).  This facility is now identified by Defendants as the Echo site.  The letter also identified Compute North's Wolf Hollow planned facility in Granbury, Texas as likely to infringe. (*Id*.).  Defendants now refer to that facility as the Delta site.  The '060 patent is one of the patents specifically identified in the letter.  (*Id*.).

136.    On information and belief, on or about November 25, 2022, Defendants acquired certain assets of Compute North LLC ("Compute North").  (Exhibit 7; Exhibit 5, at 142-143).  In connection with that transaction, Defendant USDKM acquired an interest in the King Mountain facility through an Asset Purchase Agreement between it and Compute North Member, LLC. (Exhibit 7).  Upon information and belief, USBTC is also the site operator for the Delta site through its subsidiary USMIO.  (Exhibit 5, at 7, 138).

137.    Upon information and belief, due diligence was done in connection with Defendants acquiring Compute North's assets and with Defendant USDKM acquiring an interest in King Mountain, and such diligence resulted in Defendants learning that Lancium put Compute

North on notice of patent infringement with respect to the '060 patent on October 24, 2022. Thus, Defendants had notice of the '060 patent and that Lancium contended Defendants' newly-acquired assets, and Compute North and Defendants' use and/or management thereof, infringed the '060 patent.

138. On information and belief, in violation of 35 U.S.C. § 271(b), Defendants induce others, including third-party owners of datacenters for which Defendants manage operations, to infringe one or more of the claims of the '060 patent by encouraging and facilitating them to perform actions known by Defendants to infringe. Defendants do so, for example, by encouraging and facilitating them to use the BTM Accused Instrumentalities with the intent that such use will infringe the '060 patent, and Defendants do so with notice that Lancium contended that their continued operation of Compute North's previous assets infringed the '060 patent.

139. On information and belief, in violation of 35 U.S.C. § 271(c), Defendants with knowledge of the '060 patent, sell or offer to sell the BTM Accused Instrumentalities, knowing they are especially made or especially adapted for practicing the inventions of the '060 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, the BTM Accused Instrumentalities are designed for an infringing purpose and are not suited for other purposes. Upon information and belief, Defendants are indirectly infringing one or more claims of the '060 patent by actively contributing to their customers' direct infringement within the United States.

140. Defendants' acts of infringement have caused and will continue to cause substantial and irreparable damage to Lancium.

141. As a result of the infringement of the '060 patent by Defendants, Lancium has been damaged.

142. Lancium is entitled to injunctive relief under 35 U.S.C. § 283.

143. In addition to injunctive relief, Lancium is entitled to recover damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Lancium for the infringement, but in no event less than a reasonable royalty.

144. Defendants' acts of infringement have been willful since they were done with knowledge of the '060 patent and with knowledge that Defendants' BTM Accused Instrumentalities and/or the use thereof infringed the '060 patent. Lancium is entitled to an award of up to treble damages pursuant to 35 U.S.C. § 284.

145. Due to Defendants' willful infringement, this case is exceptional, and Lancium is entitled to an award of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT VI – INFRINGEMENT OF U.S. PATENT NO. 10,608,433

146. Lancium incorporates by reference and re-alleges paragraphs 1-39 of this Complaint as if fully set forth herein.

147. The '433 patent generally relates to methods, systems, and non-transitory computer readable medium for adjusting power consumption based on a fixed-duration power option agreement. The claims of the '433 patent, including claim 1, recite novel and inventive systems, methods, and/or non-transitory computer readable mediums.

148. For example, claim 1 of the '433 patent recites:

1. A system comprising:

a set of computing systems, wherein the set of computing systems is configured to preform computational operations using power from a grid;

a control system configured to:

monitor a set of conditions;

receive power option data based, at least in part, on a power option agreement, wherein the power option data specify: (i) a set of minimum power thresholds, and (ii) a set of time intervals, wherein each minimum power threshold in the set of minimum power thresholds is associated with a time interval in the set of time intervals;

responsive to receiving the power option data, determining a performance strategy for the set of computing systems based on a combination of at least one condition in the set of conditions, wherein the performance strategy comprises a power consumption target for the set of computing systems for each time interval in the set of time intervals, wherein each power consumption target is equal to or greater than the minimum power threshold associated with each time interval; and

provide instructions to the set of computing systems to perform one or more computational operations based on the performance strategy.

149.     Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including claim 1, of the '433 patent in violation of 35 U.S.C. § 271(a).

150.     The AS Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '433 patent, including at least claim 1.  By way of a non-limiting example, the AS Accused Instrumentalities are systems that comprise a set of computing systems (*e.g.*, cryptocurrency miners) that are configured to perform computational operations, such as those used to mine cryptocurrency, including Bitcoin, using power from multiple sources, including power from the grid.  For example, USBTC's website explains that Defendant USMIO is the strategic operator of choice for Bitcoin mine owners and explains that USMIO employs purpose-built operating technology, including the Operator asset management platform and Reactor energy curtailment platform to automate site operations and maximize returns.  (Exhibit 1).  Bitcoin miners are computing systems that perform computational operations and to perform these operations the miners need power, and such power may be supplied by the electrical grid.

151.     The AS Accused Instrumentalities have a control system configured to monitor conditions.  For example, the Operator asset management platform "drives miner efficiency by tracking miners in real-time at the site, container, and unit levels."  (Exhibit 1; Exhibit 5, at 138-139).  And, as Mr. Genoot explained on the Final Merger call between Hut 8 Mining Corp. and USBTC:  "[T]he software [USBTC's software] is designed to provide real time monitoring capabilities to optimize the energy consumption of thousands of machines across the site and maximizing the hardware's efficiency."  (Exhibit 8, at 5).  Upon information and belief, the picture below shows the dashboard of part of the control system that identifies the location, type, and status of miners at the Delta site, as well as other monitored data.  (Exhibit 6, at 14).



152.     Upon information and belief, the AS Accused Instrumentalities' control system receives power option data based, at least in part, on a power option agreement, wherein the power option data specify: (i) a set of minimum power thresholds, and (ii) a set of time intervals, wherein each minimum power threshold in the set of minimum power thresholds is associated with a time interval in the set of time intervals.  For example, Defendant USMIO has an in-house energy team that brings "deep expertise" in, among other things, "ancillary services." (Exhibit 1).  Ancillary

service programs are a type of demand response program in which, for example, loads enter into an agreement to curtail power consumption under certain conditions in return for financial consideration. USBTC brings "seemless participation in [a] wide range of ancillary service programs using custom firmware with a set of rapid consumption adjustment and chip frequency modulating commands for commonly used miners." (Exhibit 6, at 13; Exhibit 5, at 140). To participate in certain ancillary service programs within, for example, ERCOT and the participating entity (*e.g.*, a cryptocurrency datacenter acting as a load and registered as a Load Resource) enters into a specific type of agreement (*e.g.*, a power option agreement) that provides a power entity (*e.g.*, ERCOT) the option to instruct the load to curtail a specified amount of power in exchange for the load agreeing to consume at least a specified amount of power (the minimum power threshold) over a set of time periods. Because Defendants indicate that they participate in "a wide range of ancillary service programs offered by Independent Service Operators" (Exhibit 5, at 140), operate within the ERCOT system, and indicate the AS Accused Instrumentalities monitor conditions, and can ramp miners up and down within seconds, upon information and belief, Defendants participate as a Load Resource in at least ERCOT ancillary services programs (and perhaps others) requiring that the AS Accused Instrumentalities' control system receives power option data based, at least in part, on a power option agreement, and that such data specifies a set of minimum power thresholds and a set of time intervals, and that each minimum power threshold is associated with a time interval in the set of time intervals.

153. Upon information and belief, the AS Accused Instrumentalities' control system can, responsive to receiving the power option data, determine a performance strategy for the set of computing systems based on a combination of at least a portion of the power option data and at least one condition in the set of conditions, wherein the performance strategy comprises a power

consumption target for the set of computing systems for each time interval in the set of time intervals, wherein each power consumption target is equal to or greater than the minimum power threshold associated with each time interval. For example, Defendants' Operator platform monitors conditions and Defendants' Reactor curtailment platform adjusts the energy consumption of each miner in the AS Accused Instrumentalities in real-time based on its unique profitability profile. (Exhibit 1; Exhibit 5, at 138-140; Exhibit 6, at 14). In the instance of participating in ERCOT ancillary service programs as a Load Resource, the control system would receive the minimum power threshold data (the power option data) and using that data combined with a condition (*e.g.*, Bitcoin price, power price, global hash rate, etc.) determine a power consumption target for the set of computing systems (miners) for each time interval within the set of time intervals and, because in the instances of participating in ERCOT ancillary services programs as a Load Resource, the system would need to maintain a power usage of at least the minimum power threshold that power consumption target would be equal to or greater than the minimum power threshold for each time interval. USBTC "participates in demand response programs to monetize its flexible load structure" while also using its Reactor curtailment platform to "simultaneously reducing the risk profile of ancillary service program participation." (Exhibit 5, at 140).

154.    Upon information and belief, the AS Accused Instrumentalities' control system provides instructions to the set of computing systems to perform one or more computational operations based on the performance strategy. For example, instructions provided to the miners (or to a subset of the miners) to curtail for certain periods of time to help ensure profitability, as

shown below.  (Exhibit 6, at 14).



155.    On October 24, 2022, Lancium sent a letter to Compute North Holdings, Inc. notifying it that "certain Compute North affiliates are operating, and other affiliates intend to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology."  (Exhibit 16).  The letter specifically identified Compute North's King Mountain facility in McCamey, Texas operated by joint venture affiliate TZRC LLC as infringing Lancium's patent rights.  (*Id*.).  This facility is now identified by Defendants as the Echo site.  The letter also identified Compute North's Wolf Hollow planned facility in Granbury, Texas as likely to infringe.  (*Id*.).  Defendants now refer to that facility as the Delta site.  The '433 patent is one of the patents specifically identified in the letter.  (*Id*.).

156.    On information and belief, on or about November 25, 2022, Defendants acquired certain assets of Compute North LLC ("Compute North").  (Exhibit 7; Exhibit 5, at 142-143).  In connection with that transaction, Defendant USDKM acquired an interest in the King Mountain facility through an Asset Purchase Agreement between it and Compute North Member, LLC.  (Exhibit 7).  Upon information and belief, USBTC is also the site operator for the Delta site through its subsidiary USMIO.  (Exhibit 5, at 7, 138).

157.     Upon information and belief, due diligence was done in connection with Defendants acquiring Compute North's assets and with Defendant USDKM acquiring an interest in King Mountain, and such diligence resulted in Defendants learning that Lancium put Compute North on notice of patent infringement with respect to the '433 patent on October 24, 2022. Thus, Defendants had notice of the '433 patent and that Lancium contended Defendants' newly-acquired assets, and Compute North and Defendants' use and/or management thereof, infringed the '433 patent.

158.     On information and belief, in violation of 35 U.S.C. § 271(b), Defendants induce others, including third-party owners of datacenters for which Defendants manage operations, to infringe one or more of the claims of the '433 patent by encouraging and facilitating them to perform actions known by Defendants to infringe. Defendants do so, for example, by encouraging and facilitating their customers to use the AS Accused Instrumentalities with the intent that such use will infringe the '433 patent, and Defendants do so with notice that Lancium contended that their continued operation of Compute North's previous assets infringed the '433 patent.

159.     On information and belief, in violation of 35 U.S.C. § 271(c), Defendants with knowledge of the '433 patent, sell and/or offer to sell the AS Accused Instrumentalities, knowing they are especially made or especially adapted for practicing the inventions of the '433 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, the AS Accused Instrumentalities are designed for an infringing purpose and are not suited for other purposes. Upon information and belief, Defendants are indirectly infringing one or more claims of the '433 patent by actively contributing to their customers' direct infringement within the United States.

160.     Defendants' acts of infringement have caused and will continue to cause substantial and irreparable damage to Lancium.

161.     As a result of the infringement of the '433 patent by Defendants, Lancium has been damaged.

162.     Lancium is entitled to injunctive relief under 35 U.S.C. § 283.

163.     In addition to injunctive relief, Lancium is entitled to recover damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Lancium for the infringement, but in no event less than a reasonable royalty.

164.     Defendants' acts of infringement have been willful since they were done with knowledge of the '433 patent and with knowledge that Defendants' AS Accused Instrumentalities and/or the use thereof infringed the '433 patent.  Lancium is entitled to an award of up to treble damages pursuant to 35 U.S.C. § 284.

165.     Due to Defendants' willful infringement, this case is exceptional, and Lancium is entitled to an award of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT VII – INFRINGEMENT OF U.S. PATENT NO. 11,594,888

166.     Lancium incorporates by reference and re-alleges paragraphs 1-39 of this Complaint as if fully set forth herein.

167.     The '888 patent, including claim 21, generally relates to novel and inventive methods, systems, and non-transitory computer readable medium for adjusting power consumption based on a fixed-duration power option agreement.

168.     For example, claim 21 of the '888 patent recites:

21.     A method comprising:

monitoring, by a control system, a set of conditions related to operation of computing systems of a set of computing systems;

receiving, at the control system, power option data, wherein the power option data specify: (i) a set of power thresholds, and (ii) a set of time intervals, wherein each power threshold in the set of power thresholds is associated with a time interval in the set of time intervals;

responsive to receiving the power option data, determining control instructions for at least some of the computing systems of the set of computing systems based at least in part on a combination of at least a portion of the power option data and at least one condition of the set of conditions; and

causing power consumption of the at least some of the computing systems of the set of computing systems to be dynamically adjusted as a function of the control instructions.

169.    Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including claim 21, of the '888 patent in violation of 35 U.S.C. § 271(a).

170.    The AS Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '888 patent, including at least claim 21.

171.    By way of a non-limiting example, the AS Accused Instrumentalities have a control system that monitors conditions related to operation of computing systems of a set of computing systems.   For example, the Operator asset management platform "drives miner efficiency by tracking miners in real-time at the site, container, and unit levels." (Exhibit 1).  And, as Mr. Genoot explained on the Final Merger call between Hut 8 Mining Corp. and USBTC:  "[T]he software [USBTC's software] is designed to provide real time monitoring capabilities to optimize the energy consumption of thousands of machines across the site and maximizing the hardware's efficiency." (Exhibit 8, at 5).  Upon information and belief, the picture below shows the dashboard of part of the control system that identifies the location, type, and status of miners at the Delta site, as well as other monitored data.  (Exhibit 6, at 14).



172.    The AS Accused Instrumentalities include a set of computing systems (*e.g.*, cryptocurrency miners) that are configured to perform computational operations, such as those used to mine cryptocurrency, including Bitcoin, using power from multiple sources, including power from the grid.  For example, USBTC's website explains that Defendant USMIO is the strategic operator of choice for Bitcoin mine owners and explains that USMIO employs purpose-built operating technology, including the Operator asset management platform and Reactor energy curtailment platform to automate site operations and maximize returns.  (Exhibit 1; Exhibit 5, at 138-140; Exhibit 6, at 14).  Bitcoin miners are computing systems that perform computational operations and to perform these operations the miners need power, and such power may be supplied by the electrical grid.

173.    Upon information and belief, the AS Accused Instrumentalities' control system receives power option data, wherein the power option data specify: (i) a set of power thresholds, and (ii) a set of time intervals, wherein each power threshold in the set of power thresholds is associated with a time interval in the set of time intervals.  For example, Defendant USMIO has an in-house energy team that brings "deep expertise" in, among other things, "ancillary services."

Ancillary service programs are a type of demand response program in which, for example, loads enter into an agreement to curtail power consumption under certain conditions in return for financial consideration. USBTC brings "seemless participation in [a] wide range of ancillary service programs using custom firmware with a set of rapid consumption adjustment and chip frequency modulating commands for commonly used miners." (Exhibit 6, at 13). To participate in certain ancillary service programs, the participating entity (*e.g.*, a cryptocurrency datacenter acting as a load) and a power entity enter into an agreement that provides the power entity the option to instruct the load to curtail a specified amount of power in exchange for the load agreeing to consume at least a specified amount of power (*e.g.*, a type of power threshold) over a set of time periods. Because Defendants indicate that they participate in "a wide range of ancillary service programs offered by Independent Service Operators" (Exhibit 5, at 140), and because the AS Accused Instrumentalities monitor conditions and can ramp miners up and down within seconds, upon information and belief, Defendants participate as a load in at least ERCOT and/or private ancillary services programs requiring that the AS Accused Instrumentalities' control system receives power option data and that such data specifies a set of power thresholds and a set of time intervals, and that each power threshold is associated with a time interval in the set of time intervals.

174. Upon information and belief, the AS Accused Instrumentalities' control system can, responsive to receiving the power option data, determine control instructions for at least some of the computing systems in a set of computing systems based at least in part on a combination of at least a portion of the power option data and at least one condition of the set of conditions and causing power consumption of at least some of the computing systems of the set of computing systems to be dynamically adjusted as a function of the control instructions. For example,

Defendants' Operator platform management monitors conditions and Defendants' Reactor curtailment platform adjusts the energy consumption of each miner in the AS Accused Instrumentalities in real-time based on its unique profitability profile. (Exhibit 5, at 138-140; Exhibit 6, at 14). In the instance of participating in an ERCOT ancillary service programs as a Load Resource, the control system would receive the power threshold data (the power option data) and using that data combined with a condition (*e.g.*, Bitcoin price, power price, global hash rate, etc.) determine control instructions for at least some of the computing systems (miners) for each time interval within the set of time intervals and, because in the instances of participating in, *e.g.*, an ERCOT ancillary services programs, the control system, via control instructions, would need to dynamically adjust power consumption of at least some of the computing systems of the set of computing systems in order to maintain a power usage of at least the power threshold so that power consumption would be equal to or greater than the power threshold for each time interval.  For example, USBTC "participates in demand response programs to monetize its flexible load structure" while also using its Reactor curtailment platform to "simultaneously reducing the risk profile of ancillary service program participation."  (Exhibit 5, at 140). Additionally, "[t]hese commands are integrated into the Reactor energy curtailment platform, which gives USBTC the ability to participate in a wide range of ancillary service programs offered by Independent System Operators …. The speed of these power modulating commands supports USBTC's goal of maximizing profitability by examining power markets granularly to ensure that each decision made by Reactor aligns with USBTC's broader energy strategy, while the chip frequency-modulating commands enable Reactor to adjust the efficiency of USBTC's data centers in real-time to protect against downside." (*Id.*).

175.    Upon information and belief, the AS Accused Instrumentalities' control system causes dynamic adjustment of power consumption as a function of the control instructions.  For example, instructions provided to the miners (or to a subset of the miners) to curtail for certain periods of time help ensure profitability, as shown below.  (Exhibit 6, at 14).



176.    On October 24, 2022, Lancium sent a letter to Compute North Holdings, Inc. notifying it that "certain Compute North affiliates are operating, and other affiliates intend to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology."  (Exhibit 16).  The letter specifically identified Compute North's King Mountain facility in McCamey, Texas operated by joint venture affiliate TZRC LLC as infringing Lancium's patent rights.  (*Id*.).  This facility is now identified by Defendants as the Echo site.  The letter also identified Compute North's Wolf Hollow planned facility in Granbury, Texas as likely to infringe. (*Id*.).  Defendants now refer to that facility as the Delta site.

177.    On information and belief, on or about November 25, 2022, Defendants acquired certain assets of Compute North LLC ("Compute North").  (Exhibit 7; Exhibit 5, at 142-143).  In connection with that transaction, Defendant USDKM acquired an interest in the King Mountain facility through an Asset Purchase Agreement between it and Compute North Member, LLC.

(Exhibit 7). As part of the diligence done in connection with Defendants acquiring Compute North's assets and with Defendant USDKM acquiring an interest in King Mountain, upon information and belief, Defendants would have learned of the '888 patent. Thus, by late November 2022, Defendants knew or should have known of the '888 patent.

178. On information and belief, in violation of 35 U.S.C. § 271(b), Defendants induce others, including third-party owners of datacenters for which Defendants manage operations, to infringe one or more of the claims of the '888 patent by encouraging and facilitating them to perform actions known by Defendants to infringe. Defendants do so, for example, by encouraging and facilitating their customers to use the AS Accused Instrumentalities with knowledge of the '888 patent and with the intent that such use will infringe the '888 patent.

179. On information and belief, in violation of 35 U.S.C. § 271(c), Defendants with knowledge of the '888 patent, sell and/or offer to sell the AS Accused Instrumentalities, knowing they are especially made or especially adapted for practicing the inventions of the '888 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, the AS Accused Instrumentalities are designed for an infringing purpose and are not suited for other purposes. Upon information and belief, Defendants are indirectly infringing one or more claims of the '888 patent by actively contributing to their customers' direct infringement within the United States.

180. Defendants' acts of infringement have caused and will continue to cause substantial and irreparable damage to Lancium.

181. As a result of the infringement of the '888 patent by Defendants, Lancium has been damaged.

182. Lancium is entitled to injunctive relief under 35 U.S.C. § 283.

183.    In addition to injunctive relief, Lancium is entitled to recover damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Lancium for the infringement, but in no event less than a reasonable royalty.

184.    Defendants' acts of infringement have been willful since they were done with knowledge of the '888 patent and with knowledge that Defendants' AS Accused Instrumentalities and/or the use thereof infringed the '888 patent. Lancium is entitled to an award of up to treble damages pursuant to 35 U.S.C. § 284.

185.    Due to Defendants' willful infringement, this case is exceptional, and Lancium is entitled to an award of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Lancium respectfully requests that this Court find in its favor and against each of USBTC, USMIO, and USDKM, and that the Court grant Lancium the following relief:

A.    Judgment in favor of Lancium that each of USBTC, USMIO, and USDKM has directly infringed, either literally and/or under the doctrine of equivalents, one or more claims of each of the Asserted Patents;

B.    Judgment in favor of Lancium that each of USBTC, USMIO, and USDKM has induced infringement of each of the Asserted Patents;

C.    Judgment in favor of Lancium that each of USBTC, USMIO, and USDKM has contributed to the infringement of each of the Asserted Patents;

D.    An award of all damages adequate to compensate Lancium for Defendants' infringement of each of the Asserted Patents;

E.    Judgment that Defendants' infringement was willful and that the Court award treble damages for the period of such willful infringement pursuant to at least 35 U.S.C. § 284;

F.      An award of pre-judgment and post-judgment interest at the maximum rate permitted by law;

G.      A finding that this is an exceptional case and awarding Lancium its costs, expenses, disbursements, and reasonable attorney's fees related to Defendants' infringement under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law;

H.      A permanent injunction preventing Defendants, their officers, agents, servants and employees, and those person in active concert and participation with any of them, from infringement of one or more claims of each of the Asserted Patents or, in the alternative, if the Court finds that an injunction is not warranted, Lancium requests an award of post-judgment damages adequate to compensate for future infringement;

I.      That Lancium be granted all other relief, in law or equity, as the Court may deem just and proper.

## JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Lancium hereby requests a trial by jury on all issues so triable.

Dated: May 10, 2023

Respectfully submitted,

**BARNES & THORNBURG LLP**

By: *s/Mark C. Nelson*

Mark C. Nelson
Texas Bar No. 00794361
BARNES & THORNBURG LLP
2121 N. Pearl Street, Suite 700
Dallas, TX 75201
Email: mnelson@btlaw.com
Telephone: 214-258-4200
Fax: 214-258-4199

Adam M. Kaufmann (*pro hac vice* to be filed)
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, IL 60606
Email: adam.kaufmann@btlaw.com
Telephone: 312-214-8319
Fax: 312-759-5646

*Attorneys for Plaintiff Lancium LLC*

# BARNES & THORNBURG LLP

One North Wacker Drive, Suite 4400
Chicago, IL 60606-2833 U.S.A.
(312) 357-1313
Fax (312) 759-5646

www.btlaw.com

Kurt W. Rohde
Partner
312-214-4505
kurt.rohde@btlaw.com

October 24, 2022

Compute North Holdings, Inc.
Attn: Legal Dept
7575 Corporate Way, Eden Prairie, Minnesota 55344

cc:
Compute North Holdings, Inc., c/o National Registered Agents, Inc., 1209 Orange St, Wilmington, DE 19801
Compute North LLC, c/o Registered Agent
CN Big Spring LLC, c/o Registered Agent
Compute North SD, LLC, c/o Registered Agent
Compute North NE05 LLC, c/o Registered Agent
Compute North Member LLC, c/o Registered Agent
TZRC LLC, c/o Registered Agent
CN Corpus Christi LLC, c/o Registered Agent
CN Minden LLC, c/o Registered Agent
CN Wolf Hollow LLC, c/o Registered Agent

Registered Agent: Harvard Business Services, Inc., 16192 Coastal Hwy, Lewes, DE 19958

Via: email to legal@computenorth.com and mail to all entities

RE: **Infringement of Lancium Patents**

Dear Compute North:

I represent Lancium LLC in connection with its intellectual property rights. Since 2017, Lancium has been a leader in the development and deployment of technologies for promoting and expanding the use of renewable energy and concurrently improving grid stability. Lancium has expended substantial time and effort in the development of such technologies and has accordingly protected its intellectual property rights in its technologies.

We have recently become aware that certain Compute North affiliates are operating, and other affiliates are intending to operate, bitcoin mining facilities that infringe one or more patents covering Lancium's technology. With this letter we are putting you on notice that Lancium has certain intellectual property rights relating to behind-the-meter and grid-connected operation of computing facilities and that we believe operation of the following facilities is in contravention of Lancium's patent rights.

Specifically, we have identified the following operational facilities as infringing Lancium's patent rights in one or more of the below listed patents:

Compute North
October 24, 2022
Page 2

- **Big Spring**, located in Big Spring, Texas and owned and/or operated by affiliate CN Big Spring LLC.

- **North Sioux City**, located in North Sioux City, South Dakota and owned and/or operated by affiliate Compute North SD, LLC.

- **Kearney**, located in Kearney, Nebraska and owned and/or operated by affiliate Compute North NE05 LLC.

- **King Mountain**, located in McCamey, Texas and owned and/or operated by joint-venture affiliate TZRC LLC.

Additionally, we have identified the following planned facilities that, upon operation, are likely to infringe Lancium's patent rights in one or more of the below listed patents:

- **Corpus Christi**, located in Corpus Christi, Texas and owned and/or operated by affiliate CN Corpus Christi LLC.

- **Minden**, located in Minden, Nebraska and owned and/or operated by affiliate CN Minden LLC.

- **Wolf Hollow**, located in Granbury, Texas and owned and/or operated by affiliate CN Wolf Hollow LLC.

**<u>List of Patents</u>**

- U.S. Patent No. 11,016,456 ("Method and system for dynamic power delivery to a flexible datacenter using unutilized energy sources")

- U.S. Patent No. 11,163,280 ("Method and system for dynamic power delivery to a flexible datacenter using unutilized energy sources")

- U.S. Patent No. 11,031,813 ("Systems and methods for auxiliary power management of behind-the-meter power loads")

- U.S. Patent No. 11,016,553 ("Methods and systems for distributed power control of flexible datacenters")

- U.S. Patent No. 10,444,818 ("Methods and systems for distributed power control of flexible datacenters")

- U.S. Patent No. 11,275,427 ("Methods and systems for distributed power control of flexible datacenters")

- U.S. Patent No. 11,397,999 ("Modifying computing system operations based on cost and power conditions")

**BARNES & THORNBURG LLP**

Compute North
October 24, 2022
Page 3

- U.S. Patent No. 10,608,433 ("Methods and systems for adjusting power consumption based on a fixed-duration power option agreement")

- U.S. Patent No. 11,031,783 ("Methods and systems for adjusting power consumption based on a fixed-duration power option agreement")

We ask that you review the above listed patents. Please respond to us as soon as practical to discuss resolution and to potentially avoid the need for Lancium to take action to enforce its patent rights.

Respectfully,

Kurt W. Rohde
Partner, Barnes & Thornburg LLP
Intellectual Property Counsel for Lancium LLC

**BARNES & THORNBURG** LLP