IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| OBM, INC., <br><br> Plaintiff, <br><br> v. <br><br> LANCIUM LLC, <br><br> Defendant. | Civil Action No: 4:23-cv-01798 <br><br> **JURY TRIAL DEMANDED** |

**DECLARATION OF DANIEL LAWRENCE IN SUPPORT OF
PLAINTIFF OBM, INC.'S RESPONSE IN OPPOSITION TO
DEFENDANT LANCIUM LLC'S MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER / DECLARATORY JUDGMENT JURISDICTION**

I, Daniel Lawrence, being over the age of 18 and competent to make the declarations herein, do hereby declare that:

1. I co-founded OBM, LLC in December 2017. In January of 2022 I became Chief Executive Officer (CEO) of OBM, Inc. As CEO I am responsible for all operations at OBM.

A. **Background**

2. Since 2018, OBM has been providing data mining software solutions to cryptocurrency companies through its software management program, Foreman. Foreman provides for the remote monitoring and management of virtually all aspects of mining operations. Foreman further offers site and farm visualization, reporting and diagnostics, security auditing, energy curtailment and integrations with non-miner devices (such as network switches, PDUs, cooling towers, etc.). Foreman also assisted customers in obtaining Controllable Load Resource ("CLR") compliance with Electric Reliability Council of Texas ("ERCOT") by participating in Demand Response until it was forced to disable this functionality in the face of litigation threats

1

from Lancium. I would like to re-enable the functionality but cannot do so under risk that Lancium will sue OBM or OBM's customers for infringement of U.S. Patent No. 10,608,433 (the "'433 Patent").

3. Cryptocurrency mining uses datacenters to mine and is an energy-intensive process, so many cryptocurrency companies have made attempts to reduce energy cost, which would, in turn, increase the value of the mined cryptocurrency. Many cryptocurrency companies operating in Texas have also begun participating in the many energy curtailment programs offered by ERCOT by participating in Demand Response, which preserves ERCOT system reliability and mitigates price spikes by collaborating with market participants who have the ability to reduce or modify electricity in response to instructions or signals. Companies that want to participate in Demand Response can qualify and register as a CLR, which is a load resource capable of controllably reducing or increasing consumption under dispatch control by ERCOT.

4. To meet the energy curtailment demands of its customers, Foreman has a "Power Control" feature that provides a customer with the ability to adjust its energy consumption at a site to a specific megawatt (MW) target. Foreman also has the functionality to assist its Texas customers in passing ERCOT's Security Constrained Economic Dispatch ("SCED") qualification test.

5. OBM initially began offering CLR compliance functionality through its Foreman software on August 22, 2022.

6. OBM provides the public with information about the features and functionality of the Foreman software. For example, OBM has participated in webinars, podcasts, and posted informational videos on YouTube discussing Foreman's functionality.

7. From July 13, 2022 to March 8, 2023, OBM worked with Customer 1 using its Foreman software to perform internal CLR compliance testing. On March 29, 2023, Customer 1 informed me that it successfully passed ERCOT testing and became CLR compliant.

8. In December 2022, OBM began working with Customer 2 to work toward helping Customer 2 become CLR complaint through the use of Foreman.

B. **Timeline of Events**

9. In or around the summer of 2022, OBM's Foreman software began running in a customer's Fort Stockton, Texas facility. It is my understanding from Lancium that this customer works with Lancium, and also uses Lancium's software product. On September 12, 2022, Brandon Greenfield, Lancium's IT Control Manager, joined as a user to this customer's OBM account, in which he was granted access to the Foreman software.

10. In mid-September 2022, this customer, Lancium, and OBM had discussions concerning the security of Lancium's data on OBM's Foreman. After some initial discussions, Lancium reached out to OBM requesting OBM's Service Organization Controls 2 ("SOC 2") report. A SOC 2 report explains the security and privacy controls OBM has in place to protect its customers' data. On September 29, 2022, I sent a Non-Disclosure Agreement to Lancium, stating that an NDA was required prior to sharing OBM's SOC 2 report. Ex. 3 at 3. Later that day, Mr. Greenfield sent back the NDA with edits. *Id* at 2. After reviewing Lancium's edits to the NDA, I was concerned that Lancium was attempting to use the NDA to obtain and retain OBM's confidential information and became concerned with entering into such a broad agreement.

11. On November 2, 2022, I published a series of videos on the Foreman YouTube page, including videos discussing Foreman's automated curtailment with power control. https://www.youtube.com/watch?v=zrfDkio0El4. Ex. 13.

12. On November 17, 2022, Ian Rock, Lancium's Vice President of IT Operations, coordinated a meeting with OBM at the Texas Blockchain Summit. Mr. Rock and Lancium's Chief Technology Officer, Ray Cline, both attended the meeting. Within a few minutes of the conversation, Mr. Rock told me that customers using Foreman could be infringing on Lancium's patents. After hearing this accusation, I was immediately concerned and felt very threatened that Lancium was considering suing my customers for patent infringement. Mr. Rock also discussed Lancium's patents and its patented technology. Mr. Rock further explained that OBM and Lancium were both running software in the same facility through a common customer. Mr. Rock then proceeded to discuss how OBM and Lancium should meet and discuss going to market together because CLR and energy management was Lancium's specialty and OBM was "undervaluing" energy management by offering it for a price lower than the price Lancium was offering it. I took this to mean that Lancium saw Foreman as a threat to its business. After this conversation, I immediately reached out to my counsel prior to returning to the OBM booth at the conference.

13. In January 2023, Mr. Rock again requested a copy of OBM's SOC 2 report. Ex. 4 at 2-3. In attempt to avoid Lancium suing OBM or its customers, I provided Lancium with a one-way NDA, which only covered the SOC 2 report, and agreed to provide Lancium with a copy of OBM's SOC 2 report. *Id.* at 1-2.

14. On March 8, 2023, OBM successfully helped Customer 1 use Foreman to pass the CLR compliance testing with ERCOT.

15. On March 8, 2023, at Empower, a conference hosted by the Digital Wildcatters, Mr. Rock came up to OBM's booth, pulled me to the side, and said that we needed to have a chat.

16. On March 28, 2023, I was featured on The Mining Pod podcast, where I discuss OBM's upcoming CLR capabilities. https://compassmining.io/education/automation-remote-management-with-foreman-daniel-lawrence-the-mining-pod/. Ex. 14. On the same day, Mr. Rock reached out via email to discuss business terms. Ex. 5 at 1. The email again did not contain any proposed business terms.

17. On April 3, 2023, Mr. Rock reached out again via email requesting that the parties discuss business terms. Ex. 5 at 1. Shortly after receiving the email from Mr. Rock, I received a letter from Barnes & Thornburg stating that their client Lancium would like to discuss business terms regarding a possible relationship. The letter further stated: "Based on publicly available information, it is possible that the functionality of your Foreman Software may relate to the subject matter of patented technology developed by Lancium" and specifically mentioned and attached the '433 Patent. Dkt. 1-2. Based on previous comments regarding infringement, Lancium's statements to the public that it intended to enforce its IP, and Lancium's prior suit against Layer1 Technologies, I interpreted Lancium's letter as a threat of filing suit against OBM for infringement of Lancium's patents.

18. The next morning, on April 4, 2023, I reluctantly replied to Mr. Rock to coordinate a meeting. Ex. 7 at 5. I also replied to the lawyer at Barnes & Thornburg stating that the letter was received.

19. On the afternoon of April 4, 2023, I had a meeting via telephone with Mr. Rock, which was about 10 minutes long. *See* Ex. 7 at 4. Mr. Rock told me Lancium would send business terms soon.

20. On April 4, 2023, I disabled the CLR capabilities of our Foreman software in response to the letter from Barnes & Thornburg. OBM would like to re-enable the CLR capabilities but cannot do so while under threat of a patent lawsuit against OBM or its customers.

21. In the middle of April 2023, Customer 2 reached out to OBM regarding the performance of additional testing using Foreman. In the beginning of May 2023, Customer 2 informed OBM that Foreman was no longer providing CLR capabilities and requested that OBM enable the functionality. Unfortunately, because of the threats of litigation against OBM and its customers, OBM could not comply with Customer 2's request and did not re-enable the CLR functionality in Foreman.

22. Disabling CLR capabilities reduced the number of services Foreman provides, which hinders OBM's pursuit of additional customers.

23. On April 5, 2023, I had a telephone call with Michael McNamara, Lancium's CEO, as a general meet and greet. Ex. 6. The call was about 10 minutes long. Mr. McNamara did not discuss any business terms with me.

24. On April 17, 2023, I still had not received any business terms from Lancium. I reached out to Mr. Rock via email to see when we could expect them. Ex. 7 at 3. Later that day, I received an email from Scott McFarland, Lancium's new CRO, stating that Mr. Rock was on PTO. *Id.* at 2.

25. On April 26, 2023, I had a meeting with Mr. McFarland to discuss possible business terms. Ex. 8. During the call, Mr. McFarland mentioned that Lancium still did not have business terms. Mr. McFarland followed our call with an email, requesting our next meeting to take place during Bitcoin 2023 and requested a May 18, 2023 happy hour with Mr. Rock to discuss terms. Ex. 9.

26. Following the conversations with Mr. McFarland and the lack of any written business terms, I felt that Lancium was using the threat of litigation from the April 3rd letter to OBM's detriment. After several weeks of failing to provide business terms, as Lancium stated they would, I believed that Lancium was trying to prevent OBM from continuing to offer the CLR functionality within Foreman to its customers. In addition, given Lancium's litigious history, I also felt Lancium was stalling on proposing business terms to buy time to prepare to file a lawsuit against OBM. On May 2, 2023, to protect OBM and OBM's client, OBM's attorneys sent a responsive letter to Lancium's attorney stating that OBM does not infringe the '433 Patent. The letter further explained that Lancium had failed to propose any business terms, but OBM was ready to discuss a licensing proposal when Lancium was. Dkt. 1-3.

27. Mr. McFarland reached out on May 2, 2023 to move the business term discussion up. Mr. McFarland and I had a meeting via telephone on May 4, 2023. Ex. 10. Within the first two minutes of the call, Scott stated: "it's obvious that we're both trying to avoid litigation." I took Mr. McFarland's comment as implying that Lancium intended to sue OBM. I stated that Lancium needed to send business terms and OBM was still waiting to see proposed terms in writing. Mr. McFarland then stated that he would work on drafting business terms while he was at the DC World conference. On May 6, 2023, I received an email from Mr. McFarland stating: "I had more time to think about some possible terms in relation to a partnership and have reviewed those with Michael and Ali. Before I draft up any slides or document around them, I wanted to give you a call and discuss directly with you so you have some idea of numbers and potential." Ex. 11 at 2.

28. On May 9, 2023, Mr. McFarland and I had a meeting via telephone to discuss draft business terms. *See* Ex. 12 at 1. Mr. McFarland still had not sent over any terms in writing. During

the call, Mr. McFarland stated that there would be a 90/10 split on the CLR revenue, with Lancium receiving 90% and OBM receiving 10%, and OBM and Lancium would market together at conferences. Mr. McFarland also stated that Lancium intended to start pushing into other markets outside of ERCOT and that their target was customers exceeding 50 MW. When I asked what would happen with customers under 50 MW, or customers that cannot participate in CLR based on their load profile, Mr. McFarland's response was: "we could probably build a cloud connector where we integrate with the CSPs and send the signal to turn on/off to Foreman." This meant that Lancium would not be providing services to customers with lower load profiles, and Foreman's Demand Response CLR functionality would have to be integrated with Lancium. These terms were extremely non-favorable to OBM. Nonetheless, I informed Mr. McFarland that we needed to see the terms on paper so we could model things out.

29.    Following our call, Mr. McFarland emailed me and stated that we needed to have an NDA in place before Lancium could share business terms on paper. I replied to Mr. McFarland, stating that I would send the NDA over to legal. Ex. 12 at 1. We had a call scheduled for Thursday, May 11th, but I suggested we postpone the meeting until the NDA was in place so we could discuss actual terms.

30.    OBM is aware that Lancium has a negative reputation by many in the industry based, in part, on Lancium's decision to sue Layer1. I have spoken with others in the industry who have informed me they view Lancium negatively, in part, because of the patent infringement lawsuits they have filed against other cryptocurrency companies. I am also aware that Lancium has aggressively approached others in the industry, asking them to license the '433 Patent and other Lancium patents.

I hereby declare that all statements of my knowledge made in this declaration are true and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated: _____6/30/2023_____

DocuSigned by:
*Daniel Lawrence*
164617931B314C7...

Daniel Lawrence
CEO, OBM, Inc.